## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    Plaintiff,

            v.

SALLY LÓPEZ-MARTÍNEZ (2),
IVONNE M. FALCÓN-NIEVES (4),
MARIELIS FALCÓN-NIEVES (9),
GLENN O. RIVERA-PIZARRO (10),

    Defendants.

CRIM. NO. 15-739 (PAD)

## OPINION AND ORDER

Delgado-Hernández, District Judge.

      After 29 days of trial, a jury found defendants guilty of various offenses (Docket No. 810). Before the court are Ivonne Falcón-Nieves,' Marielis Falcón-Nieves,' and Glenn O. Rivera-Pizarro's motions for judgment of acquittal and for new trial (Docket Nos. 1036, 1037, 1054, 1055, and 1056), all of which the government opposed (Docket No. 1117).[1] Defendants replied (Docket No. 1141). The Government responded, noting that no substantive sur-reply was needed (Docket No. 1169).[2] For the reasons explained below, the motions are DENIED except for Mr. Rivera-Pizarro's request for judgment of acquittal as to Count 25, which is GRANTED.[3] To facilitate review, a table of contents is included in the Appendix.

---

[1] To prevent confusion, the court refers to Ivonne Falcón-Nieves as Ms. Falcón-Nieves and to Marielis Falcón-Nieves as Ms. Falcón.

[2] The Government did not include references to the Trial Transcripts to assist the court in evaluating the evidence in light of the arguments raised in defendants' motions.

[3] Count 25 charged Mr. Rivera-Pizarro with intentional misapplication of property by an agent of an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(A).

## I.    INTRODUCTION

Defendants were charged with seven other defendants in a 24-Count Indictment (Docket No. 3).  Six of the codefendants pled guilty prior to trial.  See, Docket No. 185 (Mr. Anaudi Hernández); Docket No. 288 (Mr. Carlos Luna); Docket No. 320 (Ms. Sonia Barreto); Docket No. 336 (Mr. Javier Muñiz); Docket No. 365 (Mr. Víctor Burgos); and Docket No. 475 (Mr. Xavier González).  Defendants and a codefendant – Ms. Sally López – went to trial and were found guilty as charged.  Ms. López was found guilty as to Counts 1, 2, 3, 4, and 11.  See, Docket No. 812.  Ms. Falcón-Nieves was found guilty as to Counts 1, 6, 7, 8, 9, 13 and 17.  See, Docket No. 813.  Ms. Falcón was found guilty as to Count 17.  See, Docket No. 814.  Mr. Rivera-Pizarro was found guilty as to Counts 24 and 25.  See, Docket No. 815.  Ms. López was sentenced (Docket Nos. 1254 and 1255), and appealed the conviction to the First Circuit (Docket No. 1262).[4]  The remaining defendants – the movants here – seek a judgment of acquittal or a new trial.  See, Docket Nos. 1036, 1037, 1054, 1055, and 1056.

## II.    STANDARD OF REVIEW

Rule 29 of the Federal Rules of Criminal Procedure authorizes the court to set aside the verdict and enter an acquittal after a jury verdict or discharge.  See, Fed.R.Crim.P. 29(c)(2)(setting forth authorization).  A motion for judgment of acquittal requires examination of the evidence in the light most amiable to the government to assess whether, taking all reasonable inferences in its favor, a rational fact finder could find that the prosecution "proved each of the elements of the charged crime beyond a reasonable doubt."  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999).  The hurdle to overturn a jury's conviction based on a sufficiency challenge is high, and the standard of

---

[4] See, USCA Case No. 17-1924.

review "exceedingly deferential." United States v. Binday, 804 F.3d 558, 572 (2d Cir. 2015). The

government "need not succeed in eliminating every possible theory consistent with the defendant's

innocence." United States v. Rodríguez-Durán, 507 F.3d 749, 758 (1st Cir. 2007).

In ruling on a motion for judgement of acquittal, the trial court "must resolve all evidentiary

conflicts and credibility questions in the prosecution's favor; and moreover, as among competing

inferences, two or more of which are plausible, the [court] must choose the inference that best fits

the prosecution's theory of guilt." United States v. Olbres, 61 F.3d 967, 970 (1st Cir. 1995).

Likewise, it "must reject only those interpretations that are unreasonable, insupportable, or overly

speculative, and must uphold any verdict that is supported by a plausible rendition of the record."

United States v. Ofray-Campos, 534 F.3d 1, 31-32 (1st Cir. 2008). Ultimately, it "need not believe

that no verdict other than a guilty verdict could sensibly be reached, but must only satisfy itself that

the guilty verdict finds support in a plausible rendition of the record." United States v. Cruzado-

Laureano, 404 F.3d 470, 480 (1st Cir. 2005).

In turn, Rule 33 of the Federal Rules of Criminal Procedure provides that "[u]pon the

defendant's motion, the court may vacate any judgment and grant a new trial if the interest of

justice so requires." Fed.R.Crim.P. 33(a). The court's authority to grant a new trial is broader than

the authority to "overturn a jury's verdict through a judgment of acquittal." United States v.

Rothrock, 806 F.2d 318, 321 (1st Cir. 1986). The court may weigh the evidence and assess the

credibility of the witnesses who testified at trial. Id. But the remedy of a new trial should be

sparingly used. Id. A trial judge "is not a thirteenth juror who may set aside the verdict merely

because he would have reached a different result." Id. at 322. A new trial is warranted "only where

there would be a miscarriage of justice or where the evidence preponderates heavily against the

verdict." United States v. Rodríguez-De Jesús, 202 F.3d 482, 486 (1st Cir. 2000).

### III.   OFFENSES OF CONVICTION

Defendants were convicted of one or more of the following offenses: conspiracy to commit federal programs fraud and honest services wire fraud in violation of 18 U.S.C. §§ 371 and 1349; honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; intentional misapplication of property by agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A); receipt of a bribe by an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B); and extortion through fear of economic harm in violation of 18 U.S.C. § 1951.

The conspiracy counts fall under 18 U.S.C. §§ 371 and 1349.  Section 371 ("Conspiracy to commit offense or to defraud United States"), provides that if two or more persons conspire either to commit any offense against the United States or to defraud the United States or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined or imprisoned or both.  See, 18 U.S.C. § 371.  Section 1349 ("Attempt and Conspiracy") states that any person who attempts or conspires to commit any offense under Chapter 63 of Title 18 of the United States Code ("Mail Fraud and other Fraud Offenses"), shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.  See, 18 U.S.C. § 1349.

The substantive counts derive from 18 U.S.C. §§ 1343, 1346, 666(a)(1)(A), 666(a)(1)(B), and 1951.  Section 1343 ("Fraud by wire, radio, or television") provides in part that whoever, having devised or intending to devise any scheme or artifice to defraud, transmits by means of wire in interstate or foreign commerce, any writing for the purpose of executing such scheme or

USA v. Hernández-Pérez, _et al._
Criminal No. 15-739 (PAD)
Opinion and Order
Page 5

artifice, shall be fined, imprisoned or both.[5]  18 U.S.C. § 1343.  Traditionally, the mail and wire fraud statutes reached schemes that deprived the fraud victim of money, property or some other item of economic value.  See, Martin, 228 F.3d at 15 (so noting).  Some courts expanded the permissible statutory scope to encompass schemes intended to defraud citizens of their intangible, non-property right to the honest services of their public officials.  See, United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996)(discussing honest services theory).

In 1987, the Supreme Court held that the mail fraud statute was limited to the protection of property rights, and did not prohibit schemes to defraud citizens of their right to honest and impartial government.  See, McNally v. United States, 483 U.S. 350, 359 (1987)(so holding).  Congress reacted by enacting Section 1346.  See, Sawyer, 85 F.3d at 723 (explaining origin of Section 1346).  To this end, Section 1346 provides that, for purposes of, _inter alia_, the mail and wire fraud statutes, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.  See, 18 U.S.C. § 1346.

In 2010, the Supreme Court concluded that Section 1346 covers only "bribery and kickback schemes."  Skilling v. United States, 561 U.S. 358, 367 (2010).  In this connection, Section 201 ("Bribery of public officials and witnesses"), provides in part that it is unlawful for a public official to demand, seek, receive, accept, or agree to receive or accept anything of value personally or for any other person or entity in return for being influenced in the performance of any official act, being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud on the United States, or being induced to do or omit

---

[5] Section 1343 is the counterpart to Section 1341, which prohibits mail fraud.  See, United States v. Martin, 228 F.3d 1, 15, n.17 (1st Cir. 2000)(recognizing similarity between the two sections).

USA v. Hernández-Pérez, <u>et al.</u>
Criminal No. 15-739 (PAD)
Opinion and Order
Page 6

to do any act in violation of the official duty or such official or person.  <u>See</u>, 18 U.S.C. § 201

(b)(2).[6]

Section 666(a)(1)(A)("Theft or bribery concerning programs receiving Federal funds"),

provides that whoever, being an agent of an organization, or of a State, local, or Indian tribal

government, or any agency thereof, embezzles, steals, obtains by fraud, or otherwise without

authority knowingly converts to the use of any person other than the rightful owner or intentionally

misapplies property that is valued at $5,000 or more, and is owned by, or is under the care, custody,

or control of such organization, government or agency, where the organization, government, or

agency receives, in any one year period, benefits in excess of $10,000 under a Federal program

involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance,

shall be fined, imprisoned or both.  <u>See</u>, 18 U.S.C. § 666(a)(1)(A) and (b).

Section 666(a)(1)(B) ("Theft or bribery concerning programs receiving Federal funds"),

provides that whoever, being an agent of an organization, or of a State, local, or Indian tribal

government, or any agency thereof, corruptly solicits or demands for the benefit of any person, or

accepts or agrees to accept, anything of value from any person, intending to be influenced or

rewarded in connection with any business, transaction, or series of transactions of such

organization, government, or agency involving anything of value of $5,000 or more, where the

organization, government, or agency receives, in any one year period, benefits in excess of $10,000

under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other

---

[6] Section 201 criminalizes "bribes and gratuities on the part of federal officials."  <u>United States</u> v. <u>Fernández</u>, 722 F.3d
1, 20 (1st Cir. 2013).  The statute separates the crimes of illegal bribes and illegal gratuities in two sections: Section
201(b) outlaws the offering of bribes to public officials, as well as the acceptance of bribes by those officials, while
Section 201(c) outlaws the offering and acceptance of illegal gratuities.  <u>Id.</u>

form of financial assistance shall be fined, imprisoned or both.  See, 18 U.S.C. § 666(a)(1)(B) and (b).

Finally, Section 1951 ("Interference with commerce by threats or violence," also known as the Hobbs Act) provides in part that whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce by extortion or attempts or conspires to do so, shall be fined, imprisoned or both.  18 U.S.C. § 1951(a).  For this purpose, the term "extortion" means obtaining property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, of under color of official right.  See, 18 U.S.C. § 1951(b).

## IV.    DISCUSSION

### A.  Ivonne Falcón-Nieves

Ms. Falcón-Nieves was found guilty of conspiracy to commit federal programs fraud and honest services wire fraud in violation of 18 U.S.C. § 371; conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349; honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346; receipt of a bribe by an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) and (2); and extortion through fear of economic harm in violation of 18 U.S.C. § 1951.  She was Vice President of the Puerto Rico Aqueducts and Sewers Authority ("AAA" as it is known by its Spanish initials), having previously served as its Treasurer.

According to the Indictment, Ms. Falcón-Nieves conspired with Mr. Anaudi Hernández and others in a scheme and artifice to defraud and deprive the citizens of the United States and Puerto Rico of honest services (Docket No. 3, at ¶¶ 15a, 16).  The Government alleged that Ms. Falcón-Nieves received bribes – things of value – to influence and reward her for the use of her official position to assist Mr. Hernández and his partners, providing favorable treatment to them

in matters pending before AAA.  Id. at ¶¶ 67, 68.  Additionally, as described in the Indictment, Ms. Falcón-Nieves utilized her position at the AAA to enable Ms. Falcón – her sister – to extort payments from an AAA contractor through fear of economic harm.  Id. at ¶¶ 118, 119.

    **1.  Evidence[7]**

        **a.  Background**

Ms. Falcón-Nieves' interaction with Mr. Anaudi Hernández, his partners, and AAA personnel and procedures place her in the crux of the events leading up to the Indictment and her conviction.  Mr. Hernández was involved in political fundraising (Transcript, "TR" August 29, 2016, p. 14).[8]  He was part of fundraising committees, also known as finance committees, for Governor Alejandro García-Padilla and House Speaker Jaime Perelló.  Id.[9]  He engaged in political fundraising because he saw an opportunity to do business with the government (TR September 6, 2016, p. 93).  His intention was not to support political beliefs, but to seek benefits for his pocket. Id. at 94.  Rather, he wished to obtain government contracts, and an important element toward accomplishing this goal was having people he could trust within agencies, so that he could have access to them (TR August 20, 2016, pp. 53-54).  And he obtained access when the candidates that he supported were elected in the 2012 general election.  Id. at 35, 40.

---

[7] The evidence is presented in the light most favorable to the Government.

[8] As mentioned, Mr. Hernández was indicted in this case (Docket No. 3).  He pled guilty to conspiracy to commit wire fraud and federal programs fraud in violation of 18 U.S.C. § 371, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349; conspiracy to commit honest services wire fraud in violation of Section 1349; honest services wire fraud in violation of Section 1343; paying a bribe to an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(2); and intentional misapplication of property by agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A) and 2 (Docket No. 185).

[9] Mr. García-Padilla was the Popular Democratic Party's ("PPD") candidate for Governor in the 2012 general election in Puerto Rico.  Mr. Perelló was a candidate for an at-large seat in the House of Representatives.  Both were elected and entered office in January 2013. In the 2012 election, the PPD ousted the New Progressive Party from power, gaining control of the Executive and Legislative branches of the Puerto Rico government. See, ww2.ceepur.org.

To implement his plan, after the election Mr. Hernández and his partners organized corporations for the purpose of generating government-contract proposals, obtain the contracts, and/or serve as recipients for payments to the individual partners (TR August 24, 2016, pp. 6, 27-30).[10] These included 3 Comm. Global, Kendall Consulting, Links Group, and Three Queens Corp. Id.[11] Additionally, Mr. Hernández zeroed in on several government agencies, including AAA; ADL;[12] the General Services Administration; the Departments of Tourism, Education and of the Family; the Office of Improvement of Public Schools; and the House of Representatives (TR September 2, 2016, pp. 47-48).

As to the AAA, Mr. Hernández' goal was to work different types of projects such as construction, training and implementation of technology (TR August 29, 2016, p. 60). Respecting

---

[10] Mr. Hernández' partners were Héctor Vargas, Eder Ortiz, Javier Muñiz, Ramses Maldonado, and José Rodríguez (TR August 29, 2016, p. 89; TR August 31, 2016, p. 105). Mr. Vargas was charged on an Information in Criminal No. 16-489 (PAD) (Docket No. 2). He pled guilty to conspiracy to commit federal programs fraud and wire fraud, in violation of 18 U.S.C. § 371 (Docket No. 8). Mr. Muñiz was indicted in this case and pled guilty to conspiring to commit federal programs fraud and honest services wire fraud in violation of 18 U.S.C. § 371 (Docket No. 3). He was sentenced on March 15, 2017 (Docket No. 1105).

[11] 3 Comm. Global was created to provide technology services (TR August 24, 2016, p. 6). Mr. Vargas incorporated the company without including Mr. Hernández' name notwithstanding Hernández' interest in the corporation, to prevent problems that may arise due to Hernández' involvement in politics. The participating partners were Mr. Hernández, Mr. Ortiz, Mr. Vargas, Mr. Maldonado, and Mr. Rodríguez (TR August 29, 2016, p. 12). For his part, Mr. Ortiz created Links Group to provide consulting and training services to the government, and consulting services for companies that wanted to conduct insurance business with the government, providing advice for quotes in order to compete in the bidding process and lead them through the process (TR August 25, 2016 p. 29; TR August 24, 2016 PM, pp. 5-6). The corporation appeared under Mr. Vargas' name because Mr. Ortiz had been involved in politics (TR August 25, 2016 PM, pp. 73-74; TR August 24, 2016 PM, p. 5). The participating partners in Links were Mr. Ortiz, Mr. Hernández and Mr. Vargas (TR August 29, 2016, p. 12). Kendall was under the name of Mr. Hernández' mother-in-law. Id. at 43-44. Three-Queens was under the name of Mr. Ortiz' wife (TR August 25, 2016 PM, pp. 73-74). Mr. Hernández created Kendall and Mr. Ortiz Three-Queens, to receive payments from 3 Comm. Global or Links, after the government had paid these companies (TR August 29, 2016, p. 44).

[12] ADL stands for "Administración de Desarrollo Laboral" or Workforce Development Administration (Docket No. 3 at ¶ 3). Its Administrator, Ms. López, was charged with, and found guilty in this case of conspiracy to commit federal programs fraud and honest services wire fraud in violation of 18 U.S.C. § 371; conspiracy to commit honest services wire fraud in violation of 18 U.S.C. § 1349; honest services fraud in violation of 18 U.S.C. §§ 1343 and 1346; and receipt of a bribe by an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(B) and (2). As mentioned earlier, she was sentenced and appealed to the First Circuit.

the House of Representatives, it was everything having to do with technology.  Id. at p. 61.  To further his relationships, he invited people to activities, concerts, breakfast, lunch and dinner; and gave them gifts.  Id. at pp. 63-64, 93.

**b.      Anaudi Hernández-Falcón-Nieves**

Mr. Hernández met Ms. Falcón-Nieves after the 2012 election in a restaurant in Aguadilla, Puerto Rico (TR August 30, 2016, p. 56).  She was with a person that Mr. Hernández knew, who in turn introduced him to Ms. Falcón-Nieves.  Id.  They sat down to have breakfast (TR August 29, 2016, pp. 55-56).  Ms. Falcón-Nieves told Mr. Hernández she knew he was helping Ms. Sonia Barreto become AAA's Director of Purchasing, and that Mr. Hernández should help Ms. Barreto as much as he could, because they could not trust the then Purchasing Director (TR August 29, 2016, p. 55).[13]

At the time, Ms. Falcón-Nieves was AAA's Treasurer (TR August 30, 2016, p. 9).   In February or March 2013, she became Vice-President of AAA.  Id.  Shortly before her appointment as Vice-President, she told Mr. Hernández to stop moving people to help Ms. Barreto, because she (Ms. Falcón-Nieves) was going to accept the position of Vice-President, as such would be bringing in a team she could trust, and one of the persons in that team would be Ms. Barreto, as Director of Purchasing.  Id. at pp. 11-12.  Ms. Barreto was so appointed (TR August 29, 2016, p. 54).[14]

---

[13] Mr. Hernández and Mr. Ortiz recommended Ms. Barreto for that position at the end of 2012 or beginning of 2013 (TR August 29, 2016, pp. 54-55).  One of the most important things for Mr. Hernández' goal of securing government contracts was having people he could trust in critical positions in order to have access to the agency and present it with business proposals.  Id. at pp. 53-54.  The critical positions in AAA were the President, Vice-President, and the Directors of Purchasing and Human Resources.  Id. at p. 54.

[14] Ms. Barreto was indicted in this case (Docket No. 3).  She pled guilty to conspiracy to commit federal programs fraud and honest services wire fraud (Docket No. 320) and was sentenced on February 9, 2017 (Docket No. 1019).

  **c.**  **Potential Projects**

  In February or March 2013, Mr. Hernández began discussing with Ms. Falcón-Nieves and Ms. Barreto, possible AAA projects that might be available to his companies (TR August 30, 2016, p. 10). In the process, Ms. Falcón-Nieves and Ms. Barreto provided Mr. Hernández and his partners valuable information to help them prepare proposals (TR August 31, 2016, pp 19-21, 38-39; TR August 24, 2016, pp. 50-51). With that information, the proposals were expected to be more in line with AAA's needs (TR August 31, 2016, p. 20).

  Mr. Hernández met with Ms. Falcón-Nieves approximately eight to ten times for breakfast, lunch and dinner in the restaurant of the Sheraton Hotel in San Juan, Puerto Rico and other restaurants when he was negotiating business or had business projects or proposals before the AAA (TR August 30, 2016, pp. 12-13). They talked about proposals that Mr. Hernández and his partners had presented or were going to present, and about the possibility of conducting business with AAA (TR August 24, 2016, p. 58). Mr. Hernández or his business partners paid for those meals (TR August 31, 2016, pp. 12-13; TR August 24, 2016, pp. 58-59). Also, Mr. Hernández invited Ms. Falcón-Nieves to a concert, and gave her a Mont Blanc pen (TR August 30, 2016, pp. 12-13).[15]

  **d.**  **Requests for Information**

  On May 2, 2013, Mr. Maldonado asked Ms. Falcón-Nieves and Ms. Barreto for SAP information on AAA, more specifically: (1) the SAP version that AAA was running; (2) what were the SAP modules that AAA was using with regard to the Human Resources and purchase

---

[15] So too with Ms. Barreto (TR August 30, 2016, pp. 12-13). Additionally, Ms. Barreto asked Mr. Hernández to help her in connection with a municipal tax debt (TR August 31, 2016, p. 55; TR August 30, 2016, pp. 12-13). Mr. Muñiz paid the debt, and during dinner in a restaurant with Mr. Hernández, Mr. Ortiz, and Ms. Falcón-Nieves, Mr. Muñiz gave Ms. Barreto a document stating that the debt had been paid (TR August 31, 2016, p. 55; TR August 30, 2016, p. 13).

procedures and for the management of inventory entries (TR August 31, 2016, p. 38).[16]  According to Mr. Maldonado, the information could serve to search for the "SAP API's" that they had available in the web-site, to integrate with the modules.  Id.  Ms. Falcón-Nieves shared the information with Mr. Hernández (Exhibit 423).

On May 15, 2013, Mr. Maldonado wrote to Ms. Barreto, with a copy to Ms. Falcón-Nieves and Mr. Hernández, that Ms. Barreto had informed him of a study that McKinsey & Company had prepared for AAA (Exhibit 426-1).  AAA had contracted McKinsey some years earlier to identify areas for improvement in its purchasing department (TR August 31, 2016, pp. 18-19; September 8, 2016, p. 16).  Ms. Falcón-Nieves requested that 3 Comm. Global use McKinsey's findings and recommendations (TR August 31, 2016, pp. 94-95).  On May 20, 2013, Mr. Maldonado asked Ms. Falcón-Nieves and Ms. Barreto for the blueprints of AAA's 16 warehouses to make radio frequency, inflow and outflow, and capacity projections (Exhibit 419-1).  Ms. Falcón-Nieves and Ms. Barreto provided to Mr. Maldonado, information on AAA's Radio Identification Frequency (TR August 30, 2016, pp. 126-128; Exhibit 422-1).

### e.    Purchasing Site Proposal

Between March and April of 2013, Ms. Falcón-Nieves and Ms. Barreto delivered 3 Comm. Global's purchasing-site proposal to Mr. Héctor Sanabria (TR September 8, 2016, pp. 7, 9, 10).  Mr. Sanabria was AAA's Director of Information Technology, and at the time, Ms. Falcón-Nieves' subordinate (Exhibit 423-1, p. 1).[17]  Ms. Falcón instructed him to evaluate the proposal because it was a technology project and fell within Mr. Sanabria's responsibilities.  Id. at 7-8.  He was the

---

[16] SAP is the engine on which all of AAA's processes run (TR September 8, 2016, p. 11; TR August 24, 2016, p. 39).

[17] Ms. Falcón-Nieves supervised Mr. Sanabria from February 2013 to June or July 2013m when she was AAA's Vice-President of Administration and Finance (TR September 8, 2016, pp. 5-6).

person in charge of recommending the company that would provide those services (TR September 6, 2016, p. 78). Ms. Falcón-Nieves knew that Mr. Hernández was seeking that opportunity, as they had talked about it in meetings and in e-mails between Ms. Falcón-Nieves and Mr. Maldonado, of which Mr. Hernández and his partners were aware (TR August 30, 2016, p. 20). Ms. Falcón-Nieves supported the proposal (TR September 6, 2016, p. 76; August 31, 2016, p. 15; August 30, 2016, p. 20). And she met with Mr. Sanabria and Ms. Barreto to discuss it (TR September 8, 2016, pp. 7-8).

Mr. Sanabria's initial impressions were that the proposal was a little bit vague, lacking in substance (TR September 8, 2016, pp. 7-8). In his view, it lacked substance technologically, functionally and technically, and he so informed Ms. Falcón-Nieves and Ms. Barreto. Id. at 10. Mr. Sanabria also met with Mr. Maldonado in AAA's main office. Id. at p. 9. In the beginning, Ms. Falcón-Nieves or Ms. Barreto could have been in those meetings, and after that, the meetings were with Mr. Sanabria and somebody from his staff. Id.

On May 2, 2013, Mr. Maldonado asked Ms. Falcón-Nieves and Ms. Barreto, copying Mr. Hernández in the e-mail, for information regarding the SAP version that PRASA was running and about the SAP modules that AAA was using (Exhibit 420-1). The same day, Ms. Falcón-Nieves instructed Mr. Sanabria, copying Mr. Hernández in the e-mail, that they needed that information (Exhibit 423-1). Id. From the chain of e-mails, Mr. Sanabria was being asked to provide the SAP information to 3 Comm. Global. Mr. Sanabria e-mailed her the information requested.[18] And the

---

[18] Mr. Sanabria sent Ms. Falcón-Nieves information about SAP, including information about AAA's invoice, purchasing, logistics, human resources, payroll, and projects systems (TR September 8, 2016, p. 11). From Mr. Sanabria's perspective, 3 Comm. Global was inquiring about the SAP system that AAA was running on because of the proposal that it was submitting, and as it was outside the system, if AAA made the decision to go with 3 Comm. Global's proposal, it would have to merge both systems to be able to pass information from one side to another. Id. at 12.

next day, she forwarded the information to Mr. Hernández and Ms. Barreto.  Id.

On May 23, 2013, Mr. Maldonado sent to Mr. Sanabria, Ms. Falcón-Nieves and Ms. Barreto, with copy to Mr. Hernández, Version 8 of a revised purchasing site proposal (TR September 8, 2016, pp. 13-14; Exhibit 417).  Ms. Falcón-Nieves and probably Ms. Barreto instructed Mr. Sanabria to review the proposal (TR September 8, 2016, pp. 50-51).  On May 24, 2013, Mr. Sanabria responded to the revised proposal, mentioning the technical problems that he saw with it, including that McKinsey's findings were from six years earlier (TR September 8, 2016, p. 59; Exhibit 412).  He copied Mr. Hernández, Mr. Vargas, Ms. Falcón-Nieves and Ms. Minerva Aponte-Cruz, at the time AAA's Associate Director of Applications (TR September 8, 2016, p. 15; Exhibit 412).  This was prior to a window that would be opened thereafter to answer questions as part of a more formal request for proposal process (TR September 8, 2016, p. 51).  On May 24, 2013, Ms. Falcón-Nieves wrote to Mr. Sanabria with copy to Mr. Hernández, Mr. Vargas, Ms. Barreto and Ms. Aponte, that:

> Using McKinsey's findings was at my request.  It was a 1 million dollar expense for the AAA that we never executed and we want to turn that expense into an investment.  In 6 years we did NOT implement the recommendation and **now we are going to make the change**.

(Exhibit 412)(capitalization in original; emphasis added).  Still, Mr. Sanabria was not satisfied with 3 Comm. Global's proposal, and decided to go to the market to see if there were other options for the project (TR September 8, 2016, pp. 19-20; 52).  Thus, AAA prepared a requisition document and sent it to three entities: Mr. Hernández' 3 Comm. Global, Accenture, and IBM.  Id. The potential proponents could ask questions, to which AAA would respond, publishing the answers for the benefit of the proponents, to allow them to present proposals with the answers to

those questions (Id. at pp. 20-21; Exhibit BB-1).[19]   In due course, those companies submitted

proposals, (TR September 8, 2016, p. 21).

AAA's Executive President – Alberto Lázaro – Ms. Falcón-Nieves, Mr. Sanabria and other

persons met to discuss the proposals (TR September 8, 2016, pp. 21, 32).   Mr. Sanabria

recommended that AAA award the contract to Accenture.   Id. at 22.   After the meeting, the

participants conducted a proposal wrap-up, and the recommendation was taken to the Board of

Directors, which agreed with the recommendation.   Id.   Shortly after the meeting, the Executive

President informed Mr. Sanabria that he would no longer report to Ms. Falcón-Nieves due to some

friction with her.   Id. at 23.

### f.   Training

In a breakfast meeting in the restaurant of the Sheraton Hotel between Ms. Falcón-Nieves,

Ms. Barreto, Mr. Ortiz, Mr. Vargas, and Mr. Hernández, Ms. Falcón-Nieves raised a concern: she

needed employees for new positions but did not have the budget for it (TR August 30, 2016, p.

14).[20]   Mr. Ortiz said funds could be obtained from ADL to train the employees, because even

though AAA was a public corporation, ADL had the funds for job creation and employee training.

Id. at 14-15.   Mr. Ortiz spoke to Ms. López – then Administrator of ADL – who expressed interest

in the idea (TR August 31, 2016, pp. 29-30).   Mr. Hernández, Mr. Ortiz, Mr. Muñiz, Ms. Falcón-

Nieves, Ms. Barreto and Ms. López met to talk about how they could make the project work (TR

---

[19] One of the proponents indicated that it would like to be able to evaluate the following in regard to the way in which the transactions are carried out: (a) Sequence Diagrams; (b) Use Case Diagrams; (c) Class Diagrams; (d) Entity Relationship Diagrams (ERDs); (e) Name/references of the fields or links the user used in SAP to manage and update each of those transactions (Exhibit BB-1, p. 1).   AAA responded that it would share this information with the successful proponent during the phases of analysis of requirements and solution design.   Id.

[20] Mr. Hernández so stated (TR August 30, 2016, p. 14).   Later in his testimony, he said that Ms. Falcón-Nieves was asked if there were positions in AAA for people who were looking for a job, and she responded that there were positions but no budget to pay them (TR August 31, 2016, pp. 29-30).

August 30, 2016, p. 15). The training would be done by Links, through Mr. Muñiz, who had the experience and infrastructure to conduct the trainings (TR August 31, 2016, p. 31). Ms. Falcón-Nieves was told that Links should be chosen because Mr. Ortiz had come up with the design and was part of Links. Id. Besides, Mr. Hernández and his partners were the ones who sat down to talk to Ms. López and presented the idea on how to get the funds. Id. Ms. Falcón-Nieves was receptive to their request. Id.

But there was a problem: Ms. Falcón-Nieves did not know how to present the project (TR August 31, 2016, p. 32). Mr. Hernández offered to assist her, for he wanted to get the business. Id. So he and his partners asked ADL for documents on how proposals had been worked before between ADL and other agencies. Id. And Mr. Muñiz helped prepare AAA's proposal to ADL, sending it to Ms. Falcón-Nieves (id. at p. 31), who supported it (TR September 6, 2016, p. 78). In turn, the proposal was delivered to ADL, with a cover letter dated May 6, 2016 (TR August 31, 2016, p. 34; TR August 24, 2016, p. 27).

Two days before, on May 4, 2013, Ms. Falcón-Nieves and Ms. López had attended Mr. Hernández' birthday party and a concert in the Governor's VIP Suite in the Coliseum of Puerto Rico (TR August 24, 2016, pp. 62-65). Mr. Hernández invited them and other guests because they were people with whom Mr. Hernández and his partners had business relationships or were going to have business relationships with (TR August 29, 2016, p. 84; TR August 24, 2016, p. 65). Mr. Ortiz paid for the guests' expenses (TR August 29, 2016, p. 84; TR September 6, 2016, p. 81). AAA awarded the contract to Links (TR September 6, 2016, pp. 34-35). Ms. Falcón-Nieves worked on the transfer or allocation of funds with AAA's Executive President and the ADL Administrator (TR August 24, 2016, pp. 48-49).

From February 2013 to January 2014, Mr. Rubén Lugo was AAA's Director of Human

Resources (TR September 8, 2016, pp. 4-6).  The first six months he reported to Mr. Lázaro and then to Ms. Falcón-Nieves.  Id. at p. 6.  As Human Resources Director, Mr. Lugo signed the contract with Links.  Id. at p. 7.[21]  He stated that Ms. Falcón-Nieves was interested in the contract, which was under review in his office.  Id. at 9.  She called Mr. Lugo and went to his office to see the status of the contract, and to follow up on it (TR September 8, 2016, p. 9).  There were at least two or three meetings in Mr. Lugo's office between Ms. Falcón-Nieves, Mr. Hernández, Mr. Muñiz, and Ms. Cortés, to discuss the process, what papers were missing, and next steps, what Mr. Lugo described as office work.  Id. at p. 10.  Along with these items. The participants discussed the resources that were going to be used during the training sessions (TR September 6, 2016, p. 73).

Mr. Hernández and Mr. Muñiz went to Mr. Lugo's office at least five times because of the need to deal with missing papers or other items (TR September 8, 2016, p. 9).  For this contract, AAA formalized a funding agreement with ADL.  Id. at 10-11.  In this way, Links trained the employees that went into AAA paid for by ADL (TR August 30, 2016, p. 15).  Links stood to collect as much as $635,483.64 (Exhibit 37-1, p. 9).  Mr. Hernández participated in 75% of the meetings between Links and AAA (TR September 6, 2016, p. 73).

**g.      HR/RFID Proposals**

3 Comm. Global presented to AAA, proposals for a Human Resources Web Site and an RFID System (TR August 31, 2016, p. 42; Exhibit 410-1).[22]  Ms. Falcón-Nieves supported the

---

[21] The contract was also signed by Mr. Lázaro and Ms. Nancy Cortés (TR September 8, 2016, p. 12).  Ms. Cortés, who was AAA's Training Director, reported to Mr. Lugo.  Id. at pp. 8, 12.

[22] RFID stands for Radio Frequency Identification (TR August 30, 2016, p. 127).  Basically, the project called for installation of GPS in AAA's facilities (TR August 31, 2016, pp. 22-23).

proposals (TR August 31, 2016, pp. 48-49 [HR proposal]; TR August 30, 2016, pp. 127-128 [RFID proposal]).  But they did not result in contracts for Mr. Hernández' company or those of his partners.[23]

### h.    Dosing.

AAA awarded one of Mr. Hernández' partner's company – EKO Technologies – a five-year contract to save between 50%-60% of chemicals used in AAA plants (TR September 1, 2016, pp. 46-47).  EKO belonged to Mr. Rodríguez, who used it for when the partners had profits at 3 Comm. Global.  Id. at 75.  Even though 3 Comm. Global had submitted the proposal, the partners decided that EKO should instead sign the contract because the offices of 3 Comm. Global had been searched, Mr. Hernández was identified as a person of interest in a corruption case involving a local judge (Manuel Acevedo),[24] and AAA's directors started to "put in-- fuss" over doing business with 3 Comm. Global (TR September 1, 2016, pp. 45, 75).

Under the agreement, EKO would install a system to measure water in water plants (TR August 24, 2016, p. 47), the objective being to reduce chemicals and chlorine in the water (TR August 25, 2016, pp. 94-95).  EKO would pay for the system, and AAA would share 50% of the savings the first year, down to 30% the next four years (TR September 1, 2016, pp. 46-47).  Mr. Vargas estimated at approximately $20 Million, the savings to AAA (TR August 26, 2016, p. 12; TR August 24, 2016, p. 95).  After a trial period, however, the contract was discontinued (TR

---

[23] Ms. Falcón-Nieves gave Mr. Sanabria a hard copy of the HR proposal (TR September 8, 2016, p. 23).  He did not give it serious consideration because it was not up to expectations.  Id. at 24.

[24] See, United States v. Manuel Acevedo, 898 F.3d 150, 154-155 (1st Cir. 2018)(sustaining defendant's conviction for participating in a conspiracy to bribe an agent of an organization receiving federal funds in violation of 18 U.S.C. § 371, and of receiving a bribe in violation of 18 U.S.C. § 666(a)(1)(B)).

September 6, 2016, p. 89).[25]  EKO did not make money on the deal (TR August 25, 2016, p. 78).

Ms. Falcón-Nieves had no involvement with this contract (TR August 26, 2016, p. 12).

### i.  **Accounts Payable**

#### i.  **Contractor**

Mr. Ramón Crespo was a contractor of AAA between 2009 and 2013 (TR September 9, 2016, pp. 4-5).  He was the owner and President of IA Mech Chem, Inc. ("IA Mech").  Id. at pp. 5-6.  The company wed out green areas, picked up stray dogs, provided mechanics services, sold chemicals, and worked on sanitary pipes for AAA.  Id.  To work for AAA, he participated in a bidding process.  Once the bid was awarded, he picked up a purchase order, and went on to work when asked by AAA.  Id. at p. 7.  After finishing the work, pictures were taken, or an AAA supervisor would inspect the work to make sure it was done properly.  Id. at pp. 9-11.  If the supervisor was not satisfied, AAA issued a 1332 form stating that the job was not satisfactory.  Id. at p. 11.  Mr. Crespo was never issued a 1332.  Id.  After the supervisor verified that the work was done correctly, Mr. Crespo would prepare an invoice, the AAA supervisor would sign it and the invoice would be taken to AAA's central office for payment.  Id. at p. 12.  The payments, however, basically stopped at the beginning of 2013.  Id. at p. 93.  In April 2013 there was a debt of close to one million dollars.  Id. at pp. 93-94.

Mr. Crespo spoke with Mr. Rey Rivera, who worked for Mr. Ortiz, telling him that he wanted to know why AAA sought to cancel part of his contract (TR September 9, 2016, pp. 42, 46-47).  Mr. Rivera talked to Mr. Ortiz, who told Mr. Hernández that there was a client that needed to collect money that was owed to him in AAA from the previous administration, and if they could

---

[25] Assuming that Mr. Vargas' projections are accurate, based on the contract compensation formula EKO stood to collect millions of dollars.

collect the money, the client would pay them for getting the money out of AAA (TR August 30, 2016, p. 17).

Around that time, Mr. Rivera sold Mr. Crespo a $2,500 ticket for a party to be held for the Governor at the Vanderbilt Hotel in San Juan (TR August 30, 2016, p. 17). Approximately 250 persons attended. Id. at 47-48. After the Governor gave a speech, Mr. Rivera introduced Mr. Crespo to Mr. Ortiz, stating "this is the contractor that I told you had the problem" (TR September 9, 2016, p. 48). Mr. Ortiz said, "everything that we're going to do, everything that you're going to say, you're going to talk to Rey." Id. at pp. 48-49. Mr. Rivera also introduced Mr. Crespo to Mr. Hernández. Id. at p. 49. When Mr. Crespo started telling Hernández about the contract, Mr. Hernández said, "anything that you need to do, you do it through Rey" and left. Id. After the fund-raiser, Mr. Rivera told Mr. Crespo that he had financial problems, and since he was helping Mr. Crespo, he asked for $5,000. Id. Mr. Crespo gave him the check. Id. at pp. 49-50. But Mr. Rivera never paid him back. Id. at p. 50.

Mr. Hernández called and met with Ms. Falcón-Nieves regarding IA Mech's pending invoices (TR September 6, 2016, p. 92). She told him that Mr. Crespo was doing change orders; did not know how to invoice; and was invoicing for services that were outside the scope of the contract. Id. at 67, 92. Meanwhile, Mr. Rivera arranged two meetings between Mr. Crespo and Mr. Hernández (TR September 9, 2016, p. 50).

The first meeting was in El Buen Café in Hatillo, Puerto Rico. Upon arriving, Mr. Hernández was sitting in the restaurant, Mr. Rivera told Mr. Crespo to wait while he talked to Mr. Hernández, and five minutes later, they called Mr. Crespo to join them. Id. at pp. 50-51. Mr. Crespo started talking about the contract, but Mr. Hernández said, "just a moment" with a document in his hand. Id. at 51. And he told Mr. Crespo "they owe you a million dollars … that

million dollars is not for payment … if you want to collect that million dollars, you have to give me ten percent." Id. There was no agreement on that particular day. Id.

The second meeting was in Pelayo Restaurant in San Juan, Puerto Rico (TR September 9, 2016, pp. 51-52). Mr. Crespo arrived first. Id. at p. 52. Mr. Hernández came walking, sat down and asked if he (Mr. Crespo) had thought about it enough. Id. As the checks from AAA were not coming out, Mr. Crespo said that he would do it. Id. Mr. Hernández asked about the payment-Mr. Hernández' fee -and Mr. Crespo responded that he would pay Mr. Hernández when AAA paid him, because he did not have a hundred thousand dollars at hand. Id. Mr. Hernández mentioned "that he had put in the trust position Ms. Sonia Barreto and Ivonne Falcón." Id. at p. 54. Mr. Crespo recognized the name Ivonne Falcón as Ms. Marielis Falcón's sister, and made the first $50,000 payment in seven or eight checks totaling $50,000. Id. at pp. 54-55.

After the second meeting, part of the money that Mr. Crespo understood was owed appeared, and little by little, he was paid (TR September 9, 2016, p. 99). When the other checks came out, Mr. Rivera told Mr. Crespo that he was going to pick up the remaining $50,000. Id. at p. 63. Mr. Crespo told Rivera to pick them up inside the bank, and finally gave him twenty-five bundles of $2,000, which Rivera put in a bag. Id. at pp. 63-64.[26]

### ii. Ms. Falcón-Nieves' Role

At the time of trial, Ms. Lourdes Alsina was the Finance Manager for AAA's Eastern Region (TR September 12, 2016, at p. 4). She had worked at AAA for twenty-four years and knows Ms. Falcón-Nieves. Id. at 4, 6. In April 2013, she was asked to find funds to pay IA Mech. Id. at pp. 27-28. She saw a Process Sheet dated April 22, 2013, from Ms. Falcón-Nieves but signed

---

[26] Mr. Crespo's understanding was that Mr. Ortiz, Mr. Hernández, and to a lesser extent Mr. Rivera, were going to make money from the $100,000 that he paid to collect from AAA (TR September 9, 2016, p. 55).

by her secretary, Ms. Nanette Nazario, to Mr. Teodoro Cruz, Assistant Director of Finance, listing invoices owed to IA Mech, instructing him to verify the invoices, which amounted to $889,816.20 and according to the contractor had not been paid, and to inform Ms. Falcón-Nieves of the result. Id. at pp. 28-31.

On April 26, 2013, Ms. Alsina wrote to Ms. Falcón-Nieves stating that the metro budget was exhausted, Alsina had asked the Infrastructure Director for funds to pay pending invoices for up to $1,000,000 until June 30, 2013, and the Infrastructure Director did not assign the funds (TR September 12, 2016, p. 36; Exhibit 313-1). She asked for Falcón-Nieves' intervention so that the funds could be allocated to pay the pending invoices, most of which were from IA Mech, knowing that Ms. Falcón-Nieves had interest in IA Mech (TR September 12, 2016, pp. 36, 86-87). Along the same line, the Regional Director had asked Ms. Alsina to request the information from Ms. Falcón-Nieves because she had told the Director that they were going to get the funds. Id. at pp. 36-37, 86. Ms. Falcón-Nieves responded asking if Alsina and Orlando Rivera, the Director of Fixed Capital, had done the exercise of identifying projects that could be closed, to use the left over for funding. Id. at 35-36.

Within the same time frame, Mr. Cruz wrote to Ms. Falcón-Nieves, Ms. Sonia Barreto, and Conchita Delgado Benítez, stating in part "Bingo. IA Mech had an increase of $800,000 to the PO" (TR September 12, 2016, p. 37-38; Exhibit 327-1). To that end, Ms. Alsina contacted different finance officers in the area to receive IA Mech's invoices, because the contractor had performed jobs without an authorized purchase order (TR September 12, 2016, pp. 38-40). A purchase order must be open so that a payment can be made. Id. at 39. The person in charge of opening the purchase order on this particular matter was Ms. Barreto. Id.

In the meantime, the Director of Infrastructure requested that Ms. Alsina prepare a list of

projects that needed an increase in the capitalized budget of the AAA's Eastern Region, which she

did, earmarking $1,548,350.92 for that purpose (TR September 12, 2016, pp. 40-42; Exhibit 317-

1).[27]  On May 13, 2013, the Assistant of the Infrastructure Director informed Ms. Alsina that in

connection with the $1.5 Million project allocation, they were assigning $834,043 to finance IA

Mech's costs (TR September 12, 2016, p. 46, Exhibit 321-1).[28]  No funds, however, were

immediately assigned to cover other contractors.  Id.[29]

On May 20, 2013, Ms. Falcón-Nieves' secretary notified Ms. Alsina that Ms. Falcón-

Nieves wanted to pay the next day (TR September 12, 2016, p. 47).  Ms. Alsina asked AAA finance

personnel to receive IA Mech's invoices with the corresponding release numbers, because

"Ivonne" (Ms. Falcón-Nieves) wanted to pay the next day (TR September 12, 2016, p. 48; Exhibit

322-1).  A partial payment was made two days later (TR September 12, 2016, p. 48).

On May 22, 2013, Ms. Falcón-Nieves asked Ms. Alsina for help because the system did

not recognize a project number (TR September 12, 2016, pp. 50-52; Exhibit 320-1).  On May 29,

2013, Ms. Falcón-Nieves expressed that there were still $350,000 in invoices awaiting payment

out of a total of $800,000 for IA Mech that had not been entered into the system (TR September

6, 2016, pp. 54-55; Exhibit 319-1).  On May 30, 2013, AAA issued two checks to IA Mech, one

for $364,661 and one for $10,000 (TR September 6, 2016, pp. 55-56).

---

[27] Within the capital improvements program, AAA tries to identify leftover monies from any other project or from any other of the items in the budget (TR September 21, 2016, p. 6).  On occasion, some projects are put on hold so that the agency can fund other projects.  Id.  Once the funds are identified, they are assigned.  Id.

[28]  The debt to IA Mech increased from 2012 and 2013 for lack of purchase order and funds to pay for the projects (TR September 12, 2016, p. 73).

[29] After receiving Ms. Alsina's request, the Director of Infrastructure instructed her finance director to search for the funds (TR September 21, 2016, pp. 6-7).  She said that the finance director assigned the budget in two separate e-mails, first for IA Mech, and the remainder one week later.  Id. at 8-9.

## 2. Arguments

### a. Sufficiency of Evidence

Ms. Falcón-Nieves argues that the Government failed to prove all counts against her, including conspiracy, honest services wire fraud, federal programs bribery, and extortion (Docket No.1054, pp. 2, 6-7, 29; Docket No. 1055, pp. 4-5, p. 20).[30] But the record places her directly collaborating with Mr. Hernández and his partners to benefit them, while receiving things of value in a manner sustaining a reasonable inference of intent to commit, and of committing the offenses charged.

A conspiracy conviction under 18 U.S.C. § 371 requires proof that the defendant agreed to commit an unlawful act and voluntarily participated in the scheme, and one of the conspirators took an affirmative step in furtherance of the conspiracy. See, United States v. McDonough, 727 F.3d 143, 156 (1st Cir. 2013)(addressing topic); United States v. Cassiere, 4 F.3d 1006, 1015 (1st Cir. 1993)(similar). The conspiracy is complete "upon the agreement to do [the] unlawful act as implemented by one or more overt acts." United States v. Giry, 818 F.2d 120, 126 (1st Cir. 1987). A conspirator does not have to participate "in every overt act or know all the details to be charged as a member of the conspiracy." United States v. Soto-Beníquez, 356 F.3d 1, 19 (1st Cir. 2003)(so noting).

Conspiratorial agreement "need not be express so long as its existence can plausibly be inferred from the defendants' words and actions and the interdependence of activities and persons involved." United States v. Boylan, 898 F.2d 230, 241-242 (1st Cir.), *cert. denied* 498 U.S. 849

---

[30] The extortion conviction will be discussed below, after describing the evidence in connection with Ms. Falcón and the link with Ms. Falcón-Nieves as AAA's Treasurer.

(1990). Evidence of participation in the conspiracy may include "inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes." United States v. Gómez-Pabón, 911 F.2d 847, 852 (1st Cir. 1990), *cert. denied sub nom.* Guzmán v. United States, 498 U.S. 1074 (1991).

As for the substantive offenses, honest services wire fraud under 18 U.S.C. §§ 1343 and 1346 focuses on two, and only two, types of activities: bribery and kickback schemes. See, Skilling, 561 U.S. at 358 (so holding).[31] For its part, 18 U.S.C. § 666 (a)(1)(B) criminalizes federal programs bribery, which requires a showing that the agent of a covered entity corruptly solicited or demanded, or accepted or agreed to accept, anything of value intending to be influenced or rewarded in connection with any business, transaction or series of transactions in the entity involving anything of value of not less than $5,000.00. See, Fernández, 722 F.3d at 20-26 (analyzing provision).

In both statutory settings, the core illegal conduct revolves around payment of money or anything of value from a payor in return for a promise by the recipient for official action. Correspondingly, the government must show a *quid pro quo*. See, United States v. McDonough, 727 F.3d 143, 152 (1st Cir. 2013)(addressing topic in connection with §§ 1341, 1343 and 1346); United States v. Carrasco-Castillo, 442 F.Supp.3d 479, 486 (D.P.R. 2020)(same with respect to Section 666 (a)(1)(B))(quoting United States v. Gracie, 731 F.3d 1, 3 (1st Cir. 2013) and Fernández, 722 F.3d at 22). The *quid pro quo* need not be tied to a specific act by the recipient. See, McDonough, 727 F.3d at 152 (so observing in context of 18 U.S.C. §§ 1341, 1343 and 1346), United States v. Suhl, 885 F.3d 1106, 1115 (8th Cir. 2018)(same as to Section 666). Rather, it is

---

[31] There was no allegation or evidence of kickbacks in this case.

sufficient if the public official understood that "he or she was expected to exercise some influence

on the payor's behalf as opportunities arose." McDonough, 727 F.3d at 152-153.[32]

---

[32] This is known as a "stream of benefits" theory of prosecution, under which bribery can be accomplished through an ongoing course of conduct, so long as the evidence shows that the favors and gifts flowing to a public official are in exchange for a pattern of official action favorable to the donor. Woodward v. United States, 905 F.3d 40, 46 (1st Cir. 2018). The theory was endorsed in three cases that the Supreme Court cited favorably in Skilling, 561 U.S. at 358: United States v. Ganim, 510 F.3d 134, 147-149 (2d Cir. 2007); United States v. Kemp, 500 F.3d 257, 281-286 (3d Cir. 2007), and United States v. Whitfield, 590 F.3d 325, 352-353 (5th Cir. 2009), *cert. denied* 131 S.Ct. 124 (2010). In each of these cases, the Courts upheld convictions for honest-services bribery based on ongoing courses of conduct – where things of value were provided to the official in exchange for official acts performed as opportunities arose – rejecting as a requirement that a specific official act be identified at the time of payment. See, Whitfield, 590 F.3d at 353; Ganim, 510 F.3d at 142, 148-149; and Kemp, 500 F.3d at 281-282. As now Justice Sotomayor pointed out in Ganim, 510 F.3d at 134, there is no need to find that the specific act to be performed was identified at the time of the promise, nor a need to link each specific benefit to a single official act, for to "require otherwise, could subvert the ends of justice in cases …involving ongoing bribery schemes" (id., at 147), where people "do not always spell out in advance the specific match between gift and act." Id. at 148. Thus, bribery can be accomplished through an ongoing course of conduct, provided the evidence shows that the "favors and gifts flowing to a public official [are] *in exchange* for a pattern of official actions favorable to the donor." Id. at 149 (quoting United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998))(brackets and emphasis in original). Along the same line, see, Kemp, 500 F.3d at 282 ("We agree with the government that the District Court's instruction to the jury that it could convict upon finding a stream of benefits was legally correct. The key to whether a gift constitutes a bribe is whether the parties intended for the benefit to be made in exchange for some official action; the government need not prove that each gift was provided with the intent to prompt a specific official act. Rather, the *quid pro quo* requirement is satisfied [where] the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor. Thus, payments may be made with the intent to retain the official's services on an as needed basis, so that whenever the opportunity presents itself the official will take specific action on the payor's behalf")(internal quotations omitted); and Whitfield, 590 F.3d at 353 ("The law only requires that the Government prove the specific intent to give or receive something of value in exchange for an official act to be performed sometime in the future"). See also, United States v. Solomon, 892 F.3d 273, 276-277 (7th Cir. 2018)("To convict someone of honest-services fraud, the government must prove that there is an agreement to pay a bribe or kickback … [T]his reaches schemes that involve a stream of benefits over time, not just singly negotiated deals. The bribery theory does not require that each *quid* or item of value, be linked to a specific *quo,* or official act*"*)(internal citations and quotations omitted*)*;United States v. Abbey, 560 F.3d 513, 518 (6th Cir. 2009)("…[I]t is sufficient if the public official understood that he or she was expected to exercise some influence on the payor's behalf as opportunities arose"); United States v. Quinn, 359 F.3d 666, 673 (4th Cir. 2004)(*quid pro quo* requirement satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor). The First Circuit subscribes to this line of thinking. See, United States v. López-Cotto, 884 F.3d 1, 8 (1st Cir. 2018)("When a defendant is indicted on the stream of benefits approach, the prosecution must prove an agreement for the ongoing stream of benefits rather than an agreement for stand-alone bribes. The prosecution need not, however, link the value of the government business conferred to any particular benefit received by the official"); McDonough, 727 F.3d at 154 (Bribery "can be accomplished through an ongoing course of conduct, so long as the evidence shows that the 'favors and gifts flowing to a public official [are] in exchange for a pattern of official actions favorable to the donor'")(internal quotations omitted); Woodward, 905 F.3d at 46 (same). Some defendants have argued that in McDonnell v. United States, 136 S.Ct. 2355 (2016), the Supreme Court invalidated the "stream of benefits" theory of bribery. See, Woodward, 905 F.3d at 48 (raising issue); United States v. Menéndez, 291 F.Supp.3d 606, 613 (D. N. J. 2018)(similar). But McDonnell "neither abolished the "stream of benefits" theory nor held that an official act that is the object of an illegal *quid pro quo* agreement must be identified at the time the agreement is made." Menéndez, 291 F.Supp.3d at 615-616. It merely narrowed the definition of "official act," saying nothing new about what nexus must be shown between a thing of value and an official act. Id. at 616. In other words, McDonnell is about the *quo*, not the *pro*. Id. See also, United States v. Malkus, 696 Fed.Appx. 251, 253 (9th Cir. 2017)("McDonnell did not change

A payor completes the crimes of honest-services and federal-funds bribery as soon as he offers payment in exchange for official action, even if the intended recipient "does nothing or immediately turns him in to law enforcement."  United States v. Suhl, 885 F.3d 1106, 111 (8th Cir. 2018).  The recipient violates the law "by merely seeking or demanding the bribe, regardless of whether he accepts or even agrees to accept it."  United States v. Muhammad, 120 F.3d 688, 694 (7th Cir. 1997).  But the interaction between the subjects may lead to an agreement.

As bribes "are seldom accompanied by written contracts, receipts, or public declaration of intentions," evidence of a corrupt agreement in a bribery case is usually circumstantial. McDonough, 727 F.3d at 153.  Proof of an explicit promise to perform or not perform certain acts is not necessary.  See, United States v. Bryant, 655 F.3d 232, 241 (3d Cir. 2011)(evidence of a *quid pro quo* can be implicit); Jennings, 160 F.3d at 1014 (to prove bribery, the government is not required to prove an expressed intention or agreement to engage in a *quid pro quo*, as it may be established by circumstantial evidence).  So, "[m]otives and consequences, not formalities, are the keys for determining whether a public official entered into an agreement to accept a bribe."  United States v. Terry, 707 F.3d 607, 613 (6th Cir. 2013).  The official infringes the statutes by agreeing to be influenced, regardless of whether he in fact acts on the promise or agreement.  See, Carrasco-Castillo, 442 F.Supp.3d at 490 (applying formulation).

---

the 'linkage' requirement of federal bribery statutes …").  Tracking the same issue, in Woodward, 905 F.3d at 40, the First Circuit observed that McDonnell did not discuss the "stream of benefits" theory.  Id. at 48.  Moreover, McDonnell did not do so out of disapproval, but because it was not implicated in that case.  Id.  As a result, the First Circuit expressed it was confident that the "stream of benefits" theory "remains valid today."  Id. at 48.  Given the widespread acceptance of this theory of prosecution; the fact that the Supreme Court does not normally overturn, or dramatically limit earlier authority "*sub silentio*," Menéndez. 291 F.Supp.3d at 616 (citing Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 18 (2000)); and that Justice Sotomayor, who authored the stream of benefits opinion in Ganim as a Judge on the Second Circuit, joined the McDonnell opinion, the First Circuit's assessment is on point.  In any case, as reference to the evidence in the text shows, the record reflects specific official matters on which Ms. Falcón-Nieves acted as she received bribes.

On this account, the evidence sustains Ms. Falcón-Nieves' conviction.  It shows purposeful behavior, repeated interactions between Ms. Falcón-Nieves and Mr. Hernández and his partners, multiple overt acts, and what in effect evolved into a two-way street between Ms. Falcón-Nieves and Mr. Hernández and the partners, who provided Ms. Falcón-Nieves with things of value while receiving from her, assistance to arrange for payment of pending invoices to an AAA contractor, from whom Mr. Hernández and Mr. Ortiz in turn extracted a substantial fee; internal, proprietary AAA information and proposal reviews; suggestions geared toward making the partners' proposals more in line with, and attractive to AAA; facilitating the award of a contract to Links for training of AAA employees financed through ADL; and exerting pressure on a subordinate to favor 3 Comm. Global's purchasing-site proposal.

In these conditions, the record is both sufficient to support a finding of required agreement and participation, and adequate to conclude that Ms. Falcón-Nieves accepted bribes, items of value in return for official action, and was a knowing and willing participant in the scheme alleged and shown to have taken place here.  See, United States v. Woodward, 149 F.3d 46, 51, 58 (1st Cir. 1998)(sustaining convictions under 18 U.S.C. §§ 371, 1341, 1343, and 1952 where standard operating procedure was for donor to pay for defendant's meals, drinks and golf); United States v. Flemming, 223 Fed.Appx. 117, 1, 3-4 (3d Cir. 2007)(sustaining convictions under 18 U.S.C. §§ 371, 1343, and 666(a)(2) where contractor paid public officials to expedite payments to contractor); Bryant, 655 F.3d at 242 (based on the timing of defendant's official acts, a jury could infer that defendant intended to accept a stream of benefits in exchange for his official acts during the relevant period of employment); Miserendino v. United States, 307 F.Supp.3d 480, 485 (E.D. Va. 2018)(defendant convicted of various offenses, including bribery, where, among other things, he assisted in the preparation of "statements of work" for tasks that payors sought to perform under

U.S. Government contracts, subcontracts, and task orders); United States v. Bills, 2016 WL 4528075, *2-*3 (N.D.Ill. Aug. 29, 2016) (defendant participated in scheme to defraud City of Chicago of honest services by, among other things, assisting contractor with its proposal by providing insider information and assistance on responses to the Selection Committee's questions to exemplify contractor's strengths).[33]

From this perspective, it is of no consequence that 3 Comm. Global's purchase-site and other proposals did not come to fruition. The wire fraud statute "punishes the scheme, not its success." Pasquantino v. United States, 544 U.S. 349, 371 (2005). It "does not require successful completion of the scheme." United States v. Schuler, 458 F.3d 1148, 1153 (10th Cir. 2006). By extension, it is unnecessary that the "[g]overnment allege or prove that the victim of the scheme was actually defrauded." United States v. George, 477 F.2d 508, 512 (7th Cir. 1973). And the same principle applies to federal programs bribery. See, United States v. Pretty, 98 F.3d 1213, 1210 (10th Cir. 1996)(Section 666 requires only intent to be influenced, rather than actual influence). The fact that the defendant might prove "unable to perform," does not preclude conviction for either the conspiracy or the substantive offense. United States v. Potter, 463 F.3d 9, 13, 16-17 (1st Cir. 2006).

Ms. Falcón-Nieves contends that she acted for the benefit of AAA, by saving it money in the hiring and training of new employees or by attempting to establish electronic systems for the

---

[33] See also, United States v. Rybicki, 354 F.3d 124, 132, 146-147 (2d Cir. 2003)(upholding convictions under 18 U.S.C. §§ 1341 and 1343 of attorneys who arranged for payments to be made to claims adjusters to induce them to expedite the settlement of attorney's clients' claims); United States v. Menendez, 291 F.Supp.3d 606, 616 (D.N.J. 2018)(evidence sufficient to show bribery because given that all of defendant's official acts occurred during the relatively short period of January 2006 through January 2013, during the same period the payor gave defendant a stay in an upscale Parisian hotel, various flights without cost, and stays at his villa in the Dominican Republic, and the official did not have to specify the means that he would use to perform his end of the bargain, a rational juror could conclude that there was an implicit agreement to exchange things of value for official acts).

control of purchases (Docket No. 1054, p. 7; Docket No. 1055, p. 5).  A scheme to defraud is not offset by gains or potential gains to individuals or entities that do not participate in the scheme. See, United States v. Siegelman, 640 F.3d 1159, 1165-1166 (11th Cir. 2011)(defendant guilty of federal funds bribery and honest services fraud after exchanging a seat on a state board for a donation to a foundation campaigning for a ballot initiative to establish a lottery to fund education). A participant in a scheme to defraud is guilty even if he is an "altruist." United States v. Spano, 421 F.3d 599, 603 (7th Cir. 2005).

Ms. Falcón-Nieves claims that she never agreed or intended to do anything illegal (Docket No. 1055, p. 4).  Intent "can be inferred from a defendant's conduct in light of the surrounding circumstances." Woodward, 149 F.3d at 60.  Ms. Falcón-Nieves' conduct allowed the jury to conclude that she possessed the requisite criminal intent.  Juries are fully equipped to assess inferences taken from "what the participants say, mean and do." McDonough, 727 F.3d at 153.

### b. Official Acts

Ms. Falcón-Nieves posits that there was no evidence of an official act to support her conviction (Docket No. 1054, pp. 19, 22; Docket No. 1055, p. 4).[34]  In McDonnell, 136 S.Ct. at 2355, the Supreme Court considered the proper interpretation of the term "official act."  In that case, the former Governor of Virginia was convicted of extortion under 18 U.S.C. § 1951(a), conspiracy to commit extortion, honest services wire fraud under 18 U.S.C. § 1343 and § 1346, and conspiracy to commit honest services wire fraud under 18 U.S.C. § 1349.  While the Governor was in office, he accepted money and lavish gifts from Jonnie Williams, a chief

---

[34] The argument appears to run counter to Ms. Falcón-Nieves' claim that she acted for the benefit of AAA by saving it money in the hiring and training of new employees and by attempting to establish electronic systems for the control of purchases (Docket No. 1054, p. 7; Docket No. 1055, p. 5).

executive officer of Star Scientific, a company and campaign donor interested in having the state of Virginia conduct tests on Anatabloc, a new nutritional supplement derived from anatabine, a compound found in tobacco.  Id. at p. 2361.

The parties agreed to define "official act" with reference to the federal bribery statute, 18 U.S.C. § 201, which in relevant part required proof that the Governor had committed or agreed to commit an official act in exchange for undisputed loans and gifts.  See, McDonnell, 136 S.Ct. at 2364-2365.  Thus, at issue was whether arranging a meeting, contacting another public official, or hosting an event, without more, concerning the subject, including a broad policy issue such as Virginia economic development, qualified as an official act.  And in holding that these actions did not, the Supreme Court found in the statutory text two requirements to prove an "official act."

First, the government must identify a question, matter, cause, suit, proceeding or controversy that (a) is pending or that may by law be brought before a public official, and (b) involves a formal exercise of governmental power similar in nature to a lawsuit, a hearing, or administrative determination.  See, McDonnell, 136 S.Ct. at 2368 (partially quoting 18 U.S.C. § 201(a)(3)).  The Supreme Court interpreted a "pending" matter as "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete."  Id. at 2369.  A matter that "may by law be brought" is "something within the specific duties of an official's position." Id.  It may be "pending either before the public official who is performing the official act, or before another public official."  Id.

Second, the government must prove that the public official made a decision or took an action on that question, matter, cause, suit, proceeding, or controversy, or agreed to do so.  See, McDonnell, 136 S.Ct. at 2368 (partially quoting 18 U.S.C. § 201(a)(3)).  Such an action includes using one's official position to exert pressure on another official to perform an official act or to

advise another official, knowing or intending that such advice will form the basis for an official act by another official.  Id. at 2372.  From these parameters, Ms. Falcón-Nieves engaged in official acts.

### c.  Links Contract

The awarding of a government contract involves a question, matter, cause, controversy or proceeding before a public official.   See, Repak, 852 F.3d at 253-254 ("The assigning of contractors to [agency] projects can thus 'naturally [be] described' as a matter 'pending' before the [agency]"); Miserendino, 307 F.Supp.3d at 490 ("[T]he awarding of contracts, subcontracts, and task orders is a question, matter, cause, suit, proceeding or controversy that is pending or may by law be brought before a public official")(internal quotations omitted).[35]   And Ms. Falcón-Nieves acted on that question, matter, cause or proceeding.

The proposal to ADL was an important element to move the Links contract forward, for without funding from ADL there could be no contract with Links.  Links would do the training, but ADL would transfer the funds.  Mr. Muñiz worked on the proposal that AAA would submit to ADL, giving it to Ms. Falcón-Nieves.  The proposal was passed along to the Executive President projected to ADL.   Thus, Ms. Falcón-Nieves acted on a pending question, matter, cause, or proceeding, putting on the table the proposal for funding that the Executive President needed to place before ADL.  In effect, she advised him, knowing or intending that such advice would form the basis for an official act by another official, in this case, the tendering of the proposal before ADL.  See, United States v. Conley, 290 F.Supp.3d 647, 658 (E.D.Ky. 2017) (defendant acted on a question, matter, cause, or controversy by providing Fiscal Court with the information it needed

---

[35] See also, Valdés v. United States, 475 F.3d 1319, 1324 (D.C.Cir. 2007)(official act includes decision about what firm should supply submarines to the Navy).

to award construction contract).

At a different, but related level, a jury could reasonably find that Ms. Falcón-Nieves participated in the Links contract review process, a question, matter, cause, or proceeding pending before the agency. She made the HR Director- by her account one of the decision makers, the other being AAA's Executive President (Docket No. 1141, p. 11) -aware of her interest in the contract by stopping by the Director's Office, where the contract was under review, to check on its status and follow up on it. Likewise, she took part in meetings to discuss the contract, what papers were missing, and next steps, assuming an active role in this undertaking.

If every action related to a project were an official act, the requirement that the public official make a decision or take an action on that project or agree to do so would be "meaningless." McDonnell, 136 S.Ct. at 2371. That is why simply expressing support for a project in a meeting, event, or call does not qualify as "a decision or action" on the project. Id. But more than that happened here. See, United States v. Spellissy, 710 Fed.Appx. 392, 395 (11th Cir. 2017)(official act where evidence showed defendant's participation in the review and prioritization of a specific proposal pending before the Comparative Testing Office). Furthermore, even if one were to conclude that Ms. Falcón-Nieves did not take any action involving the Links contract, based on her interaction with Mr. Hernández and his partners, a jury could reasonably conclude that she agreed to do so, a category of "official act" under McDonnell, See, 136 S.Ct. at 2372 (summing up discussion of the term "official act").

### d. 3 Comm. Global's Purchasing Site Proposal

This proposal involved a technology project. As it fell within Mr. Sanabria's area of responsibility, Ms. Falcón-Nieves gave it to Mr. Sanabria for evaluation. Once the proposal was so given to Mr. Sanabria, it became a matter, question, cause, controversy, or proceeding, "the

kind of thing that [could] be put on an agenda, tracked for progress, and then checked of as complete." Repak, 852 F.3d at 253-254.  In turn, Ms. Falcón-Nieves took action on the proposal, participating in the review process to beef up the proposal, and attempting to exert pressure on Mr. Sanabria to favor 3 Comm. Global.

Mr. Sanabria's initial take on the proposal was negative.  In his words, it lacked substance.  Facing this negative review, Mr. Maldonado asked Ms. Falcón-Nieves for information about AAA's internal system (SAP), which she directed Mr. Sanabria to furnish her, in an e-mail chain making Mr. Sanabria aware that the information was being requested by Mr. Maldonado to incorporate in the proposal.  Eventually, 3 Comm. Global put together a revised proposal, which Ms. Falcón-Nieves directed Mr. Sanabria to review.  He did so, identifying technical problems with the proposal, and informed Mr. Maldonado of them, including that McKinsey's findings and recommendations were from six years earlier.  In reaction to Mr. Sanabria's comment about McKinsey, Ms. Falcón-Nieves wrote to Mr. Sanabria and others that using McKinsey's findings was at her request, and even though the recommendations had not been implemented, they were "going to make the change."

This was not the same as innocuous conduct by a government official attempting to serve a constituent.  In effect, Ms. Falcón-Nieves was directing her subordinate to provide information and guidance to 3 Comm. Global while a proposal was pending, in an effort to help 3 Comm. Global secure the contract with AAA.  See, Bills, 2016 WL 4528075 at * 2 (official acts included working with contractor during request for proposal process to develop and codify elaborate, accurate, and articulated response to selection committee's questions to exemplify contractor's strengths while highlighting competing applicant companies' weaknesses; influencing selection committee members to vote for contractor's proposal; and assisting contractor during the contract

negotiation process).

Even more, Ms. Falcón-Nieves attempted to exert pressure on Mr. Sanabria.  To repeat, Mr. Sanabria initially saw a vague proposal.  Then, a directive from Ms. Falcón-Nieves to give her important AAA internal system information, to share with that same entity (3 Comm. Global).  Evaluating an updated version of the proposal on Ms. Falcón-Nieves' instructions, Mr. Sanabria identified technical problems, including McKinsey's findings, of which he informed Mr. Maldonado.  And in response, Ms. Falcón-Nieves let him know that using McKinsey had been at her request and overrode his observation that the study was from six years back, stating that they were "going to make the change" that AAA had not implemented.  Shortly after Mr. Sanabria recommended that the project not be granted to 3 Comm. Global but to another contractor, the Executive President informed Mr. Sanabria that he would no longer report to Ms. Falcón-Nieves because there was some friction with her.

Ms. Falcón-Nieves' actions amounted to more than simply expressing support for a project.  They may reasonably be construed as an attempt to pressure Mr. Sanabria to favor an entity that had before him a proposal to do business with AAA.  Active participation in the review of a proposal pending before an agency to attempt to influence the outcome adds up to an official act.  See, United States v. Pawlowski, 351 F.Supp.3d 840, 855 (E.D. Pa. 2018)(rejecting argument that defendant took no decision or action to satisfy McDonnell inasmuch as he did not personally act on a zoning application, because based on the evidence, a reasonable jury could have found that he exerted pressure to perform an official act, i.e. expedite zoning application, or advised other public officials to do so, knowing or intending that such advice would result in the application

being expedited).[36] Otherwise, even if one were to conclude that Ms. Falcón-Nieves did not take action with respect to a question, matter, cause, controversy, or proceeding involving the purchasing-site proposal, taking into account the interaction described earlier between Ms. Falcón-Nieves and Mr. Hernández and his partners, a jury could reasonably find that she agreed to do so, which, as discussed above, constitutes an official act under McDonnell.

**e. Payment to IA Mech**

As previously described, AAA released funds to IA Mech.  In McDonnell, the Supreme Court concluded that a Community Revitalization Commission's allocation of grant money was sufficiently "focused and concrete" and involved "a formal exercise of governmental power" such as required to be acted on in order to configure an official act.  See, 136 S.Ct. at 2370 (discussing issue).  So too with the decision to release money to pay IA Mech.  See, United States v. Halloran, 821 F.3d 321, 340 n.13 (2d Cir. 2016)(disbursement of public funds recognized as an official act). And Ms. Falcón-Nieves acted on that question, matter, cause, controversy, or proceeding, for the evidence shows that she had an active role in ensuring that AAA paid the contractor, which allowed Mr. Hernández and his partner, Mr. Ortiz, to collect $100,000 from Mr. Crespo.  See, United States v. Halloran, 664 Fed.Appx. 23, 28 (2d Cir. 2016)(defendant's attempt to help allocate funds for a project that payor was interested in considered official action).

---

[36] The Court specifically observed that, "[b]ased on the evidence, including Ruchlewicz informing Pawlowski about Haddad's zoning issue, Ruchlewicz's representations to Haddad that Pawlowski had agreed to solve Haddad's zoning problem, and Pawlowski's exclamations of the great lengths he had gone to help Haddad, a reasonable jury could have found that Pawloswski exerted pressure on Dougherty and Nemith to perform an official act, i.e. – expedite Haddad's zoning application – or advised them to do so, knowing or intending that such advice would result in Haddad's application being expedited."  Pawloswski, 351 F.Supp.3d at 855 (internal brackets and quotations omitted).  See also, United States v. Porter, 2017 WL 1095040, * 3 & n.3 (E.D.Ky. March 22, 2017)(pressuring city council member to approve payment of a storage bill by withholding the bill from council members and giving them instead a packet with summaries of expenses, and informing a council member who requested a copy of the invoice, that "he would need to file an open records request to obtain it").

### f.  Counterarguments

Ms. Falcón-Nieves maintains that she only met with Mr. Hernández, received his proposals, and referred them to others for evaluation (Docket No. 1054, p. 20).  At most, she says, these were preliminary steps consisting of providing access, but never reached the point of granting a contract to Mr. Hernández.  Id.  Setting aside the fact that Ms. Falcón-Nieves did facilitate the granting of a contract – the Links contract – and had an instrumental role in ensuring payment to IA Mech, "a decision or an action on a qualifying step" does qualify as an official act.  McDonnell v. United States, 136 S.Ct. at 2370.[37]  A contract award is not necessary for a finding of official act.  Intermediate steps such as proposal reviews and recommendations suffice.  See, Conley, 290 F.Supp.3d at 657 (submitting pre-contract information that formed the basis for contract-award decision).

Yet as McDonnell teaches, there is a threshold.  Merely setting up a meeting, hosting an event, or referring people to another public official does not qualify as an official act.  See, McDonnell, 136 S.Ct. at 2371.  Those acts, however, can serve as "evidence of an agreement to take an official act."  Id. at 2371.  And Ms. Falcón-Nieves did not merely meet with Mr. Hernández and his partners as well the AAA manager in charge of technology.  As mentioned earlier, she also attempted to exert pressure on that manager, and made recommendations to Mr. Hernández' partners on how to improve or enhance 3 Comm. Global's proposal, sharing with Mr. Hernández and the partners AAA's internal information regarding software as well as McKinsey's findings and recommendations.  See, United States v. Poirier, 321 F.3d 1024 (11th Cir. 2003), *corrected at*

---

[37] As the Supreme Court observed, "[a] decision or action to initiate a research study – or a decision or action on a qualifying step, such as narrowing down the list of potential research topics – would qualify as an official act." McDonnell, 136 S.Ct. at 2370 (internal quotations omitted).

2003 WL 21211926 (11th Cir. Apr. 1, 2003)(sustaining convictions under 18 U.S.C. §§ 371 and 1343, in case involving a county agent retained to serve as the county's financial advisor, who faxed county's documents to one of the bidders in return for money, including copy of county's early draft request for proposal, of county's nearly-final draft request for proposal, and of proposal submitted by one the competitors).  The fact that the official who is bribed is only one of several and could not award a contract by herself does not change the character of the scheme where "[s]he is expected to have influence enough to secure the end in view."  United States v. George, 477 F.2d 508, 512 (7th Cir. 1973).

### g.  **Vagueness**

Ms. Falcón-Nieves argues that the honest-services wire fraud charges are unconstitutionally vague on their face and as applied (Docket No. 1054, pp. 24, 27).  A penal statute is void for vagueness if it fails to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  Kolender v. Lawson, 461 U.S. 352, 357 (1983).  That is not the case here.

The honest-services doctrine arose from various decisions interpreting the phrase "scheme or artifice to defraud" in the original mail fraud statute of 1842, to encompass not only deprivations of money or property but also certain "intangible rights," Skilling, 561 U.S. at 399-400, including good government and honest services.  See, United States v. Freedman, 568 F.Supp. 450, 453 (N.D.Ill. 1983)("It is too late to argue, as an original proposition, that it strains that statutory language to embrace 'intangible rights' schemes to defraud- such as those by public officials to deprive their constituencies of the right to good government or honest services").  Even if a scheme occasioned a money or property gain for the betrayed party, courts reasoned that actionable harm

lay in the denial of that party's right to the offender's "honest services." Skilling, 561 U.S. at 400.

In this way, a scheme to obtain "a public contract on more favorable terms than would be got otherwise by bribing a public official would not only be a plan to commit the crime of bribery, but would also be a scheme to defraud the public." Id. (quoting Shushan v. United States, 117 F.2d 110, 115 (1941)).  And over time, an increasing number of courts recognized that a recreant employee – public or private – could be prosecuted under the e-mail fraud statute if he breached his allegiance to his employer.  Id. at 401.

In 1987, the development of the "intangible rights" line of cases, and thus the honest-services doctrine, came to a halt with the Supreme Court's decision in McNally, 483 U.S. at 350. That case involved a state political party chairman, Hunt, whose selection of Kentucky's insurance agent was contingent upon an arrangement to procure a share of the agent's commissions through kickbacks paid to various insurance companies designated by Hunt as political patronage.  Under the Government's theory of mail fraud, the fraud occurred when Hunt, Gray (a public official), and McNally (a private business person), set up a fake insurance agency to receive some of the commissions.  Hunt pleaded guilty, but a jury convicted Gray and McNally.

The Supreme Court reversed the convictions, holding that while "[t]he mail fraud statute clearly protects property rights, [it] does not refer to the intangible right of the citizenry to good government."  It added, "[i]f Congress desire[d] to go further, it must speak more clearly than it has."  Id.  Congress was quick to respond, adopting §1346, which provides: "For the purposes of [Chapter 63 of Title 18 of the United States Code ("Mail Fraud and Other Fraud Offenses")], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services."  Thus, the statute restored the mail fraud statute to its pre-McNally position, incorporating those decisions of the Courts of Appeals recognizing an intangible

right to honest services.  See, Skilling, 561 U.S. at 402, 404-405 (commenting on effect of decision).[38]

In 2010, the Supreme Court decided Skilling, holding that Section 1346 is constitutional, but only when confined in scope to "the bribe-and-kickback core of the pre-McNally case law." Skilling, 561 U.S. at 409.  Skilling arose out of the indictment of Jeffrey Skilling, the former Chief Executive Officer of Enron Corporation, for among other things, "conspiring to defraud Enron's shareholders by misrepresenting the company's fiscal health, thereby artificially inflating the stock price." Id. at 413.  He was convicted and challenged the conviction, arguing that Section 1346 was unconstitutionally vague in violation of the Fifth Amendment.  Id. at 402 (summarizing defendant's argument).

The Supreme Court explained that any vagueness concerns regarding Section 1346 could be obviated through a "limiting construction" of the statute.  See, Skilling, 561 U.S. at 405-406. It reasoned that the "vast majority of the honest-services cases" involved offenders who, in violation of a fiduciary duty, participated in "bribery or kickback schemes." Id. at 407.  In consequence, it limited the scope of Section 1346 to these "core" pre-McNally applications, construing honest services fraud to forbid fraudulent schemes to deprive another of honest services through bribes or kickbacks.  Id. at 404, 409.[39]  On that basis, it concluded that interpreted to

---

[38] See also, 134 Cong. Rec. H11, 251 (daily ed. Oct. 21, 1988)(statement of Rep. Conyers)("This amendment restores the mail fraud provision to where that provision was before the McNally decision"; Id. at S17,376 (daily ed. Nov. 10, 1988)(statement of Sen. Biden)("this section overturns the decision of McNally v. United States…. Under the amendment, those statutes will protect any person's intangible right to the honest services of another, including the right of the public to the honest services of public officials"); Cleveland v. United States, 531 U.S. 12, 19-20 (2000)(noting that "Congress amended the law specifically to cover one of the 'intangible rights' that lower courts had protected under §1341 prior to McNally: 'the intangible right of honest services'"); United States v. Grandmaison, 77 F.3d 555, 566 (1st Cir. 1996)(pointing out that Congress enacted Section 1346 to reverse McNally and restore mail fraud convictions to their pre-McNally status by allowing the government to predicate mail fraud prosecutions on deprivations of the intangible right of honest services).

[39] Skilling eliminated all sub-theories of honest services fraud such as self-dealing that go beyond bribes or kickbacks,

encompass only bribery and kickback schemes, Section 1346 "is not unconstitutionally vague,"

and does not present any due process concerns, either in terms of fair notice or the risk of arbitrary

and discriminatory enforcement. Skilling, 561 U.S. at 412. And applying this formulation, it held

that, "[a] criminal defendant who participated in a bribery or kickback scheme … cannot tenably

complain about prosecution under §1346 on vagueness grounds." Id. at 413.[40] Therefore, Skilling

forecloses Ms. Falcón-Nieves' facial vagueness challenge, for the honest services violations in this

case were defined in terms of bribery.

     As for vagueness as applied, Ms. Falcón-Nieves' conduct falls squarely under the statute's

proscription. See, United States v. Rybicki, 354 F.3d 124, 132, 146-147 (2d Cir. 2003)(18 U.S.C.

§ § 1341 and 1343 are not vague as applied, given that defendants' behavior fell within the statute's

clear proscription); Halloran, 664 Fed.Appx. at 26 (rejecting vagueness as applied challenge to

§§ 1343 and 1346, for the scheme in question clearly fell within the scope of the bribery core of

the arguable statutory reach). Ms. Falcón-Nieves was a public official, and as one court observed,

bribery of a public official is "the paradigm case of honest services fraud." United States v.

Langford, 647 F.3d 1309, 1321 (11th Cir. 2011). So, the jury could easily have found that this

was a "heartland" *quid pro quo* case. Potter, 463 F.3d at 18. Besides, any potential vagueness is

put to rest by the statutory *scienter* requirement. See, United States v. Nelson, 712 F.3d 498, 510

(11th Cir. 2013)(rejecting vagueness as applied challenge to §§ 1341, 1346, and 666(a)(1)B) in

part due to *scienter* requirement); United States v. Crozier, 987 F.2d 893, 900 (2d Cir.

---

but not particular types of bribery, such as stream of benefits. See, Bryant, 655 F.3d at 245 (so observing).

[40] Because the Government did not at any time allege and its evidence did not show that Mr. Skilling engaged in bribery by soliciting or accepting side payments in exchange for making the misrepresentations at issue, "[he] did not commit honest-services fraud." Skilling, 561 U.S. at 413.

1993)(rejecting "vagueness as applied" challenge to conviction under Section 666(c) in part because statute contains the *mens rea* of intent).[41]

With this in mind, to convict Ms. Falcón-Nieves for honest-services fraud, the Government had to prove that she devised or intended to devise a scheme or artifice to deprive another of the intangible right of honest services by way of a bribe.  See, 18 U.S.C. §§ 1341, 1346.  Likewise, to convict her of federal funds bribery, the Government had to prove that she "corruptly" solicited or demanded anything of value "intending to be influenced or rewarded."  See, 18 U.S.C. § 666(a)(1)(B).  If the defendant reasonably believed that her conduct was lawful, due to the nature of her role in the events underlying her conviction, the jury could have found that she did not have the intent required to commit these crimes.  But the jury did not.  There is no "vagueness as applied" problem here.  See, United States v. Caro-Muñiz, 406 F.3d 22, 24-27 (1st Cir. 2005)(upholding conviction for bribery under 18 U.S.C. § 666(a)(1)(B) despite argument that statute was unconstitutional "as applied" to the facts of the case).

**h. Presentation of Evidence**

Ms. Falcón-Nieves claims the Government opted to present its evidence in a random way, "going back and forth from fundraising activities for the governor, then for [speaker] Perelló, from a contract to another, from persons not indicted and not witnesses and from Defendant to Defendant" (Docket No. 1054 at p. 28).  The Government, however, followed a logical sequence. It was not difficult to keep track of which evidence pertained to which charges and which defendant.  At the end of the day, all evidence came together, and albeit arguments are not

---

[41] While the specific intent requirement does not necessarily validate a criminal statue against all vagueness challenges, it "eliminate[s] the objection that the statue punishes the accused for an offense of which he was unaware."  United States v. Bohonus, 628 F.2d 1167, 1174 (9th Cir. 1980).

evidence, Ms. Falcón-Nieves' counsel thoroughly explained to the jury during closing argument, Ms. Falcón-Nieves' view of the evidence (Docket No. 1364, pp. 138-172).[42]

### i.  Ethics

Ms. Falcón-Nieves contends the Government misled the jury by questioning witnesses about whether or not certain actions were improper under Puerto Rico's ethics law (Docket No. 1054, p. 28).  During direct examination, the Government asked Mr. Rubén Lugo, AAA's HR Director from February 2013 to January 2014, whether government ethics training was given to the employees in the year that he worked in AAA (TR September 8, 2016, p. 13).  He answered in the affirmative.  Id.  Asked about what the speaker talked about during the training, he said "dealing with contracts, influences, examples of receiving gifts, examples of wrongdoing."  Id.  Asked what was explained in the training regarding acceptance of gifts (id., pp. 30-31), he answered that government employees "have to be aware or careful of accepting gifts or accepting other things in exchange for … work."  Id. at 31.  In cross-examination, he was asked whether the key word was "in exchange for" (id., p. 34), to which he answered, "yes."  Id.[43]

The Government did not ask the jury to conclude that because an action may be unethical under Puerto Rico law, that action would violate federal law.  The court instructed the jury as to the elements they needed to consider, and nowhere in those instructions are references to the ethics statute of Puerto Rico.  And from the way that Mr. Lugo described what the seminar speaker said – which he did in two of his answers during direct examination and three of the answers during

---

[42] Ms. Falcón-Nieves' counsel focused the jury's attention on aspects of the evidence associated with Ms. Falcón-Nieves, stating at one point: "There are three sets of facts that the [G]overnment is trying to establish against Ivonne Falcón.  3 Comm proposal, the Links contract for training and the IA Mech invoices" (Docket No. 1364, p. 163).

[43] During re-cross examination, Mr. Rivera-Pizarro's counsel also asked a Government witness – Mr. Víctor Burgos – if he was familiar with the ethics law of Puerto Rico (TR September 15, 2016, p. 75).  The witness answered "[n]ot all of it but part of it."  Id.  Counsel did not ask follow-up questions on this subject.

cross-examination – the ethics prohibition referred to gifts or things of value in exchange for work, that is, to bribes, which matches the Government's theory with respect to all counts against Ms. Falcón-Nieves, except for the Hobbs Act count, which does not involve bribe(s).  In that sense, there is no room to argue that the witness' five responses about the local ethics law were misleading or unduly prejudicial to Ms. Falcón-Nieves.

### B.  Ms. Falcón/Ms. Falcón-Nieves

Ms. Falcón and Ms. Falcón-Nieves were found guilty of extortion through fear of economic harm in violation of 18 U.S.C. § 1951.  The Indictment alleges that Ms. Falcón extorted payments from a AAA contractor assisted by her sister, AAA Treasurer Ms. Falcón-Nieves, through fear of economic loss (Docket No. 3 at ¶¶ 118, 119).  The charge arose out of Ms. Falcón's interaction with Mr. Crespo and her sister, Ms. Falcón-Nieves.

### 1.  Evidence[44]

### a.  Background

Mr. Crespo has known Ms. Falcón for a number of years (TR September 9, 2016, pp. 11-13).  He met her in 1992 or 1994, when he was 13 or 14 years of age.  Id. at p. 14.  At that time, she owned or worked in a restaurant called La China ("The Orange"), selling natural orange juice, breakfast, and fried fritters.  Id.  His mother worked in the second floor, and he would come down to have breakfast, which is how he met Ms. Falcón.  Id.  In 2012, he was in a restaurant in Caguas, Puerto Rico and saw Ms. Falcón (TR September 9, 2016, pp. 14-15).  He thought he knew her and said "hi," she said "hi, I am Marielis Falcón," and they started talking.  Id. at pp. 14-15.  She said he was remodeling some apartments that she had for rent close to the restaurant, and he told her

---

[44] The evidence is presented in the light most favorable to the Government.

that he was a AAA contractor.  Id. at p. 15.  She asked how it was going for him there, and he responded that there were highs and lows because sometimes he got paid quickly but other times it took longer.  Id.  She asked if Mr. Crespo knew the person who paid, and he stated that her name was Ivonne Falcón (Ms. Falcón-Nieves).  Id.  Ms. Falcón stated that Ivonne Falcón was her sister.  Id.

Ms. Falcón said they were taking weeds out in the green area next to the back of the apartments (TR September 9, 2016, p. 16).  Mr. Crespo responded that he could make a quote for her and went to the area.  Id.  In the area were two apartments with eight or ten huge African Tulipan trees.  Id.  They were difficult to cut, because they could fall either way, to the houses or backyards.  Id.  Ms. Falcón told Mr. Crespo to pay for the job and invoice her.  Id. at p. 18.  The work took between one week and a half to two weeks.  Id. at p. 17.  Mr. Crespo prepared the invoice, and Ms. Falcón asked how much AAA owed him.  Id. at p. 18.  Mr. Crespo said about $20,000, and Ms. Falcón made a telephone call to "Bonsi," asking if Mr. Crespo's check could be issued.  Id. at pp. 18-19.

When Mr. Crespo was about to take the invoice out of his pocket, Ms. Falcón said that they were squared off, because as his AAA invoice would be paid, she had done a favor to Mr. Crespo, and thus, he could not invoice her for the work that he had done for her (TR September 9, 2016, pp. 17-19).[45]  Id. at pp.19-20.  When this happened, Mr. Crespo thought he was "screwed," because if somebody had the power to issue a check in five minutes, she also had the power to stop it.  Id. at p. 20.

---

[45] Mr. Crespo was going to charge Ms. Falcón $2,000 for labor and $450-$500 to dumb the material in the incinerator (TR September 9, 2016, p. 23).

**b. Payments**

Some time after the initial incident, Ms. Falcón called Mr. Crespo, asked how much AAA owed him, told him to go pick up the check, inquired as to where he would be, he answered Doral Bank in Guaynabo (where he went to cash the check), and when he came out of the bank, she greeted him, saying "you know, talking as a friend … you see how we … deal with this and how we can help with this. And for this, five or ten percent is collected to do this," which Mr. Crespo interpreted as a payment to expedite payments (TR September 9, 2016, pp. 24-25).

Later, Mr. Crespo spoke to Ms. Falcón at least once a week (TR September 9, 2016, pp. 21, 23-24). He paid her ten percent of whatever AAA paid him, thinking that if she had the power to issue the check, she had to power to stop it, and he was afraid that payments would stop (TR September 9, 2016, pp. 25-27). He paid Ms. Falcón more than $100,000 in cash. Id. at 26, 65. He would pay Ms. Falcón in front of the bank, or wherever she told him to go. Id. at 26.

Once, Mr. Crespo had a conversation with Mr. Steve Alicea, the engineer in charge of operations in Mr. Crespo's company, and they agreed that instead of $7,000, Mr. Crespo would give Ms. Falcón $2,000 (TR September 9, 2016, pp. 27-28). She took the money and left, and he received no check or check pick-up call in almost a month. Id. at p. 28. So, Mr. Crespo called Ms. Falcón and paid her what he "owed." Id. Furthermore, Ms. Falcón asked Mr. Crespo to pay a contractor who was remodeling a property of Ms. Falcón. Id. He made the payments in check. Id. On Ms. Falcón's instructions, one check was for $5,000, to the order of Eduardo Hernández, the other for $7,000, to the order of Ashlie Hernández. Id. at pp. 33-37. Ms. Falcón never paid Mr. Crespo for having made those payments for her. Id. at p.37.

Mr. Crespo testified that AAA payments stopped at the beginning of 2013 (TR September 9, 2016, p. 92). In May 2013 and June 2013, he made two cash checks, for $7,000 and $10,000,

both of which Ms. Falcón endorsed. Id. at 68-70. Ms. Falcón did not make any collection efforts at that time, but according to Mr. Crespo, the checks were part of some money that had been left over from previous efforts (TR September 12, 2016, p. 4). And he gave her checks because when he told Mr. Francisco Christian of Doral Bank what was happening, Mr. Christian told him that he (Mr. Crespo) needed evidence. Id. at pp. 4-5. Ms. Falcón had said the money was for some remodeling in connection with ambulances that she had. Id. at p. 101.

Mr. Crespo lived with the money that came day in and day out, as he had to pay the subcontractors (TR September 9, 2016, p. 22). He needed machinery to perform that work. Id. All of the equipment that he purchased came from the United States, outside of Puerto Rico. Id. at pp. 8, 67-68. And he had operational expenses, including payment to subcontractors. Id. at p. 67.

### c. AAA

In 2011, AAA paid contractors in 30 days of the due date of the invoice (TR September 12, 2016, p. 10). Because of AAA's financial situation, the term increased to 45 days in 2012 (TR September 21, 2016, p. 25). By 2016 it had increased to 60 days (TR September 12, 2016, p. 10; TR September 21, 2016, p. 23). In 2011 and 2012 the payment dates for IA Mech were being advanced (TR September 12, 2016, pp. 16-17). In 2012, the pattern of advance payments to this company was most dramatic. Id. at p. 26. In 2011, it received $250,000 in payments before the due date, and in 2012, $842,397 (TR September 21, 2016, p. 10). According to AAA's Eastern Region Finance Manager, that put other suppliers at a disadvantage and affected the cash flow (TR September 12, 2016, p. 17).[46] The Treasurer had discretion to decide whom to pay (TR September

---

[46] AAA's Finance Director- Efraín Acosta -testified that in 2011, AAA paid contractors $383,222,464 ahead of time, and in 2012, $333,612,208 (TR September 21, 2016, p. 12). He could not say how much AAA paid after the due date

21, 2016, p. 28).  In 2012, the Treasurer was Ms. Falcón-Nieves.  Id. at p. 6.

### d.  Ms. Falcón-Nieves

In 2012, Ms. Falcón-Nieves and her secretary, Nannette Nazario, contacted Ms. Alsina regarding two contractors, IA Mech and Dávila Transport (TR September 12, 2016, p. 7).  They did so to inform Ms. Alsina that payment was going to be made to those contractors, and for the computer system to be expedited so that Alsina could expedite the payments.  Id. at pp. 7-8.  Ms. Alsina would notify those in AAA receiving the contractors' goods and services.  Id. at p. 8.  Once they entered the invoices, they system would process them, issuing a payment date in accordance with the due date of the invoice.  Id. at p. 8.  If funds are available, the Treasurer would pay the invoice once it is due.  Id.  In case of IA Mech, the payment date was being advanced: invoices were being paid even when not due, ahead of time.  Id. at pp. 16-17.[47]  The person who authorized the checks was Ms. Falcón Nieves.  Id. at pp. 13, 19-23, 92.[48]

---

[47] (id. at 14), although acknowledged that contractors complain that AAA does not pay in a timely manner.  Id. at p. 15. He said that the complaint is based on the fact that contractors know the due date for their payment and have not received their payments by that date.  Id.  Further, he admitted that payment after the due date happens constantly.  Id. He stated that there were special cases of contractors that need to be paid quickly because of credit issues and some other things that AAA takes into account, and that there are situations in which contractors will require advance payment in order to continue providing services to AAA, but those would be important contractors.  Id. at p. 16.  He conceded that each case is individual.  Id. at p. 12.  He did not, however, know why IA Mech was paid in advance or before the due date (id. at p. 18) but recognized that if payment was advanced because of the financial relationship of a high-ranking AAA official's relative to a contractor, that would not be a very good reason for advancing payments. Id. at p. 19.  AAA pays over a billion dollars per year in purchases and contracts.  Id. at p. 21.  In 2012, it received $125,044,000 in federal funds, in 2013, $74,775,000, in 2014, $78,136, 000, and in 2015, $116,048,000 (TR September 12, 2016, p. 6).  Mr. Acosta supervised Ms. Falcón-Nieves for approximately ten years.  Id. at p. 5.

[47] In some cases, invoices were paid two or three days earlier (TR September 12, 2016, pp. 77, 79).  In other instances, they were paid 20 days earlier (id. at pp. 20, 23) and approximately 30 days before the due date.  Id. at p. 22.  In one case, the invoice was paid the next day.  Id. at p. 24.

[48] Further, the person who authorizes issuance of checks appears in the system under the user name, and in this case, it was Ms. Falcón-Nieves (TR September 12, 2016, pp. 91-92).

### 2. Arguments

#### a. Sufficiency of Evidence

Ms. Falcón-Nieves and Ms. Falcón allege that there was no evidence of extortion based on fear of economic harm (Docket No. 1054, p. 29; Docket No. 1056, pp. 15-16). The Hobbs Act provides that "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by … extortion, or attempts or conspires so to do … shall be [punished]." 18 U.S.C. § 1951 (a). The statute defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951 (b)(2). The term "fear encompasses fear of economic loss … including the possibility of lost business opportunities.' United States v. Vázquez-Botet, 532 F.3d 37, 60 (1st Cir. 2008)(internal quotations omitted).

To establish the required element of fear, the government must show "that the victim reasonably feared that noncompliance with the putative extortionist's terms would result in economic loss." United States v. Cruz-Arroyo, 461 F.3d 69, 74 (1st Cir. 2006), *cert. denied*, 549 U.S. 1182 (2007). The threat need not be express. The government's burden is satisfied "if it can show that the victim believed that economic loss would result for his or her failure to comply with the alleged extortionist's terms, and that the circumstances surrounding this conduct rendered that fear reasonable." United States v. Bucci, 839 F.2d 825, 828 (1st Cir. 1988). The threat "need not be express." United States v. Hairston, 46 F. 3d 361, 365 (4th Cir. 1995). A defendant who "threatens a victim in esoteric, veiled, or elliptical language need not offer a simultaneous translation or define his terms, as long as he thinks or should think that the victim understands what has been said." United States v. Goodoak, 836 F.2d 708, 714 (1st Cir. 1988)(citing United States v. DiCarlo, 565 F.2d 802, 807 (1st Cir. 1977), *cert. denied*, 435 U.S. 924 (1978)(stating that

USA v. Hernández-Pérez, <u>et al.</u>
Criminal No. 15-739 (PAD)
Opinion and Order
Page 50

defendant's "lesson on the alleged political facts of life in Boston could be taken as a thinly veiled

reference to payoffs")).

The Government presented evidence that Ms. Falcón instilled fear on Mr. Crespo relying

on her sister, the Treasurer of AAA.  Mr. Crespo feared that if he did not pay Ms. Falcón in

exchange for the payments from AAA, he would no longer receive the payments that he was

entitled to.  He testified about the consequences of this scenario and why he continued to make

payments in exchange for the release of checks from AAA, explaining it was important that he

receive the money AAA owed him in order to be able to pay his employees and subcontractors, as

otherwise, he would have problems with them (TR September 9, 2016, p. 22).  Moreover, in 2012

Ms. Falcón-Nieves was inquiring in AAA about payments due to IA Mech; a payments list

demonstrates accelerated payments to IA Mech in that period; and there was a lull in payments

from AAA when Mr. Crespo decided to temporarily halt payments to Ms. Falcón.

In sum, the evidence is sufficient to support the contention that Mr. Crespo paid for fear of

economic harm.  <u>See</u>, <u>United States</u> v. <u>Shoemaker</u>, 746 F.3d 614, 616-617 (5th Cir. 2014)(in

context of 18 U.S.C. §§ 371 and 666, upholding convictions where Chairman of Board of Trustees

requested contractor to pay him $5.00 for every nursing hour that contractor's company billed at

community hospital, in return for ensuring that hospital used the contractor and paid its bills in a

timely manner); <u>Vázquez-Botet</u>, 532 F.3d at 61 (evidence of fear found where contractors testified

that they agreed to pay the money because if they did not, they feared the government could make

life very difficult for their business by delaying payments, cancelling contracts, and not awarding

contracts in the future, and they knew that the recipients of the money were people with influence

in the government); <u>Bucci</u>, 839 F.2d at 828 (defendant was the brother-in-law of the director of

the city's department of public works – the head of the department that would be leasing the

contractor's trucks – the codefendant was the head of the city's legal department, and even though

neither of them directly controlled the awarding of contracts, they exploited a reasonable belief

that they had the power to influence who would receive the contract award and subsequent

payments under it, and therefore, the jury could conclude that the contractor feared that if he

stopped making kickbacks, he would stop receiving payments from the city); Hairston, 46 F. 3d at

370 ("The evidence and reasonable inferences disclose that when Larco declined to retain Sumler,

Hairston voted against Larco.  When Larco retained Sumler and made other payments to Sumler,

Hairston voted in factor of Larco.  The record is sufficient to prove that Sumler and Hairston

induced Larco to pay under threat of economic harm").[49]

Ms. Falcón-Nieves claims that there was no threat from Ms. Falcón, "who only helped to

expedite [Mr. Crespo's] payments" (Docket No. 1054, p. 31; Docket No. 1055, p. 19).  But that

was a determination for the jury.  See, United States v. Torcasio, 959 F.2d 503, 505-506 (4th Cir.

1992)(upholding extortion conviction despite defendant's version that money was paid pursuant

to a legitimate contract, for the task of resolving conflicting testimony and permissible inferences

flowing from such evidence belong to the fact finder).[50]  The payer's "readiness and even eagerness

to play the game does not mean that extortion did not occur."  United States v. Buffis, 867 F.3d

230, 235 (1st Cir. 2017)(internal quotations omitted).  Conduct is "no less extortion because the

---

[49] See also, United States v. Repak, 852 F.2d 230, 251 (3d Cir. 2017)(extortion shown in part with evidence that contractor's employee felt that if "they" did not follow the defendant's instructions, they would lose work, and the concern was based on more than intuition); United States v. Greger, 716 F.2d 1275, 1276-1277 (9th Cir. 1983)(victims paid out of fear that failure to do so would cause loss of lucrative contracts); United States v. Pomrenke, 198 F.Supp.3d 648, 693-695 (W.D.Va. 2016)(extortion shown where, among other things, witness testified that he believed the vendor would have lost work had it refused to pay for Christmas party as the defendant asked it to).

[50] In another aspect of the case, Torcasio expressed that the decision in McCormick v. United States, 500 U.S. 257 (1991), requiring a specific *quid pro quo* did not apply outside "the area of campaign contributions."  Torcasio, 959 F.2d at 506.  In Hairston, 46 F.3d at 361, the Fourth Circuit pointed out that in Evans v. United States, 504 U.S. 255 (1992), decided after Torcasio, the Supreme Court "wrote broadly enough" to require *quid pro quo* in cases charging extortion under color of official right.  Hairston, 46 F. 3d at 372.  McCormick and Evans are discussed below.

victim may in some sense receive an economic benefit." United States v. French, 628 F.2d 1069, 1074 (8th Cir. 1980)(citing in part United States v. Howe, 353 F.Supp. 419 (W.D.Mo. 1973) (extortion victim compelled to allow vending machine on premises and to give up part of its profits to extortioner)). And both sisters were implicated in the scheme. See, United States v. Gerald, 624 F.2d 1291, 1299 (5th Cir. 1980)(…[T]he evidence was sufficient for a reasonable jury to find, beyond a reasonable doubt, that Gerald either sought to induce the $25,000 payment by exploiting Carter's fear of economic loss or that Gerald aided and abetted Menzie in such an attempt"). Ms. Falcón induced and exploited the fear, and Ms. Falcón-Nieves aided and abetted in the extortion. See, United States v. Blackwood, 768 F.2d 131, 135-136 (7th Cir. 1985)(sustaining Hobbs Act conviction where, even though appellant's official position did not encompass the power to render judicial decisions, a jury could have found that the payor- an undercover FBI agent -reasonably believed that appellant's power to affect judicial determinations was due in part to his official position as a patrolman assigned to the Traffic Court Unit who worked as a liaison between the court and the police department, and the connections and contacts that the position gave him).

### b. Link to Commerce

Ms. Falcón argues that the definition of commerce included in the Hobbs Act does not make any mention of Puerto Rico (Docket No. 1056, p. 10). The Hobbs Act defines "commerce" to mean "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." 18 U.S.C. § 1951(B)(3).

Puerto Rico is an "unincorporated territory" of the United States subject to the Territorial

Clause, U.S. CONST. Art. IV, § 3, cl. 2.  Maysonet-Robles v. Cabrero, 323 F.3d 43, 53 (1st Cir. 2003).[51]  As such, it textually falls within the intra-territory provision of the statute.  See, United States v. Liburd, 291 F.Supp.2d 383, 385 (D.V.I. 2003)("Liburd's argument fails because the constitutional nexus of impact on interstate commerce that restrains the application of the Hobbs Act in a State of the Union does not limit its application to the Virgin Islands")(citing United States v. Bright, 54 Fed.Appx. 765, 766 (3d Cir. 2002)(unpublished)("[B]ecause Article 1V of the Constitution gives Congress plenary power to regulate intra-territorial conduct, the Hobbs Act convictions are not subject to challenge based on the Commerce Clause"); United States v. Hodge, 77 F.Supp.2d 674, 678 (D.V. I. 1999)("The Hobbs Act defines 'commerce' to mean 'commerce within … any Territory … of the United States.' This is in accord with the obvious fact that the Virgin Islands is not a state")(statutory reference omitted); United States v. Jiménez-Torres, 435 F.3d 3, 8 n.2 (1st Cir. 2006)(sustaining jurisdiction under Hobbs Act for acts in Puerto Rico because the business in question – a gas station– had purchased approximately 40,000 gallons of gasoline that originated in a refinery located in the U.S. Virgin Islands in the two months preceding the station owner's murder, and the Hobbs Act defines "commerce" to include commerce among United States territories).

### c.  Maldonado-Burgos/PROMESA

Relying on United States v. Maldonado-Burgos, 844 F.3d 339 (1st Cir. 2016), Ms. Falcón

---

[51] See also, Franklin California Tax-Free Trust v. Puerto Rico, 805 F.3d 322, 344 (1st Cir. 2015)("Puerto Rico is constitutionally a territory")(internal quotations omitted).  As a territorial entity, Puerto Rico nevertheless boasts "a relationship to the United States that has no parallel in … [United States'] history."  Puerto Rico v. Sánchez-Valle, 136 S.Ct. 1863, 1876 (2016).  In a well-documented and comprehensive commentary, "Why Puerto Rico Does Not Need Further Experimentation With Its Future: A Reply To The Notion of 'Territorial Federalism'," 131-3 Harvard Law Review Forum (January 2018), Juan R. Torruella examines the different phases of Puerto Rico's territorial relationship with the United States, divided into what the author has labeled "the four 'experiments' in the colonial governance of Puerto Rico by the United States."  Id. at pp. 65-66.

argues that conduct occurring solely within Puerto Rico does not suffice to sustain the conviction (Docket No. 1056, pp. 10-13). In that case, the First Circuit held that 18 U.S.C. § 2421(a) of the Mann Act, which penalizes transporting anyone "in interstate or foreign commerce, or in any Territory or Possession of the United States" to commit a sex crime, did not apply to travel within Puerto Rico. Maldonado-Burgos, 844 F.3d at 349-350. To reach the decision, the First Circuit surveyed the evolution of the relationship between Puerto Rico and the United States since 1898, when the United States invaded Puerto Rico during the Hispanic American War, up to the period of 1950-1952, during which Congress passed legislation which later became part of the Federal Relations Act, authorizing Puerto Rico to adopt a constitution, and the Puerto Rico Constitution became law with congressional approval. Id. Further, it observed that the congressional purpose behind the 1950-1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with States of the Union, and concluded that had the framers of the Mann Act been aware of the evolution of the relationship between Puerto Rico and the United States that took place in the decades since the passage of the Mann Act, they would have intended to treat Puerto Rico as a State under § 2421(a). Id. at 350.

Ms. Falcón argues that Maldonado-Burgos requires the same conclusion in connection with the Hobbs Act (Docket No. 1056, p. 13). Applying that same test, however, leads to a different result. For its first fifty-four years as a United States territory – from 1898 to 1952 – Puerto Rico's internal affairs were almost entirely "subject to the command of Congress and a local government largely run by federal appointees." United States v. Cotto-Flores, 970 F.3d 17, 28 (1st Cir. 2020)(internal quotations omitted). Over time, Congress gave Puerto Rico "limited self-government over local affairs but kept a firm grip on levers of colonial control." Id. In 1950, Congress "authorized Puerto Rico to call a convention to draft its own constitution, which would

take effect when ratified by popular referendum in Puerto Rico and approved by Congress." Id.
Two years later, Congress approved the new constitution, repealed inconsistent provisions in the
organic act in effect at the time- the Jones Act of March 2, 1917 – and rechristened the remainder
the Puerto Rico Federal Relations Act, "which (along with the U.S. Constitution) is now the
cornerstone of [Puerto Rico's] legal relationship with the federal government." Id. at 29.  In the
process, Congress granted Puerto Rico "a measure of autonomy comparable to that possessed by
the States." Id.

With this background, as in Maldonado-Burgos the question is whether the "[Hobbs] Act's
framers, if aware of Puerto Rico's current [post-] constitutional status, would have intended it to
be treated as a 'State' or 'territory' under the Act." Cotto-Flores, 970 F.3d at 31.  If Congressional
action had stopped in 1952, the answer may have been the same reached in Maldonado-Burgos.
But Congress stepped in the opposite direction, enacting the Puerto Rico Oversight, Management,
and Economic Stability Act ("PROMESA"), Pub. L. No. 114-187, 130 Stat. 549 (2016), 48 U.S.C.
§§ 2101-2241.  Considering this provision's pervasive sweep, had the framers of the Hobbs Act
been aware of the 1950-1952 developments in light of PROMESA, they would not have intended
to treat Puerto Rico as a State but as a territory.  See, Cotto-Flores, 970 F.3d at 35, n.15 ("Congress
does not plainly lack plenary power under the Territorial Clause to criminalize certain intra-
jurisdictional activity in Puerto Rico simply because it may not do so under the Commerce Clause
within the fifty states")(quoting United States v. Ríos-Rivera, 913 F.3d 38, 44 (1st Cir. 2019)
(holding that district court did not plainly err in upholding application of § 2423 [of the Mann Act]
to activity within Puerto Rico as a valid exercise of Congress' authority under the Territory
Clause").

Congress enacted PROMESA pursuant to its power under the Territorial Clause, to "make all needful Rules and Regulations respecting the Territory … belonging to the United States." Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, 140 S.Ct. 1649, 1656 (2020).[52] The statute creates a structure for exercising federal oversight over the fiscal affairs of territories including Puerto Rico, with a seven-member Financial Oversight and Management Board (the "Board") with broad powers of budgetary and financial control; puts in place procedures for adjusting debts accumulated by the Puerto Rico government and its instrumentalities; and expedites approvals of key energy projects and other critical projects in Puerto Rico. See, D. Andrew Austin, *The Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA; H.R. 5278, S. 2328)*, Congressional Research Service, July 1, 2016, at p. 1 (discussing topic).[53]

### 1. Oversight Board

The Board is unelected, appointed by the President, and not subject to Senate confirmation, provided the President selects six of the members from lists prepared by Congressional leaders. See, 48 U.S.C. § 2121(b)(1) and (e) (establishing Board, setting membership, and delineating appointment process). The Board is to be considered an entity within "the territorial government"

---

[52] In connection with PROMESA, the term "territory" includes Puerto Rico and four additional U.S. territories. See, 48 U.S.C. at § 2104 (20). The term "covered territory" means a territory for which an Oversight Board has been established. Id. at § 2104(8). PROMESA expressly establishes one such Board for Puerto Rico. Id. at § 2121(b)(1). Likewise, it defines "Government of Puerto Rico" as "the Commonwealth of Puerto Rico, including all its territorial instrumentalities." Id. at § 2104(11).

[53] PROMESA consists of seven titles, as follows: Title I "Establishment and Organization of Oversight Board"); Title II ("Responsibilities of Oversight Board"); Title III ("Adjustment of Debts"); Title IV (Miscellaneous Provisions"); Title V ("Puerto Rico Infrastructure Revitalization"); Title VI ("Creditor Collective Action"); and Title VII ("Sense of Congress regarding Permanent, Pro-Growth Fiscal Reforms"). A complete analysis of all Titles is beyond the scope of this Opinion, which only summarizes the main provisions relevant to the question of whether Puerto Rico enjoys the degree of autonomy and independence normally associated with a State of the Union.

of Puerto Rico.  Id. at § 2121(c)(1).  The Governor serves as an ex officio member, "without voting rights."  Id. at § 2121 (e)(3).  Neither the Governor nor the Legislature of Puerto Rico may exercise any control, supervision, oversight or review over the Board or its activities; or enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the purposes of PROMESA, as determined by the Board.  Id. at § 2128(a).  Moreover, the Board's Executive Director and staff may be appointed and paid without regard to any provision of the laws of Puerto Rico governing appointments and salaries.  Id. at § 2123(c).  And their actions are not subject to Puerto Rico's procurement laws.  Id.

### 2.  Access to Information

The Board shall have the right to secure copies, whether written or electronic, of such records, documents, information, data, or metadata from the territorial government necessary to enable the Board to carry out its responsibilities.  See, 48 U.S.C. § 2124(c)(2).  Thus, at the Board's request, the Board shall be granted direct access to such information systems, records, documents, information, or data as will enable it to carry out its responsibilities.  Id.  The head of the responsible entity of the territorial government shall provide the Board with such information and assistance (including granting the Board direct access to automated or other information systems) as the Board requires.  Id.

### 3.  Fiscal Plans

The Governor must submit Fiscal Plans for Board approval and certification.  See, 48 U.S.C. § 2141(a).  Such Plans shall provide estimates of revenues and expenditures in conformance with agreed accounting standards; ensure funding of essential public services; provide adequate funding for public pension systems; provide for the elimination of structural deficits; provide for a sustainable debt burden; include a debt sustainability analysis; improve fiscal governance,

accountability and internal controls; enable the achievement of fiscal targets; create independent forecasts of revenue for the period covered by the Fiscal Plan; provide for capital expenditures and investments necessary to promote economic growth; adopt appropriate recommendations submitted by the Board; include such additional information as the Board deems necessary; ensure that assets, funds, or resources are not loaned to, transferred to, or otherwise used for the benefit of the territory or a covered territorial instrumentality unless permitted by the territory's constitution, an approved adjustment plan under Title III of PROMESA, or a Qualifying Modification approved under Title VI of PROMESA; respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of the territory or covered territorial instrumentality in effect prior to the date of PROMESA's enactment.  Id. at § 2141(b).

The Board shall review any proposed Fiscal Plan to determine whether it satisfies the requirements of PROMESA.  See, 48 U.S.C. § 2141(c)(3).  If the Plan does not satisfy such requirements, the Board shall provide to the Governor notice of the violation including recommendations for revisions to the Plan and an opportunity to correct the violation.  Id. at § 2141(c)(3)(B).  In turn, the Governor shall submit to the Board a revised proposed Fiscal Plan by the time specified in the Board's notice.  Id. at § 2141(d)(1).  If he fails to submit to the Board a Fiscal Plan that the Board in its discretion determines satisfies PROMESA, the Board shall develop and submit to the Governor and the Legislature a Fiscal Plan that satisfies PROMESA.  Id. at § 2141(d)(2).  In that case, the Fiscal Plan shall be deemed approved by the Governor.  Id. at § 2141(e)(2).

### 4.  Budgets

First, the Governor shall submit to the Board proposed budgets within the timeframe the Board sets.  See, 48 U.S.C. § 2142(a)(c)(1).  If the Board determines that the budget is not compliant, the Board shall so notify the Governor, providing him with an opportunity to correct the violation.  Id. at § 2142(c)(1)(B).[54]  If the Governor fails to develop a compliant budget within the time the Board determines, the Board shall submit to the Governor and the Legislature a revised compliant budget.  Id. at § 2142(c)(2).

Second, the Legislature shall submit to the Board the budget it has adopted, and the Board shall determine whether the budget is compliant.  See, 48 U.S.C. § 2142(d)(1).  If the budget is not compliant, the Board shall provide to the Legislature a notice of violation that includes a description of any necessary corrective action, and an opportunity to correct the violation.  Id. at § 2142(d)(1)(B).  If the Legislature fails to adopt the budget that in the Board's opinion is compliant by the day before the first day of the fiscal year for which the budget is being developed, the Board shall submit a budget to the Governor and the Legislature.  That budget shall be deemed approved by the Governor and the Legislature, and shall be in full force and effect beginning on the first day of the applicable fiscal year.  Id. at § 2142(d)(2) and (e)(3).

### 5.  Reports

Not later than 15 days after the last day of each quarter of a fiscal year (beginning with the fiscal year determined by the Board), the Governor shall submit to the Board a report, in such form as the Board may require, describing the actual cash revenues, cash expenditures and cash flows of the territorial government for the preceding quarter, as compared to the projected revenues,

---

[54] The term "compliance budget" means a budget prepared in accordance with agreed accounting standards, and the applicable Fiscal Plan.  See, 48 U.S.C. § 2104(6).

expenditures, and cash flows contained in the certified budget for such preceding quarter, and any other information requested by the Board which may include a balance sheet or a requirement that the Governor provide information for each covered territorial instrumentality separately.  See, 48 U.S.C. § 2143(a).

If the Board determines that the actual quarterly revenues, expenditures, or cash flows of the territorial government are not consistent with the projected revenues, expenditures, or cash flows set forth in the certified budget for such quarter, the Board shall require the territorial government to provide such additional information as the Board determines to be necessary to explain the inconsistency; and if the additional information does not provide an explanation for the inconsistency that the Board finds reasonable and appropriate, it shall advise the territorial government to correct the inconsistency by implementing remedial action.  See, 48 U.S.C. § 2143(b).  If the territorial government fails to provide additional information or fails to correct an inconsistency, the Board shall certify to the President, the House of Representatives Committee of Natural Resources, the Senate Committee on Energy and Natural Resources, the Governor, and the Legislature that the territorial government is inconsistent with the applicable certified budget, describing the nature and amount of the inconsistency.  Id. at § 2143(c).

Should the Governor and the Legislature fail to correct the inconsistency, the Board shall make appropriate reductions in non-debt expenditures to ensure that the actual quarterly revenues and expenditures for the territorial government are in compliance with the applicable certified territory budget.  See, 48 U.S.C. § 2143(d)(1).  With respect to covered territorial instrumentalities, the Board may make similar reductions, institute automatic hiring freezes, and prohibit the instrumentalities from entering into any contract or engaging in any financial or other transactions, unless the contract or transaction was previously approved by the Board.  Id. at § 2143(d)(2).

### 6.   Submission of Legislative Acts

Not later than seven business days after the territorial government duly enacts any law during any fiscal year in which the Board is in operation, the Governor shall submit the law to the Board with a formal estimate prepared by an appropriate entity of the territorial government with expertise in budgets and financial management of the impact, if any, that the law will have on expenditures and revenues.  See, 48 U.S.C. § 2144(a).  If the Governor fails to submit the estimate, the Board shall send a notification to the Governor and the Legislature to provide the missing estimate or compliance certification.  Id. at §§ 2144(a)(3) and (4).  In the event the territorial government fails to comply with a direction given by the Board, the Board may take such actions as it considers necessary, consistent with PROMESA, to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement of the law.  Id. at § 2144(a)(5).

### 7.   Contracts, Rules, Regulations and Executive Orders

The Board may establish policies to require prior Board approval of certain contracts, including proposed leases and contracts to a governmental entity or government-owned corporations rather than private enterprises, to ensure that such proposed contracts promote market competition and are not inconsistent with the approved Fiscal Plan.  See, 48 U.S.C. § 2144(b)(2).  This authority extends to rules, regulations, and executive orders proposed to be issued by the Governor (or the head of any department or agency of the territorial government), in the same manner as such provisions apply to a contract.  Id. at § 2144(b)(4).  If a contract, rule, regulation, or executive order fails to comply with policies established by the Board, the Board may take such actions as it considers necessary to ensure that such contract, rule, executive order or regulation will not adversely affect the territorial government's compliance with the Fiscal Plan, including

USA v. Hernández-Pérez, et al.
Criminal No. 15-739 (PAD)
Opinion and Order
Page 62

by preventing the execution or enforcement of the contract, rule, executive order or regulation.  Id.
at § 2144(b)(5).

### 8.  Recommendations

The Board may submit recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government, including recommendations relating to: (1) the management of the territorial government's financial affairs, including economic forecasting and multiyear fiscal forecasting capabilities, information technology, placing controls on expenditures for personnel, reducing benefit costs, reforming procurement practices, and placing other controls on expenditures; (2) the structural relationship of departments, agencies, and independent agencies within the territorial government; (3) the modification of existing revenue structures, or the establishment of additional revenue structures; (4) the establishment of alternatives for meeting obligations to pay for the pensions of territorial government employees; (5) modifications or transfers of the types of services that are the responsibility of, and are delivered by the territorial government; (6) modifications of the types of services that are delivered by entities other than the territorial government under alternative service delivery mechanisms; (7) the effect of the territory's laws and court orders on the operations of the territorial government; (8) the establishment of a personnel system for employees of the territorial government that is based upon employee performance standards; (9) the improvement of personnel training and proficiency, the adjustment of staffing levels, and the improvement of training and performance of management and supervisory personnel; and (10) the privatization and commercialization of entities within the territorial government.  See, 48 U.S.C. § 2145(a).

Not later than 90 days after receiving the recommendations, the Governor or the Legislature (whichever has the authority to adopt the recommendation) shall submit a statement to the Board that provides notice as to whether the territorial government will adopt the recommendation.  See, 48 U.S.C. § 2145(b)(1).  If the recommendations are adopted, the Governor or the Legislature shall include in the statement a written plan to implement the recommendations that includes specific performance measures to determine the extent to which the territorial government has adopted the recommendation; and a clear and specific timetable pursuant to which the territorial government will implement the recommendation.  Id. at § 2145(b)(2).  In case the Governor or Legislature decide not to adopt any of the recommendations, they shall include in the statement, explanations for the rejection of the recommendations, and shall submit the statement of explanations to the President and Congress.  Id. at § 2145(b)(3).

### 9. Funding

The territorial government must designate a dedicated funding source not subject to subsequent legislative appropriations, sufficient to support the Board's annual expenses as the Board in its sole and exclusive discretion determines.  See, 48 U.S.C. § 2127(b)(1).  Similarly, the Governor must transfer or cause to be transferred on the date the Board is established and on the 5th day of each month thereafter, the greater of $2,000,000 or such amount as the Board may determine to a new account established by the territorial government, which shall be available to and subject to the exclusive control of the Board without any legislative appropriations of the territorial government.  Id.

### 10. Compliance

Any officer or employee of the territorial government who prepares, presents, or certifies any information or report for the Board or any of its agents that is intentionally false or  misleading,

or upon learning that any such information is false or misleading, fails to immediately advise the Board or its agents in writing, shall be subject to prosecution and penalties under any laws of the territory prohibiting the provision of false information to government officials. See, 48 U.S.C. § 2124(k). In addition, any officer of the territorial government who takes any action in violation of any valid order of the Board or refuses to take any action required by any such order, shall be subject to the appropriate administrative discipline, including, when appropriate, suspension from duty without pay or removal from office, by order of the Governor. Id. The Governor shall immediately report to the Board all pertinent facts together with a statement of the action taken thereon. Id.

## 11. Implications

PROMESA subjects Puerto Rico to a degree of federal control to which no State is subjected. The members of the Board are imposed territorial officials, "local officers that Congress vested with primarily local duties." Aurelius Investment, LLC, 140 S.Ct. at 1661. As a Board, they have the authority to "file for bankruptcy on behalf of Puerto Rico or its instrumentalities." Id. at 1655. Further, they can "supervise and modify Puerto Rico's laws (and budget) to achieve fiscal responsibility and access to capital markets," and "gather evidence and conduct investigations in support of these efforts." Id. Even more, they control "the issuance of new debt for Puerto Rico," and have "the authority to substitute [their] own judgment for the considered judgment of the Governor and other elected officials." Aurelius Investment, LLC, 140 S.Ct. at 1662. Yet they are neither elected nor appointed by locally-elected officials.

The People of Puerto Rico did not vote for PROMESA, and its elected representatives may not exercise any control, supervision, or oversight over the Board or its activities, nor enact, implement, or enforce any statute, resolution, policy, or rule that would impair or defeat the

purposes of PROMESA as the Board determines.  See, 48 U.S.C. § 2128(a).  Furthermore, they

may be required to live under budgets and Fiscal Plans with which their elected representatives do

not agree; the laws its elected representatives enact as well as the contracts, rules, regulations, and

executive orders they issue may be enjoined in the Board's discretion; and they must fund the

Board – one they did not elect – with the taxes they pay.  There would be little, if any constitutional

tolerance in the event that Congress attempted to act similarly in case of a State.  See, New York

v. United States, 505 U.S. 144, 162 (1992)("While Congress has substantial powers to govern the

Nation directly, including in areas of intimate concern to the States, the Constitution has never

been understood to confer upon Congress the ability to require the States to govern according to

Congress' instructions").  With all of this in mind, had the framers of the Hobbs Act in 1946 been

aware, not only of events between 1950 and 1952 but of PROMESA, they would not have seen in

Puerto Rico the functional equivalent of a State, but a territory.[55]

### d.  De Minimis Effect

Still, considering Puerto Rico a State under the Hobbs Act would not help Ms. Falcón.  The

First Circuit has held that to bring the extortion within the reach of the Hobbs Act, "the government

need only show a realistic probability of a de minimis effect on interstate commerce."  United

States v. Vázquez-Botet, 532 F.3d 37, 60 n.19 (1st Cir. 2008).[56]  The government's required

---

[55] This is not to say that Congress lacked a rational basis to enact PROMESA.  As the Supreme Court observed in Aurelius Investment, LLC, in 2006 federal tax incentives that had previously led major business to invest in Puerto Rico expired; many industries left the island; emigration increased; the population decreased; and the public debt of Puerto Rico's government and its instrumentalities soared, rising from $39.2 billion in 2005 to $71 billion in 2016.  Puerto Rico could not service that debt, yet could not easily restructure it, as the Federal Bankruptcy Code's municipality-related Chapter 9 did not apply to Puerto Rico.  At the same time, federal bankruptcy law invalidated Puerto Rico's own local debt-restructuring statutes.  A fiscal crisis ensued to which Congress responded, enacting PROMESA.  See, Aurelius Investment, LLC, 140 S.Ct. at 1655 (describing statutory background).

[56] See also, United States v. Hathaway, 534 F.2d 386, 396 (1st Cir. 1976) (Hobbs Act reaches even those effects which are merely potential or subtle)(internal quotation marks omitted).

showing "is not onerous." United States v. Capozzi, 486 F.3d 711, 726 (1st Cir. 2007). Even potential, not actual future effects may be the basis for interstate commerce jurisdiction under the Hobbs Act. Id.

One common method for the Government to establish the required effect on interstate commerce is to show "that the defendant's activity "minimally depletes the assets of an entity doing business in interstate commerce." Id. (quoting United States v. Nguyen, 246 F.3d 52, 54 (1st Cir. 2001)). It is inconsequential that extorted funds came from business owner's personal funds rather than from corporate funds, because a jury could infer that "depletion of former ultimately effects a depletion of the latter." Nguyen, 246 F.3d at 54.

Mr. Crespo testified that the machines he would use to do the work AAA contracted IA Mech for were not manufactured in Puerto Rico but had been made in the United States and shipped to Puerto Rico, where he rented and used them for his business. Also, he stated that he paid more than $100,000 in extortion. It is clear the extortion had the effect of at least minimally depleting the assets of a company engaged in interstate commerce. See, United States v. Cruz-Arroyo, 461 F.3d 69, 76 (1st Cir. 2006)(interstate commerce nexus satisfied in extortion case where money paid to the defendant was traceable to a Puerto Rico hospital that bought much of its equipment from the United States); United States v. Cianci, 378 F.3d 71, 99 (1st Cir. 2004)(interstate commerce link satisfied under Hobbs Act where city contractor that was indisputably engaged in interstate commerce was deprived of $1,100 in order to facilitate payments to which it was entitled); United States v. Rivera-Medina, 845 F.2d 12, 15 (1st Cir. 1988)(Hobbs Act extortion conviction upheld where victim, who paid up to $1,000 per month in protection money, purchased articles necessary to his operation in the United States mainland and brought them to Puerto Rico); Capozzi, 347 F.3d at 337 (evidence that a car dealer purchased vehicles from

USA v. Hernández-Pérez, *et al.*
Criminal No. 15-739 (PAD)
Opinion and Order
Page 67

out of state was sufficient to establish interstate commerce nexus).[57]

Ms. Falcón contends that the purchase of equipment by Crespo at a dealer and/or store did not affect interstate commerce because the items had already been removed from interstate commerce (Docket No. 1056, p. 14). As support, she relies on Guzmán v. Irmadan, 322 Fed.Appx. 644, 645 (11th Cir. 2009) and Dunlop v. Industrial America Corp., 516 F.2d 498, 499 (5th Cir. 1975)(Docket No. 1056, p. 14). But those cases deal with overtime claims under the Fair Labor Standards Act, not the Hobbs Act. See, Guzmán, 322 Fed. Appx. at 644 ("Jorge Guzmán appeals the dismissal of his complaint for unpaid overtime wages under the Fair Labor Standards Act"); Dunlop, 516 F.2d at 499 ("The Secretary of Labor brought this action against defendant-appellee … to enforce various provisions of the Fair Labor Standards Act…").

In enacting the Fair Labor Standards Act, Congress did not exercise the full scope of its power under the Commerce Clause. See, Wirtz v. Wohl Shoe Co., 382 F.2d 848, 850 (5th Cir. 1967) (articulating formulation)(citing in part Mitchell v. H.B. Zachry Co., 362 U.S. 319 (1960)(referring to the "less-than-constitutional reach" of the statute's scope); Navarro v. Broney Automotive Repairs, Inc., 533 F.Supp.2d 1223, 1226 (S.D.Fla. 2008)(same)(citing Walling v. Jacksonville Paper Co., 317 U.S. 564, 579-571 (1943)("Congress did not exercise in this Act the full scope of the commerce power"). In contrast, the scope of the Hobbs Act extends "as far as Congress' power to regulate conduct under the Commerce Clause." United States v. Rodríguez-

---

[57] See also, United States v. Brennick, 405 F.3d 96, 100 (1st Cir. 2005)(stealing $522 from a retail store considered sufficient to support a Hobbs Act conviction); United States v. Augello, 451 F.2d 1167, 1168-1170 (2d Cir. 1971) (sustaining extortion conviction under Hobbs Act where victim, proprietor of a drive-in restaurant in Brooklyn, ordered the products which were the mainstay of his restaurant from a New Jersey concern, and was induced by threats to pay $250 per month to defendant in return for protection against interference in operating the restaurant, which depleted the restaurant's resources); United States v. Phillips, 577 F.2d 495, 500-501 (9th Cir. 1978)(threatening depletion of $40,000 in resources from a business engaged in interstate commerce, adequate to satisfy effect of threatened extortion on interstate commerce).

Casiano, 425 F.3d 12, 15 (1st Cir. 2005).  Thus, for purposes of the Hobbs Act, "it is not necessary that the charged crime be soaked in the stream of commerce."  United States v. Tkhilaishvili, 926 F.3d 1, 11 (1st Cir. 2019).  To the contrary, as mentioned earlier, it suffices if the government shows that the extortionate conduct created "a realistic probability of a de minimis effect on interstate commerce."  Id.  And for the reasons discussed above, that test is easily satisfied in the present case.[58]

**e.  Vagueness**

Ms. Falcón-Nieves alleges that the Hobbs Act is unconstitutionally vague on its face and as applied here (Docket No. 1054, pp. 24, 27).  She argues that the statute provides scant guidance of the line between permissible politics and federal felonies (Docket No. 1054, p. 34).  The argument does not fit the modality of Hobbs Act extortion under which Ms. Falcón was prosecuted, namely, extortion through wrongful fear of economic harm.  See, Indictment, Count 17 (Docket No. 3, p. 41).  In any event, courts have rejected void- for-vagueness constitutional challenges to the Hobbs Act as they relate to "the sections of the Act [dealing] with extortion."  United States v. Rodríguez, 360 F.3d 949, 954 (9th Cir. 2004)(collecting cases); United States v. Williams, 621 F.2d 123, 126 (5th Cir. 1980)(Hobbs Act is not "unconstitutionally vague on its face"); Bianchi v. United States, 219 F.3d 182, 189, 196 (8th Cir.), *cert. denied* 349 U.S. 915 (1955) (rejecting argument that the word 'wrongful' in the extortion definition is too vague to provide an actionable

---

[58] Compare with Capozzi, 347 F.3d at 337 ("The evidence adduced at trial showed that Gardner Park was a business that bought cars from out-of-state.  Capozzi, unhappy with the truck that he had purchased from Gardner Park, threatened violence in an attempt to extort McGrath, the owner of Gardner Park, to reimburse him $4,000 for the truck.  On these facts, the jury reasonably could have concluded that if the extortion had been successful, Gardner Park's assets would have been depleted by $4,000, at least until it could have resold Gardner's truck to another customer … Such a temporary deprivation of the assets of a company engaged in interstate commerce satisfies the "*de minimis* effect" on interstate commerce required for a successful Hobbs Act prosecution").  Here, the victim was permanently, not just temporarily, deprived of more than $100,000.

standard of guilt, while noting that the word "fear" as used in the statute "is a simple and well understood word").[59]

In a similar vein, "specific intent is part and parcel of a Hobbs Act [extortion] conviction." United States v. Boylan, 898 F.2d 230, 253 (1st Cir. 1989), which "eliminate[s] the objection that the statue punishes the accused for an offense of which he was unaware." Bohonus, 628 F.2d at 1174. And because Ms. Falcón-Nieves' conduct falls squarely under the statute's proscription, it is not unconstitutionally vague as applied in this case. See, Williams, 621 F.2d at 123, 126 (rejecting unconstitutionally vague-as-applied challenge to extortion conviction under Hobbs Act).

## C.  Glenn Rivera-Pizarro

Mr. Rivera-Pizarro was found guilty of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1346, and intentional misapplication of property by an agent of an organization receiving federal funds in violation of 18 U.S.C. § 666(a)(1)(A). According to the Indictment, he conspired with the House of Representatives' Administrator (Xavier González), the Director of Technology of the House of Representatives (Víctor Burgos), and Anaudi Hernández, in a scheme to steer contracts with the House of Representatives for telephone replacement and services to 3 Comm. Global, Inc., which, as mentioned earlier, is a company associated with Mr. Hernández, who made political contributions to the Speaker of the House (Docket No. 3 at pp. 48-49).[60]

---

[59] See also, United States v. Hutson, 843 F.2d 1232, 1236 (9th Cir. 1988)("Does the federal extortion statute give a person of ordinary intelligence fair notice of the conduct it forbids? We answer this question affirmatively. Does the statute encourage erratic arrests and convictions? We do not think so").

[60] Mr. González pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 (Docket No. 475). He was sentenced on April 20, 2017 (Docket Non. 1173). Mr. Burgos pled guilty to withholding information of a crime in violation of 18 U.S.C. § 4 (Docket No. 365). He was sentenced on March 13, 2017 (Docket No. 1089).

### 1. Evidence[61]

#### a. Background

The testimonial evidence against Mr. Rivera-Pizarro came mainly from Mr. Hernández, Mr. Vargas, and Mr. Burgos, the Puerto Rico House of Representatives' Technology Director between January 2, 2013 and April 2014 (TR September 13, 2016, p. 6). Mr. Burgos met Mr. Rivera-Pizarro when he began working in the House. Id. He described Mr. Rivera-Pizarro as Executive Assistant to the House's Administrator, Mr. Xavier González. Id. at p. 16. He said that Mr. Rivera-Pizarro would hand out instructions, particularly to Burgos. Id. at p. 15.

One of Mr. Burgos' first assignments in the House was to make an assessment of the telephone system (TR September 14, 2016, p. 68). The system had been installed 24 years earlier (TR September 13, 2016, p. 21). Replacement parts were not available. Id. The backup battery systems were no longer manufactured. Id. As a result, the telephone switchboard was not protected from power surge. Id. at p. 22. It was an analog system with copper wire pairs. Id. The patch panels were copper wired and had six to eight inches of corrosion such that every time someone made a call on the phone, noise was heard, making the system function inadequately. Id. Furthermore, every time there was a power fluctuation, the switchboard would stop working. Id. And because it was a big and old system, the energy cost was very high. Id. After Mr. Burgos finished the assessment, in February 2013 he made a presentation of findings to the Speaker of the House, Mr. Jaime Perelló (TR September 13, 2016, pp. 22-23; TR September 14, 2016, p. 68). Based on the presentation, he was instructed to proceed with changes in the equipment (TR September 13, 2016, p. 23).

---

[61] The evidence is presented in the light most favorable to the Government.

Once Mr. Burgos received the order for the telephone system, he prepared a list with the specifications of the equipment required (TR September 13, 2016, p. 27).  The specifications included two 20 megabytes per second lines, each line to be done by two separate companies to have redundancy, routers, server (either Avaya or Mitel); and analog cards, in order for the system to be capable of processing VoIP systems as well as analog.  Id. at p. 27.  The list was given to bidders.  Id.  Five companies were originally invited or sent request for proposals: Telefónica Puerto Rico, AT&T, Data Access, WorldNet, and Columbus.  Id. at p. 28.  All of these companies were dedicated to telephony.  Id.

Mr. Burgos initially planned to end the selection period by the end of March 2013 (TR September 13, 2016, p. 28).  So, the deadline was set at March (TR September 15, 2016, p. 36).  A few days before the request for proposal period was about to end, however, he ran into four people in the hallway: Mr. Anaudi Hernández, Mr. Héctor Vargas, Mr. Ramses Maldonado, and one José.  Id. at pp. 28-30.  They asked Mr. Burgos whether he was Víctor Burgos and told him they were friends of the Speaker and were there to put in a proposal for the telephone system.  Id. at p. 29.

Mr. Burgos was surprised because it was three of four days before the close of the March proposal period (TR September 15, 2016, p. 29).  He called Mr. Xavier González, who told him that those individuals were friends, and Mr. Burgos had to see them and provide them with the project's specifications, which Mr. Burgos did, explaining to them the elements of the project and what was required.  Id.  Additionally, he expressed to them that they had to hurry because they were already late.  Id.[62]

---

[62] Mr. Burgos testified that all of the bidders except 3 Comm. Global timely submitted their proposals in March (TR September 15, 2015, p. 55).

Mr. Hernández first became aware of the opportunity to do business with the House's telephone system in an activity that he and the Speaker attended (TR August 30, 2016, p. 4). The record is not clear on whether the activity was a fund-raiser for the Speaker, but Mr. Hernández approached the Speaker to see how they could help him with any technology issue. Id. The Speaker mentioned that he had a problem with the switchboard, which had been installed years earlier and had problems. Id. Based on that conversation, Mr. Hernández spoke with Mr. Maldonado, who said that they could change the switchboard. Id. Then Mr. Hernández made an appointment to talk to the Speaker about the project. Id. And after he and his partners met with Mr. Burgos, Mr. Maldonado started drafting the proposal, around March 2013. Id. at p. 5.[63]

When Mr. Burgos thought the proposal submission process had ended, it was not so. One of the representatives from Columbus stopped by Mr. Burgos' office, showed him a letter stating that the deadline had been changed, and asked him why the deadline to submit proposals was so changed (TR September 13, 2016 at p. 31). The letter, dated May 9, 2013, which Mr. Rivera-Pizarro signed, extended the deadline to May 16, 2013 at 4:00 p.m. Id. at pp. 32-33; Exhibit 406-1, p. 5. Mr. Burgos said he had no idea that the dates had been changed. Id. at p. 31. Even more, he did not know the letter existed until the Columbus representative showed it to him. Id. at p. 32.

### b. Late Proposals

After May and during the summer of 2013, following expiration of the May deadline, Mr. Burgos received e-mails from 3 Comm. Global with revised proposals and questions regarding

---

[63] It is unclear when the deadline was in March, but on March 21, 2013, Mr. Maldonado wrote to Mr. Burgos expressing that later that day, they would be sending him a revised proposal (Exhibit 185). He did so, at 2:52 PM (Exhibit 186). Mr. Hernández described the proposal as something to be listed in May (TR August 30, 2016, pp. 101-102).

proposals (TR September 13, 2016, pp. 39, 43).[64]  Mr. Burgos was not comfortable with what was going on, because the period for proposals had expired, and no one was supposed to be handing in revised proposals.  Id. at 43.  As 3 Comm. Global was submitting proposals, it discussed them with Mr. Burgos (TR September 15, 2016, p. 23).  He met with Mr. Maldonado, Mr. Vargas, and Mr. Rodríguez, but mostly with Maldonado and Rodríguez, though not every time that they requested it.  Id. at 23.  Mr. Burgos described the meetings as purely technical.  Id. at 8.

On August 6, 2013, Mr. Hernández met with Mr. González in the Capitol (TR August 31, 2016, p. 128; Exhibit 197-1).  In the meeting, downward adjustments were made to 3 Comm. Global's proposal, lowering to quote to $149,700 (TR August 31, 2016, pp. 128-131; Exhibit 386-1).  Mr. Hernández shared the information with Mr. Maldonado, who incorporated the adjustments in what would become Version 10 of 3 Comm. Global's proposal.  See, Exhibit 199-1.  On August 13, 2013, Mr. Maldonado sent to Mr. Vargas the 10th version of the proposal with a quote of $149,900 – $200 higher than adjusted in the meeting with Mr. González – so Vargas could submit it to the House.  See, Exhibit 345-1, pp. 1, 7.  The same day, Mr. Hernández advanced a copy of the same proposal by e-mail to Mr. González (TR August 31, 2016, p. 136; Exhibit 346-1).  On August 27, 2013, Mr. Hernández met with the Speaker in the Speaker's office (TR August 31, 2016, pp. 137-138).

---

[64] For example, on May 17, 2013, after the deadline to present proposals had elapsed, Mr. Maldonado sent to Mr. Rivera-Pizarro a revised proposal – the 8th version – for $346, 651 (TR September 14, 2016, p. 10; TR September 15, 2016, p. 46; Exhibit 193; Exhibit 342, p. 10).  Mr. Hernández was aware that the proposal was not on time (TR August 30, 2016, p. 5).  On June 23, 2013, Mr. Maldonado shared with Mr. Hernández the proposal's 9th version (Exhibit 194), to which Mr. Hernández reacted, stating that they had to cut $100,000 from the equipment because there was a $154,000 proposal from a competitor (Exhibit 195).

### c.  Selection Committee

Meanwhile, a committee had been put together to recommend who should be awarded the contract (TR September 13, 2016, p. 34).  Its members were Mr. Rivera-Pizarro, Mr. Burgos, Mr. José Carrión, and attorney Tirado.  Id.  The committee was supposed the evaluate the proposals and decide on the best option in terms of price, processes, and technical specifications.  Id.  However, according to Mr. Burgos, nothing was evaluated.  Id. at p. 35.  As Mr. Burgos described the process, the committee meetings were held to convince and pressure him to endorse 3 Comm. Global's proposal (TR September 13, 2016, p. 35).  He said that in a 40-45 minute meeting, the first ten minutes was talk about the proposals and the next 35 minutes was to state that "we" have to help our friends, "we" have to work as a team, you have to adapt, and you do not understand how this works (TR September 14, 2016, pp. 97-98).  Mr. Rivera-Pizarro said, I am here to help you, and if you do not do what you are told you are going to be fired (TR September 15, 2016, p. 35; TR September 14, 2016, p. 35).

The best proposal was that of WorldNet (TR September 13, 2016, p. 38).  The original proposal of 3 Comm. Global was the most expensive of the proposals.  Id. at p. 37.  It did not include removal of the old equipment.  Id.  Switchboard service would be from 8:00 AM to 8:00 PM and would not include service on the weekends.  Id.  Every service call would have a cost of one dollar.  Id.  The proposal did not comply with the specifications, as the House of Representatives works until late hours and on weekends.  Id. at pp. 37-38.

When Mr. Burgos told the members of the committee that the best proposal was WorldNet's, Mr. Rivera-Pizarro told him that Mr. Burgos was not used to that work environment, and that he had to find a way to help friends (TR September 13, 2016, p. 38).  After a brief discussion, a friend was anybody who had helped in the Speaker's campaign.  Id.  Mr. Burgos

responded that he did not care about that, because what mattered was the cost, the equipment, and quality, and that being a friend of the Speaker should not be taken into consideration unless there were complying in terms of the specifications.   Id. at pp. 38-39.   Later, Mr. Burgos had a conversation with Mr. González (TR September 13, 2016, p. 39).  Because Mr. Burgos did not want to give in to recommending 3 Comm. Global's proposal, Mr. González told him he had to obey and that "nowadays it was hard to find a job."  Id.

### d.  Committee's Recommendation

In a meeting with the Speaker at the end of August 2013, the Speaker inquired as to the status of the switchboard system.  Mr. Burgos said he did not know, that was Xavier González; the Speaker asked what was going on with the contract, González signaled toward Mr. Burgos, and the Speaker said "look, I need to have that contract signed now" (TR September 13, 2016, pp. 40, 46-47; TR September 14, 2016, pp. 4-5).  Once in Mr. González' office, he told Mr. Burgos that one of the problems he had was not following instructions, and that González needed Burgos to sign the contract because nowadays, it was difficult to find a job, an expression that Mr. Burgos interpreted as a threat (TR September 14, 2016, p. 5).  Several days later, Mr. Rivera-Pizarro summoned Mr. Burgos to his office, and told him that Burgos was not used to working in that type of environment, that Burgos needed to understand that they had to help the Speaker's friends, and if Burgos did not cooperate, he was going to get fired.  Id. at 5-6.

Following Mr. Hernández' meeting with the Speaker, toward the end of August or in September 2013, Hernández went to Mr. Burgos's office and told him that a final decision had been made with respect to the proposal (TR September 13, 2016, p. 40; TR September 14, 2016, p. 114).  On September 17, 2013, he met with Mr. Vargas, Mr. Maldonado, Mr. Rodríguez, Mr. González, and Mr. Rivera-Pizarro in the offices of 3 Comm. Global to finalize the details of the

switchboard contract for the House (TR August 31, 2016, pp. 145-147; TR September 1, 2016, pp. 11-12).  The meeting took place from 5:00 in the afternoon to 6:00 in the evening, after which they drank until around 7:00 in the evening (TR September 1, 2016, p. 12).

The next day, the selection committee recommended to Mr. Xavier González that the contract be awarded to 3 Comm. Global (TR September 13, 2016, p. 48; Exhibit 406-1, pp. 3-4).  The recommendation came about after several proposals and changes and adjustments in price (TR August 24, 2016 PM, p. 96).  The final quote was $149,900, $4,100 below that of the lowest bidder, of which Mr. Hernández and his partners were aware because the information was shared with them from inside the House (TR August 25, 2016, pp. 6-8).[65]  3 Comm. Global received information on competitors' bids throughout this process (TR August 30, 2016, p. 5).

Mr. Rivera-Pizarro, Mr. Carrión, and Mr. Burgos signed the recommendation letter (Exhibit 406-1, p. 4).  From Mr. Burgos' perspective, 3 Comm. Global did not have the experience to set up the telephone switchboard system (TR September 13, 2016, p. 40; TR September 14, 2016, p. 114).  He said that he signed the recommendation letter under duress, after months of listening to threats; being called stubborn; told that he did not know how to follow instructions, that he did not know how to do his job, that he had to help the friends of the Speaker, and that he was not used to it but that was how it was done; Mr. González saying it was hard to get a job nowadays; and Mr. Rivera-Pizarro telling Mr. Burgos that if he did not cooperate and sign the contract, he was going to be fired (TR September 13, 2016, p. 48; TR September 14, 2016, pp. 50-51).

---

[65] Mr. Vargas testified that he had access to that information through Mr. Burgos (TR August 25, 2016, pp. 7-8).  Mr. Burgos said that he did not inform members of 3 Comm. Global the price of the other competitors' proposals (TR September 13, 2016, p. 42).  That was so, because to his way of thinking, they had to compete on equal footing, it would not have been ethical or good to reveal the information to competitors, and information stated or expressed in proposals is privileged for the House of Representatives and not for other competitors to know about.  Id.  The others who would have known the prices of the competitors' bids were Mr. Rivera-Pizarro, Mr. Xavier González, Mr. José Carrión, and attorney Tirado.  Id. at p. 43.

On October 9, 2013, Mr. González signed the 3 Comm. Global contract on behalf of the House (TR September 1, 2016, p. 20; Exhibit 40). After 3 Comm. Global obtained the contract, it began working on the telephone system (TR September 13, 2016, p. 55). According to Mr. Burgos, 3 Comm. Global set up what it wanted to set up, not what Mr. Burgos had put down in the project's specifications, ignoring Mr. Burgos' recommendations, suggestions, and guidelines (TR September 13, 2016, p. 55; TR September 14, 2016, p. 64). Mr. Burgos began to protest, but the Speaker, Mr. González, and Mr. Rivera-Pizarro blamed him. Id. at 56.

On November 28, 2013, Mr. Rivera-Pizarro recommended to Mr. González that 3 Comm. Global be awarded a second contract, to service the telephone system, for $13,500 per month (TR September 6, 2016, p. 113; TR August 30, 2016, p. 98; Exhibit 406-1, pp. 2-5). 3 Comm. Global presented the lowest quote, by $15 – the closest competitor had quoted the project for $13,515 per month. See, Exhibit 406-1, p. 1. Mr. González signed the contract on behalf of the House on December 12, 2013. See, Exhibit 39-1. On February 18, 2014, the House and 3 Comm. Global amended the October 9, 2013 contract, to increase the contract amount by $37,205.00, for a total of $187,105 (Exhibit EE, pp. 1). Mr. Burgos recommended the amendment, which was signed by the Speaker on behalf of the House. Id. at p. 2.

In April 2014, Mr. González fired Mr. Burgos after he finished working on a data center project and on an electronic floor voting project for the House of Representatives (TR September 14, 2016, pp. 91-92). For the occasion, Mr. Burgos was called to a meeting in Mr. González' office and told that he was not compatible with the way they worked (TR September 13, 2016, p. 54). Mr. González, Mr. Rivera-Pizarro and Mr. José Fuentes attended the meeting. Id. Mr. Rivera-Pizarro was with Mr. González in all, if not all, of the meetings with Mr. Hernández or his partners had regarding the project in the House (TR August 29, 2016, p. 110).

### e. Fund-Raisers

As mentioned earlier, Mr. Hernández was part of the Speaker's finance committee (TR August 29, 2016, p. 14). He described a finance committee as a small, select group of people who have the capacity to raise funds through themselves or through acquaintances (TR August 29, 2016, p. 14). He testified that fund raisers continue after elections because candidates have debts from past campaigns and people think it is going to be easier for them to do business with the government. Id. at p. 21. In 2013, the Speaker's finance committee met once a month or month and a half. Id. at p. 17. The members of the committee typically discussed future activities, and activities that members conducted to fulfill quotas (TR August 31, 2016, p. 8; TR August 24, 2016, p. 89). Mr. Hernández saw the Speaker in one or two of those meetings (TR August 31, 2016, p. 9). He declared that the quota each person in the finance group had to raise was between $60,000 and $75,000 per year (TR August 29, 2016, p. 18).

In this way, Mr. Hernández hosted fundraisers for the Speaker (TR September 1, 2016, pp. 37-38). He or Mr. Vargas delivered the money collected in fund raising events to Mr. González (TR August 29, 2016, pp. 19, 21). Mr. González was part of the Speaker's finance committee while he was the Administrator of the House (TR August 24, 2016, pp. 89-90). On March 19, 2013, the Speaker's finance committee met with him. See, Exhibit 96-1. On June 19, 2013, the members of the finance team convened (TR August 31, 2016, p. 7; Exhibit 193-1). On June 26, 2013, they got together with the Speaker to coordinate an activity for July 6th: a fund raiser for the Speaker (TR August 31, 2016, pp. 125-126; Exhibit 94-1, p. 1). Even though Mr. Hernández and Mr. Vargas did not attend the fund raiser, they expressed to the committee that it could count on the tickets that they had promised. See, Exhibit 94-1, p. 2. On September 23, 2013, the committee announced a meeting to drink wine and have a chat to settle tickets for the Speaker's birthday.

See, Exhibit 365-1.  On November 2, 2013, Mr. Hernández hosted a fundraiser for the Speaker in

Hernández' house (TR September 1, 2016, pp. 36-38).

### f.  Mr. Rivera-Pizarro's Position

Mr. Rivera-Pizarro's Resumé refers to his position in the House as "Special Assistant" – in

charge of operations and administrative duties in the House of Representatives, supporting offices

and daily work in the following areas:

- Purchases and Services

- Human Resources

- Printing shop

- Post office/mail

- Transportation

- Property

- Technology

- Citizen Assistance

- Finances and Budget

See, Exhibit 206-1, p. 2.

### 2.  Arguments

### a.  Conspiracy

Mr. Rivera-Pizarro argues that the Government failed to prove a conspiracy to commit wire

fraud (Docket No. 1036, p. 1).  The Government prosecuted this count on a theory of campaign

contributions given in exchange for contracts (Docket No. 3, pp. 47-60).  In McCormick, 500 U.S.

at 257, the Supreme Court cautioned against interpreting federal law to require more for conviction

than merely proof of a campaign donation followed by an act favorable toward the donor.  The case

arose out of the conviction for extorting payments under color of official right under the Hobbs Act,

of a state elected official who sponsored legislation benefitting a group of his constituents while

receiving payments from an organization that represented the same constituents that the legislation

benefitted.  Id. at 257.  Because there were no allegations of force, violence, or fear, the question

presented was the meaning of the Hobbs Act's "color of official right" language.  Id. at 259.[66] The

official argued that the cash payments that he received were campaign contributions and, therefore,

exempt from the Hobbs Act's "color of official right" requirement.  Id. at 274, n.10.  In reversing the

conviction, the Supreme Court observed that:

> Money is constantly being solicited on behalf of candidates, who run on
> platforms and who claim support on the basis of their views and what they
> intend to do or have done.  Whatever ethical considerations and appearances
> may indicate, to hold that legislators commit the crime of federal extortion
> when they act for the benefit of constituents or support legislation furthering
> the interests of some of their constituents, shortly before or after campaign
> contributions are solicited and received from those beneficiaries, is an
> unrealistic assessment of what Congress could have meant by making it a
> crime to obtain property from another, with his consent, "under color of
> official right."  To hold otherwise would open to prosecution not only conduct
> that has long been thought to be well within the law but also conduct that in
> a very real sense is unavoidable so long as election campaigns are financed
> by private contributions or expenditures, as they have been from the
> beginning of the Nation.

Id. at 272.  Thus, a mutuality of interest or a close-in-time connection between a campaign donation

and an official act is insufficient to sustain a conviction under the Hobbs Act.  To obtain a conviction

under the Hobbs Act's "color of official right" modality, the government must establish a *quid pro*

---

[66] As stated before, the Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  See, 18 U.S.C. § 1951(b)(2).

*quo*. Id. at 273 ("We thus disagree with the Court of Appeals' holding in this case that a quid pro quo is not necessary for conviction under the Hobbs Act when an official receives a campaign contribution"). But how, then, in the particular atmosphere of campaign contributions, can people tell a criminal agreement from a large campaign contribution accepted from a contributor who expects favorable results? The Supreme Court's answer lies in the level of explicitness, which permits a line to be drawn. From this perspective:

> The receipt of [campaign] contributions is … vulnerable under the Act as having been taken under color of official right, but only if the payments are made in return for an **explicit promise or undertaking** by the official to perform or not perform an official act. In such situations the official asserts that his official conduct will be controlled by the terms of the promise or understanding.

Id. at 273 (emphasis added).

A year after McCormick, the Supreme Court decided Evans, 504 U.S. at 255. At issue was whether "an affirmative act of inducement by a public official, such as a demand, is an element of the offense of extortion 'under color of official right' prohibited by the Hobbs Act." Id. at 256. Evans was an elected member of a Georgia county commission. An FBI agent posed as a real estate investor and, over the course of several months, requested Evans' assistance in re-zoning a plot of land. At the end of one meeting, the agent handed Evans an envelope with $7,000 in cash and a $1,000 check made payable to Evans' campaign. Evans reported the check, but not the cash.

The defendant was not able to perform his end of the bargain because he was arrested before he had an opportunity to do so. He, however, was prosecuted on the theory that his acceptance of the bribe constituted an implicit promise to use his official position to serve the interests of the bribegiver. He countered that both the cash and check were campaign contributions. The Supreme Court held that an affirmative act of inducement was not required for a conviction under the Hobbs

Act. Evans, 504 U.S. at 265-266. For the Court, it was irrelevant whether the public official initiated the bribe payment. Further, it explained that fulfillment of the _quid pro quo_ is not an element of the offense, and that "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." Id. at 268. In a concurring opinion, Justice Kennedy argued that this last sentence "can be interpreted in a way that is consistent" with McCormick's _quid pro quo_ requirement. Id. at 272 (Kennedy, J., concurring in the judgment). He pointed out that the official and the payor need not state the _quid pro quo_ in express terms, for otherwise, the law's effect could be frustrated by knowing winks and nods. Id. at 274.

Consistently with this view, the _quid pro quo_ of McCormick is satisfied by something short of a formalized and thoroughly articulated contractual arrangement. As one Court pointed out, "[a]n official may be convicted without evidence equivalent to a statement such as: 'Thank you for the $10,000 campaign contribution. In return for it, I promise to introduce your bill tomorrow.'" United States v. Inzunza, 638 F.3d 1006, 1014 (9th Cir. 2011). Thus, the term "explicit" refers "not to the form of the agreement between the payor and payee, but to the degree to which the payor and payee were aware of its terms, regardless of whether those terms were articulated." United States v. Blandford, 33 F.3d 685, 696 (6th Cir. 1994).

Tracking this element, the First Circuit ruled that McCormick "applies only in the context of campaign contributions." McDonough, 727 F.3d at 155, n. 4 (citing United States v. Turner, 684 F.3d 244, 253-254 (1st Cir. 2012), _cert. denied_, 568 U.S. 1018 (2012)). To the same degree, even though McCormick and Evans involve prosecutions for Hobbs Act extortion under color of official right, courts have applied the explicit _quid pro quo_ requirement to prosecutions for wire fraud when the thing offered in exchange for an official act is a campaign contribution. See, United States

v. Ring, 706 F.3d 460, 466 (2d Cir. 2013)(assuming that McCormick extends to honest services fraud); United States v. Malone, 2006 WL 2583293, *1 (D.Nev. Sept. 6, 2006)(noting that McCormick's reasoning is equally applicable to charges of wire fraud where the scheme or artifice to defraud involves payment of campaign contributions).  By these standards, the evidence sustains Mr. Rivera-Pizarro's conviction for conspiracy to commit wire fraud.

Once again, Mr. Hernández engaged in fundraising for the Speaker.  He was on the Speaker's fundraising committee, with a fundraising quota of $60,000-$75,000 per year.  The fundraising committee did not cease operating after the 2012 general election.  In 2013, it met every month or month and a half to plan fundraising activities.  Mr. Hernández and his partner, Mr. Vargas, handed the money they raised for the Speaker's campaign committee to Mr. González, the Administrator of the House of Representatives, Mr. Rivera-Pizarro's immediate superior.

Mr. Hernández wanted something in return for that help: he wanted contracts.  Having the Speaker's ear, he moved forward in an activity.  Approaching the Speaker, he asked him how he could help, and the Speaker responded, with the telephone switchboard system.  Based on that conversation, Mr. Hernández spoke with Mr. Maldonado, who said they could change the switchboard.  Id. So, Mr. Hernández made an appointment to talk to the Speaker about the project. Id.  Mr. Rivera-Pizarro knew that Mr. Hernández and his partners wanted the telephone switchboard contract.  He was present in most of the meetings that Mr. Hernández had with Mr. González.  He knowingly agreed to participate and participated in a scheme that skewed and tainted the process to select the entity that would be awarded that contract, to favor 3 Comm. Global, Mr. Hernández' company.

Mr. Burgos put together the specifications for the project, with a March 2013 deadline.  A few days shy of the cutoff date, Mr. Hernández and his partners showed up in the House, told him

they were the Speaker's friends, and were interested in the contract. Mr. Burgos contacted Mr. González, who confirmed that Mr. Hernández and the others were friends, and that Mr. Burgos should help them. Mr. Burgos provided them with the specifications, warning that they had to worry because they were late. Mr. Burgos was surprised to learn that in a letter, Mr. Rivera-Pizarro had extended the deadline, to May 16, 2013 at 4:00 p.m. Still, 3 Comm. Global's proposal came in late, on May 17th, and was the most expensive of the proposals.

Meanwhile, a three-person committee was established to evaluate the proposals. Two of the members were Mr. Rivera-Pizarro and Mr. Burgos. Mr. Burgos voiced his opinion that the best proposal was that of WorldNet. But during the committee's meetings, little time was spent discussing the various proposals. The members spent most of the time telling Mr. Burgos that he had to help the Speaker's friends, which in Mr. Rivera-Pizarro's words, were those who had helped in the Speaker's campaign. Mr. González had described Mr. Hernández and his partners as friends, when they showed up unannounced to speak with Mr. Burgos about the project, and Mr. Burgos called Mr. González to check if he should speak with them. Even more, Mr. González told Mr. Burgos that he had to do as told, and that nowadays it was hard to find jobs.

During the summer of 2013, different versions of 3 Comm. Global were worked on, while the Speaker's fundraising committee was meeting, and fundraising events were being organized for him. Mr. Hernández and his partner Héctor Vargas gave the money that they raised to Mr. González. On August 16, 2013, Mr. Hernández met with Mr. González, and out of that meeting, 3 Comm. Global's proposal was further adjusted downward. On August 13, 2013, Mr. Hernández sent to Mr. González Version 10 of the proposal, for $149,900, sufficient to outbid the closest participant.

On August 27, 2013, Mr. Hernández met with the Speaker. In late August, Mr. Hernández told Mr. Burgos that a decision had been made. Around the same time, the Speaker told Mr. Burgos

that he wanted the contract signed.  On September 17, 2013, Mr. Hernández and his partners met with Mr. González and Mr. Rivera-Pizarro in 3 Comm. Global's office to discuss the contract.  The next day, the committee of which Mr. Rivera-Pizarro was a member recommended to Mr. González that the contract be awarded to 3 Comm. Global.  On October 9, 2013, the contract was signed.  On November 7, 2013, Mr. Hernández hosted a fundraiser for the Speaker in Hernández' house.  On December 13, 2013, a second contract for servicing the telephone system was awarded to 3 Comm. Global for $13,500 per month, which beat the closest competitor by $15.00 ($13,515-Data Access v. $13,500-3 Comm. Global).  Mr. González signed both contracts.

The evidence shows the elements of conspiracy to commit wire fraud.  See, United States v. Whiteford, 676 F.3d 348, 353 (3d Cir. 2012)(sustaining convictions under 18 U.S.C. § 371 of defendants who provided contractor with inside information on bidding to enable contractor to secure contracts); United States v. Lemire, 720 F.2d 1327, 1331, 1333-1334, 1354-1355 (D. C. Cir. 1983)(sustaining convictions under 18 U.S.C. §§ 371, 1343 and 2314 where evidence showed, among other things, that contractor was able to submit a lower bid than its competitors because of contract specification information that codefendant provided it in advance of bidding); United States v. Hasenstab, 575 F.2d 1035, 1036-1037, 1040 (2d Cir. 1978)(upholding convictions under 18 U.S.C. §§ 371, 1341 and 1343 of a defendant who, among other things, helped vendor to fix price levels and to rig bids without competition).[67]  Mr. Rivera-Pizarro was a perpetrator, but the result would not change even if he had been a mere supporter, for in a conspiracy "the supporters are as guilty as the perpetrators."  United States v. Ocasio, 136 S.Ct. 1423, 1429-1430 (2016).  When

---

[67] To be sure, the award in this case did not result from a bidding process but from a request for proposal ("RFP").  As Mr. Burgos, however, explained, even though RFP's are less formal than bids, it does not mean that the rules can be ignored so that one of the participants can unfairly obtain the contract (TR September 15, 2016, pp. 38-39).

people enter into a conspiracy, "each and every member becomes an agent for the other conspirators in carrying out the conspiracy." Id. at 1430.

In like manner, considering the chain of events, the role of Mr. Hernández as a regular, if not a permanent member of the Speaker's fundraising committee, a member with a significant monetary quota to fill; steady monthly or month-and-a half fundraising committee meetings; the dual role that Mr. González played as House Administrator and collector of campaign money; the pressure that he and Mr. Rivera-Pizarro exerted on Mr. Burgos to endorse 3 Comm. Global's proposal, initially the worst and most expensive of the proposals; Mr. Rivera-Pizarro's expression that Mr. Burgos had to help friends, meaning those who had helped in the Speaker's campaign, the only ones to which the evidence referred being Mr. Hernández and his partner Héctor Vargas, the only campaign activity depicted being that of fundraising; parallel ongoing fundraising activity and contract-proposal review processes and awards being conducted without any attempt to shield one from the other; inside information conveyed to assist the payor to lower and adjust the proposal to justify the selection; the award of the contract to 3 Comm. Global – properly characterized as the friend's company -and the signing of the contract by Mr. González, the campaign collector, together permit a rational juror to reasonably conclude that the contracts for the House's telephone system stood on an explicit *quid pro quo* relation with the campaign donations.  The evidence explicitly linked the *quid* to the *quo*.

Of course, not every campaign contribution "is a bribe in sheep's clothing."  See, Terry, 707 F.3d at 615.  Without anything more, "a jury could not reasonably infer that a campaign contribution is a bribe solely because a public official accepts a contribution and later takes an action that benefits a donor."  Id.  But when the elected official directly or through his campaign money collector and principal administrative assistant acts as the donor's "marionette," a jury can reject legitimate explanations for a contribution and infer that it flowed from a bribery agreement.  Id. at 610-611,

615-616 (sustaining conviction for conspiracy to commit mail fraud and honest services fraud and for the commission of the substantive offenses based on strong circumstantial evidence of a corrupt bargain of campaign contributions for official acts). Under these circumstances, the sum of the evidence permits a rational juror to conclude that the conspirators here were aware that campaign contributions were given in exchange for the contracts. Juries are not required "to evaluate the evidence in isolation." Woodward, 149 F.3d at 60. Individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. Id.

### b. Misapplication of Funds

Mr. Rivera-Pizarro argues the Government failed to show that he misapplied funds in violation of 18 U.S.C. § 666(a) (Docket No. 1036, p. 13). As relevant, this section penalizes an agent of an organization, state or local government receiving more than $10,000 of federal funding per year, who **intentionally misapplies** property valued at not less than $5,000 that is owned by, or is under the care, custody, or control of such organization, state or local government. Id. Courts have struggled to discern the meaning of the term "intentionally misapplies," which Congress left undefined. See, United States v. Jiménez, 705 F.3d 1305, 1308 (11th Cir. 2013)(so noting). Read too narrowly, federal prosecutors would be unable to effectuate the statute's purpose of "protect[ing] the integrity of the vast sums of money distributed through Federal programs from theft, fraud, and undue influence by bribery." Id. at 1309 (quoting Sabri v. United States, 541 U.S. 600, 606 (2004)). Read too broadly, courts would run afoul of the Rule of Lenity, "which insists that ambiguity in criminal legislation be read against the prosecutor." Jiménez, 705 F.3d at 1309.

With this in mind, "misapply" has been used in connection with disbursement in exchange for services not rendered, payment to suppliers who would not have received any contract but for bribes, payment for services that were overpriced to cover the costs of a bribe, or payment for

shoddy goods at the price prevailing for high quality goods.  See, United States v. Spirito, 2020 WL 3913470, *4 (E.D. Va. July 10, 2020)(listing examples)(citing United States v. Thompson, 484 F.3d 877, 881 (7th Cir. 2007)).[68]  As for who may misapply the property, the focus is not on the prefix of "misapply," but rather on the verb's stem.   And whatever its precise definition, caselaw indicates that, at bottom, "misapply" is a verb connoting an actor who may apply funds in the first instance, exercising some degree of power over the agency's purse.  See, United States v. Williams, 527 F.3d 1235, 1244-1245 (11th Cir. 2008)(Chief Financial and Executive Director of non-profit organization who had primary authority over the organization's finances and direct control over the bookkeepers who managed federal grant funds, intentionally misapplied the funds by directing that the organization issue a $15,000 check payable to the order of a P.R. Property Investments, an umbrella name for her private rental properties, and authorized checks to be used for other unauthorized items, such as payments on her husband's car note, rent payments on her husband's night club, and expenses related to their new home); United States v Baldridge, 559 F.3d 1126, 1139 (10th Cir. 2009)(upholding a Section 666 intentional misapplication conviction where a county commissioner filed false payment claims with the country); Jiménez, 705 F.3d at 1306, 1311 (reversing Section 666 intentional misapplication conviction because it was the Deputy Director of Program Services – not the defendant – who gave order to purchase the book in question, it was she who initiated the purchase order, and it was she who approved the purchase order).[69]

---

[68] Even though the Court held that the defendant in Thompson did not misapply the property, it was beyond dispute that she herself applied the funds: she was the section chief of the procurement office, she presided over the bidding process, and she suggested that the contract be rebid in a best-and-final procedure.  See, Thompson, 484 F.3d at 878-879 (describing defendant's role).  In this sense, she applied the funds, but did not misapply them.

[69] See also, United States v. Frazier, 53 F.3d 1105, 1111 (10th Cir. 1995)(upholding a Section 666 conviction where the defendant signed checks for training that never occurred and directed an employee to sign backdated invoices);

By contrast, it cannot be said that Mr. Rivera-Pizarro directed the use of the House of Representative's funds to the point of being able to apply – or misapply – them. Even though his position was more than clerical – according to his resumé, he provided support to various areas, including purchasing, finance, budget, technology, and human resources – the shots were called by others, higher ups in the hierarchy, with power over the House's purse. So, while he recommended that the contracts be awarded to 3 Comm. Global, it was the Speaker who said that he wanted the contract signed, and Mr. González – the House's Director of Administration, Mr. Rivera-Pizarro's immediate superior – who signed the contracts.[70]

The Government hones in on United States v. Cornier-Ortiz, 361 F.3d 29 (1st Cir. 2004), claiming that it sustains Mr. Rivera-Pizarro's conviction. In that case, one Cornier hired the brother of a Puerto Rico Public Housing Administration ("PRPHA") contract employee- Puerto Rico's liaison to the United States Department of Housing and Urban Development – in a *quid pro quo* scheme – where the PRPHA employee prepared the vouchers and approved them for payment when they were submitted to the housing authority. Id. at 32, 34-35. When the PRPHA employee created the invoices and associated documentation, he gave them to his brother, who delivered them to Cornier, who in turn submitted them to the PRPHA. Id. at 34-35. After the brother's contract expired, Cornier prepared the paperwork, for his job included administering the budget.

---

United States v. Urlacher, 979 F.2d 935, 936-937 (2d Cir. 1992)(upholding Section 666 intentional misapplication conviction where a police chief diverted hundreds of thousands of dollars, condoned the making of false accounting entries, and directed a subordinate to destroy records); Spirito, 2020 WL 3913470 at *4, *7 (denying motion for judgment of acquittal regarding Section 666 intentional misapplication conviction of a defendant who ordered that the defaulted loan be guaranteed).

[70] Around April 2014, Mr. Burgos saw a purchase order that Mr. Rivera-Pizarro signed, for two fire work units that Mr. Burgos had not requested (TR September 13, 2016, pp. 52-54). There was no evidence explaining the circumstances underlying the transaction. Because the court cannot speculate, it will not consider the purchase order as evidence that Mr. Rivera-Pizarro misapplied funds in connection with the contracts awarded to 3 Comm. Global.

So, he and the PRHPA employee were, in the Jiménez Court's words, "calling the shots." See, Jiménez, 705 F.3d at 1311. But that was not the case with Mr. Rivera-Pizarro.

For completeness, the court reviewed Fernández, 722 F.3d at 1. Its holding, however, is not contrary to the conclusion reached as to Mr. Rivera-Pizarro. In Fernández, the First Circuit rejected the argument that Puerto Rico Senators Héctor Martínez and Jorge de Castro Font were not agents of the Puerto Rico government as in their view, to qualify as such, the prosecution had to adduce evidence that they had the authority to control the expenditure of fund by the entity receiving federal funds, and it had failed to demonstrate that the senators had that authority. See, Fernández, 722 F.3d at 10-11 (summarizing argument). The First Circuit observed that the statutory text does not either mention or imply an additional qualifying requirement that the person be authorized to act specifically with respect to the entity's funds, merely requiring that the individual be "authorized to act on behalf of another person or government." Id. at 10. And it expressed that the expansive definition of "agent" in Section 666(d)(1) recognizes that an individual can affect agency funds despite a lack of power to authorize their direct disbursement. Id. at 11.[71]

Yet, as relevant, Fernández involved a prosecution for allegedly bribing Senators Martínez and de Castro Font. See, Fernández, 722 F.3d at 8 ("Defendant Bravo argues that because neither Martínez nor de Castro Font were agents of the Commonwealth, he cannot be guilty of bribing

---

[71] To this end, Section 666(d)(1) defines the term "agent" as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative." See, 18 U.S.C. § 666(d)(1). For a situation in which an "outside consultant" was found to be an "agent," see United States v. Sotomayor-Vázquez, 249 F.3d 1 (1st Cir. 2001), where the evidence showed that a codefendant – Yamil Kourí-Pérez – was essentially the director, manager, and representative of the organizations in question. Id. at 6. He diverted funds by directing the comptroller to make checks payable either to organizations that Kourí controlled or to individuals who were never told that checks were made in their names. Id. at 9.

them pursuant to § 666 (a)(2)").  The First Circuit explained that, "[e]ven if the officials accepting bribes do not have the ability to control the expenditure of an entity's funds, it cannot be denied that their fraudulent conduct poses a threat to the integrity of the entity, which in turn poses a threat to the federal funds entrusted to that entity."  Fernández, 722 F.3d at 11 (internal quotations omitted).[72]  But Mr. Rivera-Pizarro is not charged with soliciting or accepting bribes, and no one is charged with offering them to him.   Instead, Count 25 alleges that Mr. Rivera-Pizarro intentionally misapplied funds, a term that Congress did not define, which leads to the initial question.  Simply put, whether a person who cannot apply funds in the first place can be convicted for misapplying them, when that person does not exert a significant degree of control over the funds, in other words, when he does not "call the shots" as to the agency's purse in any significant way.[73]  For the reasons mentioned earlier, the court concludes that the answer is "no."  Accordingly, Mr. Rivera-Pizarro's motion for judgment of acquittal as to Count 25 must be granted.

### D.  Common Arguments

#### 1.  Joinder/Severance

Defendants complain they should not have been tried together (Docket No. 1037, pp. 7-8; Docket No. 1055, pp. 8-14; Docket No. 1056, pp. 2-6).  Joint trials "are beneficial not only for efficiency but because they limit inconvenience to witnesses, avoid delays in bringing defendants

---

[72] For the same reason, the First Circuit stated that to accept that there can only be harmful effects of dishonest conduct when the actor has authority to control the expenditure of the entity's funds would be naïve; to accept that the prohibition of such conduct by any such individuals is not rationally related to Congress' implementation of its constitutionally enumerated powers would be an unduly restrictive application of that standard; and that to fall within the scope of the federal interest, it is enough that the statutes condition the offense on the threshold amount of federal dollars defining the federal interest.  See, Fernández, 722 F.3d at 12 (internal quotations omitted).  Thus, Congress "does not have to sit by and accept the risk of operations thwarted by local and state improbity."  Id.

[73] Those would have been the Speaker, Mr. González – who plead guilty to the offense – and Mr. Hernández, who aided and abetted in the commission of the offense and pled guilty to the charge.

to trial and allow the total story to be presented to a single jury." United States v. Stillo, 57 F.3d 553, 556-557 (7th Cir. 1995). The government is entitled to charge and join parties based on what it "reasonably anticipates proving against all." Boylan, 898 F.2d at 245. A rational basis in fact, sufficient to warrant joinder, must be discernible from the fact of the indictment. Id. In this fashion, Rule 8(b) of the Federal Rules of Criminal Procedure codifies a balanced compromise between a defendant's right to have his guilt considered separately and the systemic benefit of consolidated trials. Id. Thus, it allows that two or more defendants be charged in the same indictment or information "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b).

As alleged in the Indictment, Ms. Falcón-Nieves, Mr. Rivera-Pizarro, and Ms. López were involved in a master conspiracy encompassing different subsidiary schemes. The schemes involved contractors and public officials in key government positions, to illegally generate payments through bribes. Mr. Hernández was at the top of the pyramid-type scheme. As relevant here, he worked with his partners, targeting AAA, the House of Representatives, and ADL. To this end, Mr. Hernández relied on Ms. Falcón-Nieves to do his bidding in AAA, Ms. López in ADL, and Mr. Rivera-Pizarro in the House of Representatives.[74] Relatedly, Ms. Falcón-Nieves participated with her sister, Ms. Falcón, in a scheme to extort an AAA contractor through fear of economic harm, the same contractor from whom Mr. Hernández and his partner, Eder Ortiz, extracted a substantial fee to see that he collected money from AAA, in a process that saw Ms. Falcón-Nieves act as a driver to get AAA to pay that same contractor. Furthermore, Ms. Falcón-

---

[74] These were not the only contacts through which Mr. Hernández operated, as in the case of AAA he also used Ms. Barreto, and in the House of Representatives, Mr. González.

Nieves favored Mr. Hernández and his partners so that they could benefit from a contract between AAA and Links, as part of a training program financed through ADL. Joinder was appropriate. It reflected "[a] rational basis in fact," United States v. Houle, 237 F.3d 71, 75 (1st Cir. 2001), the glue necessary to bond "defendants together in a single proceeding." Boylan, 898 F.2d at 245. In general, defendants who are indicted together "should be tried together." United States v. Floyd, 740 F.3d 22, 36 (1st Cir. 2014). The joinder here appropriately followed this presumption.

As a counterweight to joinder, Rule 14(a) of the Federal Rules of Criminal Procedure provides that, "[i]f the joinder of offenses or defendants in an indictment or information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." See, Fed.R.Crim.P. 14(a). But to overcome the presumption in favor of joinder, a defendant must demonstrate "prejudice so pervasive that it would be likely to effect a miscarriage of justice." United States v. DeLeon, 187 F.3d 60, 63 (1st Cir. 1999). The requirement "means more than the defendant might have had a better chance of acquittal in a separate trial." Id. "[G]arden variety prejudice, in and of itself, will not suffice." Boylan, 898 F.2d at 246.

Ms. Falcón-Nieves complains that the substantial amount of evidence presented regarding "nondefendants" was prejudicial to her (Docket No. 1055, p. 8).[75] Mr. Rivera-Pizarro argues that most of the evidence was not about him, which prejudiced him (Docket No. 1037, p. 7). Ms. Falcón claims that the evidence on the allegations against her was presented in less than one day

---

[75] From Ms. Falcón-Nieves' argument, the court understands that she is referring to Mr. Hernández and Mr. Vargas. See, Ms. Falcón-Nieves' motion for new trial (Docket No. 1055 at p. 10)(mentioning Mr. Hernández and Mr. Vargas). Mr. Hernández and Mr. Vargas did not face trial. As mentioned earlier, Mr. Hernández was charged in this case and pled guilty, whereas Mr. Vargas pled guilty to an information.

and a half; she was not charged of any conspiracy to commit fraud, only of extortion through fear

of economic harm; and was prejudiced by evidence about one Lutgardo Acevedo and Mr.

Hernández' fund-raising activities and interaction with other defendants including contracts,

contract modifications, and obscure bidding processes, none of which related to her (Docket No.

1056, pp. 2-6). Along the same line, she asserts that Mr. Acevedo was convicted for paying a state

court judge to acquit him in a criminal case for manslaughter; that case received massive media

coverage because the state judge was criminally charged and convicted; and evidence about Mr.

Acevedo had no bearing in the allegations against her. Id. Testimony about Mr. Acevedo was

relevant as was that of Mr. Hernández' fund-raising and other activities, and it was not unduly

prejudicial to Ms. Falcón or to any of the other defendants.

As background, while testifying about his fund-raining activities for the Governor, Mr.

Hernández said that at the end of the campaign, he and six or seven other contributors organized

"pyramids," looking for other individuals to contribute $5,000 per couple (TR August 29, 2016, p.

23). Asked about who was part of the pyramid that he organized, Mr. Hernández mentioned "Mr.

Ismael Torres, Mr. Alex Medina, Mr. Jaime Babilonia, Mr. Lutgardo Acevedo" and "two other

people but I don't remember." Id. Inquired about how much money was raised in the pyramids,

he stated about $700,000-$800,000; questioned about how much he had raised, he answered

around $100,000; and queried about how much Mr. Acevedo had contributed, he responded

$25,000. Id.

At sidebar Ms. Falcón objected, observing that Mr. Acevedo had been "highly mentioned

by the news and the media" as a person "involved in a series of cases involving corruption with

judges at the state level," and mentioning him was highly prejudicial and inflammatory and would

lead to a mistrial, inasmuch as Ms. Falcón was not linked to any of that information. Id. at pp. 24-

25.  The other defendants joined in the objection (<u>id.</u> at pp. 25, 26), which the court overruled (<u>id.</u> at p. 28), pointing out that it did not know the people in the pyramid that Mr. Hernández had referred to, including Mr. Acevedo, and did not have information as to what he did or did not do. <u>Id.</u> at pp. 29-30.

Ms. López' counsel expressed that the court could take judicial notice of Mr. Acevedo's "crime and conviction" (TR August 29, 2016, pp. 30-31; Docket No. 718).  The court did not do so, and no evidence of media coverage involving Mr. Acevedo was brought before the court's attention.  Later in his testimony, Mr. Hernández stated that he had come into the FBI's radar screen when the FBI called him to ask if he had received in his home the state judge in the case of Mr. Acevedo or helped that judge be appointed, in response to which Mr. Hernández said "no" (TR August 29, 2016, pp. 35-36).

On this account, the only reference to Mr. Acevedo came as part of Mr. Hernández' description of his fund-raising activities, a relevant topic of examination, for it was fund-raising what ultimately facilitated Mr. Hernández' goal of obtaining government contracts.  That activity eventually led him to AAA and Ms. Falcón-Nieves, Ms. Falcón's sister.  How the sisters participated in an extortion scheme directed at Mr. Crespo utilizing Ms. Falcón-Nieves' position has been explained, as well as how Mr. Hernández and his partner – Mr. Ortiz – extracted a fee from Mr. Crespo after AAA paid him with Ms. Falcón-Nieves' involvement.  Furthermore, there was no evidence of what Mr. Acevedo did or did not do with respect to the judge that presided over his state case.  And it was Mr. Hernández' links to Mr. Acevedo what steered him towards the FBI, paving the way for the events that basically dried up his business.

Ms. Falcón complains that most of this evidence has nothing to do with her.  But the fact that large amounts of testimony are irrelevant to one defendant or one defendant's involvement in

an overall scheme is far less than the involvement of others does not mandate severance. See, Boylan, 898 F.2d at 246 (recognizing reluctance to "second-guess" severance denials in those circumstances).[76] Disparity "between the relative culpability of co-defendants does not entitle a defendant to severance." United States v. DeCologero, 530 F.3d 36, 55 (1st Cir. 2008). A district court should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). And neither scenario is present here.

The Indictment is not disjointed. There is nothing to suggest that the number of defendants and charges is so large that the jury could not distinguish among them. The evidence was presented in a well-structured fashion, allowing the jury to consider it individually against each individual defendant. As a result, it was not difficult to keep track of which evidence pertained to which charges and which defendants, minimizing the risk of spillover. Besides, there were no conflicting or irreconcilable defenses- none has been identified, much less elaborated on – and any potential for undue prejudice and jury confusion was minimized with cautionary instructions and separate verdict forms.

In that regard, the court took caution to instruct the jury that separate consideration was to be given to each individual defendant and to each separate charge against him or her; and that each defendant was entitled to have his or her case determined from his or her own conduct and from

---

[76] See also, United States v. Thompson, 422 F.3d 1285, 1293, 1294 (11th Cir. 2005)(rejecting prejudicial spillover argument noting that "[t]he mere fact that there may be an enormous disparity in the evidence admissible against [one defendant] compared to the other defendants is not a sufficient basis for reversal")(internal quotations and citations omitted); De Leon, 187 F. 3d at 63 (turning down prejudicial spillover claim based on "significant disparity in both the nature and the amount of evidence introduced against [codefendant] in comparison to that introduced against [appellant]").

the evidence that may be applicable to him or her (Docket No. 1369, p. 27; Docket No. 1372, p. 14). Also, the jury was instructed that the elements of the conspiracy had to be evaluated individually and separately as to each defendant (Docket No. 1372, p. 20). And the court expressed that because Ms. Falcón was not charged in a conspiracy, statements made by conspirators should not be considered as evidence against her. Id. at p. 19.

In a similar vein, after instructing the jury on the elements of the different offenses, the court stated that, "[t]hese are the charges against the defendants, which you must evaluate separately and individually as to each of them" (Docket No. 1372, p. 57). Following the same individuation principle, the court provided the jury with four verdict forms, one for each defendant. See, Docket No. 812 (Ms. López); Docket No. 813 (Ms. Falcón-Nieves); Docket No. 814 (Ms. Falcón); and Docket No. 815 (Mr. Rivera-Pizarro). The forms separated the counts applicable to the defendant to which it corresponded, including only the defendant's name in the conspiracy count to ensure separate consideration of the evidence as to him or her. And the court instructed the jury that, "[b]ecause the evidence must be evaluated individually as to each defendant and separately as to each count, [t]hat is what you are going to do and that is how the verdict forms are organized." Id. at p. 60.

In context, these safeguards adequately protected each of the defendants during trial and deliberations. See, United States v. Rogers, 121 F.3d 12, 16 (1st Cir. 1997)(rejecting prejudicial joinder argument in part because trial court instructed the jurors to consider the evidence as to each charge and each defendant separately); Floyd, 740 F.3d at 37 (rejecting allegation of spillover prejudice as ground for severance, given that there were "appropriate limiting instructions as to the admissibility of evidence against particular defendants and as to the need to determine guilt on an individual basis"); United States v. Josleyin, 99 F.3d 1182, 1188 (1st Cir. 1996)(even assuming

misjoinder, no prejudice in part because the parties marshalled their evidentiary presentations to minimize evidentiary spillover and court instructed jury to consider the evidence against each defendant individually).

In like manner, to close the circle on Ms. Falcón's argument about Mr. Acevedo, that some or all of the jurors may have read or heard about Mr. Acevedo months or even years before trial- and no evidence about media coverage, much less "extensive" media coverage was brought for the court's consideration -does not mean they were unable to follow the court's instruction that they give separate consideration to each individual defendant and to each separate charge against him or her.[77]  The jury is presumed "capable of sorting out the evidence and considering the case of each defendant separately."  United States v. Warner, 690 F.2d 545, 553 (6th Cir. 1982).  In consequence, all things considered, no aspect of the jury's decision was substantially influenced by any misjoinder.

Ms. Falcón-Nieves alleges that in a separate trial, she would have testified regarding some of the charges, particularly the extortion charge (Docket No. 1055, p. 12).  She claims she would have testified that she had no participation in getting the payments out to IA Mech before the due date and was not responsible for her sister's actions.  Id.  Further, she states that Ms. Falcón would have provided exculpatory testimony with respect to Mr. Crespo.  Id.  But she did not so proffer in the motion for severance that she filed prior to trial.  See, "Motion to Sever" (Docket No. 263).  Even though she renewed the motion at the beginning of trial (Docket No. 1369, p. 11), and asked for a mistrial when the Government rested based on the court's decision to deny her severance

---

[77] Mr. Acevedo was arrested on June 3, 2014, more than two years before his name came up during Mr. Hernández' testimony on August 29, 2016.  See, United States v. Acevedo-López, 873 F.3d 330, 334 (1st Cir. 2017)(noting arrest date).  On August 14, 2014, Mr. Acevedo entered into a plea agreement and was sentenced on November 6, 2015 (id.), nearly nine months before Mr. Hernández' testimony.

request (Docket No. 1361, p. 60), her motions are devoid of expressions of intent to testify on her behalf or for favorable testimony from Ms. Falcón. Thus, she cannot now complain that the severance request was denied despite her need for that particular testimony or invoke prejudice from lack of it. See, Brown v. United States, 375 F.2d 310, 316-317 (D. C. Cir. 1966), *cert. denied* 87 S.Ct. 2133-2134 (1967)(rejecting attempt to reverse conviction based on ruling denying severance, as the defendant did not represent to the court during trial that he wished to call defendants as witnesses in the case).[78]

## 2. Newspaper Article

Defendants seek a new trial based on a post-verdict article in a local newspaper containing what the article describes as an interview with one of the jurors (Docket No. 1037 at p.6; Docket No. 1055 at pp. 15-18; Docket No. 1056 at p. 6-8). The government counters that a speculative statement allegedly made by an alleged member of the jury to the local press does not justify a new trial (Docket No. 1117 at p. 43). It posits that consideration of such material is not permitted by statute or applicable law. Id. at p. 39.

---

[78] Relatedly, where a defendant requests a severance to secure the testimony of a codefendant, she must demonstrate: "(1) a bona fide need for the testimony; (2) the substance of the testimony; its exculpatory nature and effect; and that the defendants will in fact testify if the cases are severed." United States v. Catalán-Román, 585 F.3d 453, 461 (1st Cir. 2009)(stating test). If the defendant can make this showing, the district court should: "(1) examine the significance of the testimony in relation to the defendant's theory of defense; (2) consider whether the testimony would be subject to substantial, damaging impeachment; (3) assess the counter arguments of judicial economy; and (4) give weight to the timeliness of the motion." Id. Ms. Falcón-Nieves never made this showing. She failed at the first tier of the test, which proves fatal to her claim. See, United States v. Font-Ramírez, 944 F.2d 42, 45 (1st Cir. 1991), *cert. denied,* 502 U.S. 1065 (1992)(denying motion for severance where co-defendant's affidavit in support of the motion did not provide the substance of the testimony and did not explain why the testimony was necessary or beneficial to the defense); United States v. Nason, 9 F.3d 155, 158-159 (1st Cir. 1993)("Nason alleged that his co-defendants, Ellen and David Finch, would testify that there was no conspiracy among the three. Standing alone, however, such an allegation is insufficient to entitle the defendant to a severance. Nason did not show, as required, that either David or Ellen Pinch would in fact testify for Nason at a separate trial); United States v. Duzac, 622 F.2d 911, 912 (5th Cir. 1980)(trial court properly denied motion for severance based on generalized, vague and speculative assertions about possible testimony from a codefendant).

The Sixth Amendment to the United States Constitution provides that an individual accused of a crime has a right to trial by an impartial jury.  U.S. Const. Amend. VI.  As the Supreme Court has explained, "[t]he essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence."  Williams v. Florida, 399 U.S. 78, 100 (1970).  In an effort to protect the jury system, the Federal Rules of Evidence enshrine the common law rule against the admission of a juror's testimony to impeach the jury's verdict.  To this end, Rule 606(b) provides in part:

> **(1) Prohibited Testimony or Other Evidence**.  Upon an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

> **(2) Exceptions**.  A juror may testify about whether: **(A)** extraneous prejudicial information was improperly brought to the jury's attention; **(B)** an outside influence was improperly brought to bear on any juror; or **(C)** a mistake was made in entering the verdict on the verdict form.

See, Fed.R.Evid. 606(b).  The Rule could not be more broad or explicit.  It reflects the centuries old principle – also known as the "non-impeachment rule" – that after a jury has reached its verdict it will not later be called into question based on the comments or conclusions they expressed during deliberations.  Peña-Rodríguez v. Colorado, 137 S.Ct. 855, 861 (2017).  Keeping with this logic, the Advisory Committee Notes to the 1972 Proposed Rule 606(b) express that: "[t]he mental operations and emotional reactions of jurors in arriving at a given result would, if allowed as a subject of inquiry, place every verdict at the mercy of jurors and invite tampering and harassment."  Thus, the rule is intended to "promote finality of verdicts, encourage free deliberations among

jurors, and maintain the integrity of the jury as a judicial decision-making body." United States v.

Lloyd, 269 F.3d 228, 237 (3d Cir. 2001).

Statements attributed to jurors appearing in the press fall within the scope of this rule. See,

United States v. Sjeklocha, 843 F.2d 485, 488 (11th Cir. 1988)(applying rule to newspaper

statement attributed to jury foreman). The only legitimate areas of post-verdict inquiry are whether

extraneous prejudicial information was improperly brought to the jury's attention, whether any

outside influence was improperly brought to bar upon any juror, or whether there was a mistake in

entering the verdict on the verdict form. See, Peña-Rodríguez, 137 S.Ct. at 864-865 (addressing

topic).

To be considered "extraneous" or "extrinsic," information must derive from a source

external to the jury, such as "publicity and information related specifically to the case the jurors

are meant to decide." Bebo v. Medeiros, 906 F.3d 129, 135 (1st Cir. 2018)(internal quotations

omitted). The ambit of extraneous information regarding which a juror may testify has been held

to include a bailiff telling jurors that the defendant had killed three people; a bailiff commenting

to a juror on the defendant's guilt within the hearing of other jurors; and reading a newspaper

article regarding the case during deliberations. Id. at 135.[79] Outside influence includes situations

where one of the prosecutors has represented a juror during divorce, Williams v. Taylor, 529 U.S.

420, 441-442 (2000); a juror in a criminal trial submitted an application for employment at the

District Attorney's office, Smith v. Phillips, 455 U.S. 209, 215-216 (1982); and a juror received a

---

[79] See also, Gafford v. Warden U.S. Penitentiary, Leaven Worth, Kan., 434 F.2d 318, 320 (10th Cir. 1970)(impromptu field trips by individual jurors to ascertain independently facts not in the record); Frede v. Downs, 428 N.E.2d 1035, 1037 (Ill.Ct.App. 1981)(in action for injury in a boating accident, juror took a book, *Piloting, Seamanship and Small Boat Handling*, into the jury room, court noting that plaintiff had not confronted the book, which contained references to matters relating to the specific issue that the jury faced).

bribe offer during trial, Remmer v. United States, 347 U.S 227, 228-230 (1954).  By contrast, evidence regarding internal influences, such as jurors' personal beliefs – except racial or ethnic stereotypes or animus – and experiences generally "may not be used to impeach a verdict." Bebos, 906 F.3d at 135.  The information in the article here falls on the "internal" side of this line, for it refers to jurors' subjective thoughts and beliefs, and there is no indication that extraneous material was introduced into the jury's deliberation room or that outside influences may have improperly been brought to bear upon jurors during deliberations.

First, Ms. Falcón-Nieves contends the article shows juror prejudice and passion (Docket No. 1055 at pp. 15-18).  She directs the court's attention to the article's reference: (1) to the need for voters to be more careful with respect to whom they favor with their vote; and (2) voters' need to bring them down (referring to elected officials).  Id. at p. 17.  She argues the jury was not able to separate her from the political figures mentioned during trial.  Id.  She attacks the statement that if the state is attentive it could have a case of tax fraud, noting that this was not a case of tax evasion. Id. at p. 18.  She posits the juror was moved or misled by the government's evidence of her bank accounts and deposits (id.) and that the juror was biased, acting as a prosecutor and not as an impartial judge.  Id.

The article does not cross the threshold required for a new trial.  It states the crimes were documented, and that the evidence was on a silver platter (Docket No. 1037-1, p. 2).  It refers to incriminating e-mails and text messages.  Id.  It mentions that the testimonies of Mr. Hernández, Mr. Vargas, and Mr. Burgos were truthful to all members of the jury.  Id.  Further, Ms. Falcón-Nieves' bank accounts were properly admitted as exhibits during trial.  See, Exhibits 401, 405, 431.  And Ms. Falcón raised a tax evasion issue during the cross-examination of Mr. Crespo.  See, TR September 9, 2016, pp. 81-82 (failure to file income tax returns for 2013 and 2014); p. 87 (no tax

withholding in payments for professional services).  So, these were not items that jurors learned about through outside contact, communication, or publicity, and did not enter the jury room through an external, prohibited route.  They were part of trial, information that each juror legitimately collected as part of the process.

In the same way, Ms. Falcón-Nieves' characterization of the jury as biased and as one that acted with passion does not carry the day.  There is no hint of racial or ethnic animus, and outside of that realm, Rule 606(b) prohibits inquiry into a juror's alleged "improper motives or prejudices." United States v. Brown, 934 F.3d 1278, 1302 (11th Cir. 2019).  Even if jurors lie in _voir dire_ in a way that conceals bias about the case – and nothing remotely approaching that situation has even been suggested here – the allegation of bias does not open the door to admissibility under Fed. R. Evid. 606(b).  See, Warger v. Shauers, 574 U.S. 40, 42, 51 (2014)(that in a damages action arising out of a motor vehicle collision, jury returned verdict for defendant but during deliberations, a juror had said that her daughter had been involved in a motor collision; her daughter was at fault; a man died; and if her daughter had been sued it would have ruined her life, did not warrant new trial given that juror's statement was inadmissible under Rule 606(b)); United States v. Smith, 424 F.3d 992, 1012-1013 (9th Cir. 2005)(juror's post-verdict letter to a prosecution witness does not justify new trial, for even if the juror's thought process was biased with the apparent infatuation that the letter evinced, the court was not free to hear evidence in this regard under Fed.R.Evid. 606(b)); Ali v. R.T.C. Grounds, 236 F.Supp.3d 1241, 1263-1264 (S. D. Cal. 2017)(that juror said he was "leaning" towards a guilty vote because "he figured the District Attorney knew what he was doing," may involve an apparent bias in favor of the prosecution, but it was part of the juror's thought processes concerning the verdict and as such, shielded by Rule 606(b)).

Similarly, the reference in the article to voters and elected officials, a reference apparently focused on the interviewee, falls in the same category.[80]  As one Court observed, "[w]e cannot expunge from jury deliberations the subjective opinions of jurors, their attitudinal expositions, or their philosophies."  United States v. Barraza, 655 F.3d 375, 380 (5th Cir. 2011).  These involve the very human elements that constitute one of the strengths of our jury system, part of jurors' mental processes, and in this way, an area that Fed.R.Evid. 606(b) places off limits as a basis to impeach a jury's verdict.  See, Mahoney v. Vondergritt, 938 F.2d 1490, 1491-14992 (1st Cir. 1991)(post-verdict assertion by a juror that, among other things, some of the jurors were concerned about getting the defendants off the street so they would not commit other crimes, not extraneous or improper outside influence justifying new trial); Fulghum v. Ford, 850 F.2d 1529, 1535 (11th Cir. 1988)(post-decision statements by a juror about his mental processes in reaching a decision "may not be used as evidence in a subsequent challenge to the decision").

It is clear that Ms. Falcón-Nieves' view of the evidence differs from the one the verdict reflects.  But that does not sustain an attack on the verdict predicated on a juror's statement about the evidence.  See, United States v. Vig, 167 F.3d 443, 450 (8th Cir. 1999)(alleged misapprehension of the evidence insufficient to sustain request for new trial; "[e]xamination of the method and manner in which a juror construes evidence presented during trial would plunge … court into the very kind of post-verdict anatomization of a juror's thought processes that is barred by Rule 606(b)"); United States v. Schwartz, 787 F.2d 257, 261 (7th Cir. 1986)(that jury allegedly

---

[80] According to the article, "He (the juror) stated that this case should open the eyes of the voter to analyze more carefully who they favor with their vote.  To me (the juror), this is a lesson to make a better decision.  We have to bring them all down from there (elected officials)."

misconceived the evidence considered insufficient ground to impeach verdict under Fed.R.Evid. 606(b)).

Second, Ms. Falcón states the article shows the jury acted with bias and prejudice (Docket No. 1056 at p. 6). She argues that the jury was prejudiced against ruling politicians, and even though none of the defendants was an elected official, they were damaged by juror bias toward the political aspect of the case. Id. at p. 7. She complains about reference in the article to the fact that her mother was a defense witness, and that the juror would not have brought his mother to the trial. She characterizes the expression as a moral judgment of disapproval to presenting mothers as witnesses in court. Id. at p. 8. The article states the mother's testimony was counterproductive, finished sinking the Falcón sisters, and if the government paid attention, it could have a case of tax fraud (Docket No. 1037-1 at p. 2).

The observations about bias discussed above in connection with Ms. Falcón-Nieves apply with equal force to Ms. Falcón. As for the article's description of how the jury evaluated the evidence, it is inadmissible by the plain language of Fed.R.Evid. 606(b). See, United States v. Leung, 796 F.3d 1032, 1036 (9th Cir. 2015)("[P]arsing how jurors considered the evidence or their mental states while hearing testimony is exactly what [. . . .] the plain text of Rule 606(b) seek[s] to prevent"); United States v. Blackwell, 459 F.3d 739, 767-768 (6th Cir. 2006)(denying motion for new trial based on juror interview published in a newspaper, stating that three jurors witnessed defendant mouth "I hate you" to a witness while the witness was testifying, the three jurors informed the other jurors of their recollections of the incident during deliberations, and that from the juror's perspective, the incident "virtually sealed" defendant's fate, as the statement constitutes inadmissible evidence of a juror's mental impressions under Fed. R. Evid. 606(b)); Carson v. Polley, 689 F.2d 562, 579-582 (5th Cir. 1982)(juror's speculation as to the weakness of the plaintiff's case, the

relationship between plaintiff and his attorney and the amount of fees plaintiff paid, considered

"subjective thoughts and emotions that may have influenced a juror's deliberations" and therefore

not a valid ground for a new trial).[81]

Third, Mr. Rivera-Pizarro claims the article shows the jury misunderstood instructions

(Docket No. 1037 at p. 6). He directs the court's attention to a portion of the article that states:

> Glenn's (Rivera-Pizarro's) case was more technical than any other
> thing. It gave pity, but when you looked at the proof and instructions
> given by the judge, then he had to be found guilty. He was sort of a
> victim, but the law explained to us that even if his participation was
> minimum, he was guilty. Even though there was not much
> electronic proof to accuse him, he had been 10 years involved in
> politics. He was not a rookie, then you had to say that [he] did not
> know, but he knew what was happening.

Mr. Rivera-Pizarro asserts the jury erroneously believed that if he knew what was going on around

him or that his participation was minimal, it had to find him guilty. Id. at 6-7. The cases are uniform

that a juror's alleged misunderstanding of the judge's instructions is not grounds for overturning a

verdict. See, United States v. Ewing, 749 Fed.Appx. 317, 324 (6th Cir. 2018)(claims that jurors

misapplied or failed to follow instructions and the law "fall within Rule 606(b)'s bar- and outside of

its exceptions -and are therefore inadmissible to impeach the verdict"); United States v. Tines, 70

F.3d 891, 898 (6th Cir. 1995)(a jury's interpretation and application of the court's instructions is part

of the deliberative process and thus "correctly excluded under Rule 606(b)"); Karl v. Burlington

Northern R. Co., 880 F.2d 68, 75 (8th Cir. 1989)("misapprehension of the law set out in the court's

instructions cannot be used to impeach a verdict"); Hatcher v. County of Alameda, 2011 WL

---

[81] See also, Plummer v. Springfield Terminal Ry. Co., 5 F.3d 1, 4 (1st Cir. 1993)(in civil case, rejecting attempt to inquire about what the jurors were thinking when they chose the verdict number that they did and whether their thinking was sound); United States v. Davis, 960 F.2d 820, 828 (9th Cir. 1992)(describing as "meritless," a motion for a new trial based on a juror's statement in an interview that "[f]rom the first day I knew [the defendant] was guilty," as the statement reflected the juror's personal feelings and beliefs concerning the defendant)(first alteration in original).

4634053, *3 (N. D. Cal. Oct. 5, 2011)(a juror's alleged misunderstanding of the court's instructions does not constitute extraneous evidence eligible for consideration under Rule 606(b), for it concerns the mental processes by which the jurors reached their decision, and as such, is "barred by the nonimpeachment rule").[82]   The same line of authority disposes of Mr. Rivera-Pizarro's contention that the jury was confused (Docket No. 1037, p. 7).  Rule 606(b) forbids consideration of evidence "regarding possible confusion on the part of the jury."  Robles v. Exxon Corp., 862 F.2d 1201, 1206 (5th Cir. 1989).

Mr. Rivera-Pizarro argues that while deliberating, the jury considered evidence not presented during trial because the article states the jury considered that Mr. Rivera-Pizarro had been in politics ten years even though no direct evidence was admitted proving that fact (Docket No. 1037, pp. 9-10).  The argument is not persuasive.  Mr. Rivera-Pizarro's Resumé was admitted as Exhibit 206-1. Among other things, it shows that from 2004-2009, Mr. Rivera-Pizarro worked in the Puerto Rico Department of Natural and Environmental Resources (id., at pp. 2-3), where he occupied different positions, including Special Assistant for Municipal Affairs, serving as liaison between Fortaleza,[83] Mayors, Legislators, and the agency he worked for.  Id.  From 2011-2012, he worked as Legislative Advisor in the Office of Representative Jaime Perelló.  Id. at p. 2.  From 2012 to "Present" (that is, October 23, 2013), he worked as Special Assistant in the House of Representatives.  Id.  In the 2012 election, he was the PPD's Candidate for District 36 Representative (id. at p. 4), and had served as

---

[82] See also, Smallwood v. Pearl Brewing Co., 489 F.2d 579, 602 n.30 (5th Cir. 1974)("Whether or not the jury misunderstood the charge of the court is not a question to be reexamined after the verdict has been rendered"), cert. denied, 419 U.S. 873 (1974).

[83] La Fortaleza is the Governor's official residence, and where he and his staff work (TR August 29, 2016, p. 83).

voting post official, President of Youth for the District of Carolina, and Alternate Presidential Delegate (Reorganization Process) in the Municipalities of Vieques and Culebra.  Id.

It is apparent that there was an evidentiary basis as to Mr. Rivera-Pizarro's work and political experience.  Evidence admitted without limitation can be used by the jury "on any issue in the case." Correa v. Hosp. San Francisco, 69 F.3d 1184, 1191 (1st Cir. 1995)(citing United States v. Castro-Lara, 970 F.2d 976, 981 (1st Cir. 1992)).  The exhibit was admitted without objection (TR September 1, 2016, pp. 24-25).  How a juror "construes the evidence presented during trial" is part of each juror's "internal mental processes," an element of the deliberative undertaking.  Vig, 167 F.3d at 450.  For the same reason, that the jury may have misconstrued the exhibit is not a valid ground "to overturn a verdict."  Gidlewski v. Bettcher Industries, Inc., 619 F.Supp. 87, 93 (E.D. Pa.), *aff'd*, 779 F.2d 42 (3d Cir. 1985).

## V.   CONCLUSION

For the reasons stated, defendants' motions for judgment of acquittal and for new trial are DENIED, except Mr. Rivera-Pizarro's motion for judgment of acquittal as to Count 25, which is GRANTED.  Correspondingly, his motion for new trial as to that Count is DENIED AS MOOT.

**SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of September, 2020.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge